ORIGINAL

WARNING:  THIS DOCUMENT FILED UNDER SEAL PURSUANT TO AMENDED
GENERAL ORDER REGARDING GUIDELINE SENTENCING FILED
ON AUGUST 22, 1990

EDWARD H. KUBO, JR.  2499
United States Attorney
District of Hawaii

LAWRENCE L. TONG  3040
Assistant U.S. Attorney
Room 6100, PJKK Federal Building
300 Ala Moana Blvd., Box 50183
Honolulu, Hawaii  96850
Telephone: (808) 541-2850
Facsimile: (808) 541-2958
E-mail: larry.tong@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

FEB 0 9 2006

at 3 o'clock and 15 min P M
SUE BEITIA, CLERK

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

UNITED STATES OF AMERICA,      )    CR. NO. 04-00150 SOM
                               )
                Plaintiff,     )    GOVERNMENT'S SENTENCING
                               )    MEMORANDUM; DECLARATION
                               )    OF LYNNE M. LOWE; EXHIBITS
         vs.                   )    "A" -"F"; DECLARATION OF
                               )    WESLEY H. L. CHOY; CERTIFICATE
                               )    OF SERVICE
PATRICK SHIN,        (01) )
                               )
                Defendant.     )    Date:  February 27, 2006
                               )    Time:  3:00 p.m.
                               )    Judge: Susan Oki Mollway
_____)

UNSEALED BY ORDER OF THE COURT
DATE: 5/15/06

SEALED
BY ORDER OF THE COURT

TABLE OF CONTENTS

PAGE

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . i

I.    INTRODUCTION . . . . . . . . . . . . . . . . . . . . . 1

II.   FACTUAL BACKGROUND . . . . . . . . . . . . . . . . . . 2

      A.  The JHL/Navy Contract for Pump #1, Dry Dock #4 . . . . 2

      B.  The JHL/Navy Contract for Pump #2, Dry Dock #4 . . . . 3

      C.  Defendant's Statement to the FBI . . . . . . . . . 8

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . 9

      A.  The Loss For Guideline Purposes Was Correctly
          Calculated. . . . . . . . . . . . . . . . . . . . . 9

          1.  Booker's Sentencing Principles May Be
              Retroactively Applied. . . . . . . . . . . . . 9

          2.  The Loss May Be Proved By A Preponderance Of
              The Evidence . . . . . . . . . . . . . . . . 10

          3.  The Guidelines Loss Was Properly Calculated As
              $380,000 . . . . . . . . . . . . . . . . . . 11

      B.  Defendant's Motion For Downward Departure Based On
          Alleged Post-Offense Rehabilitation Should Be
          Denied. . . . . . . . . . . . . . . . . . . . . . 17

          1.  Legal Principles . . . . . . . . . . . . . . 18

          2.  Defendant Fails to Establish Any Nexus
              Between His Offense Conduct and Claimed
              Post-Offense Rehabilitation . . . . . . . . . 19

          3.  Defendant Also Fails to Prove an Extraordinary
              Level of Post-Offense Rehabilitation . . . . . 22

III.  CONCLUSION . . . . . . . . . . . . . . . . . . . . . 23

## TABLE OF AUTHORITIES

PAGE

Blakely v. Washington, 542 U.S. 296 (2004) . . . . . . . . . . 9

United States v. Ameline, 409 F.3d 1073
    (9th Cir. 2005)(en banc) . . . . . . . . . . . . . . 10, 11

United States v. Booker, 543 U.S. 220 (2005) . . . . . 2, 10-11

United States v. Craven, 239 F.3d 91 (1st Cir. 2001),
    reversed on remand, 358 F.3d 11 (1st Cir. 2004) . . . . 18

United States v. Dare, 425, F.3d 634 (9th Cir. 2005) . . . . 11

United States v. Dupas, 419 F.3d 916 (9th Cir. 2005) . . . . 10

United States v. Howard, 894 F.2d 1085 (9th Cir. 1990) . 10, 11

United States v. Kim, 313 F. Supp.2d 295 (S.D.N.Y. 2004) 20, 21

United States v. Rogers, 400 F.3d 640 (8th Cir. 2005) . . . . 18

United States v. Stuart, 384 F.3d 1243 (11th Cir. 2004) . . . 19

United States v. Tucker, 386 F.3d 273 (D.C. Cir. 2004) . . . 18

United States v. Tzoc-Sierra, 387 F.3d 978
    (9th Cir. 2004) . . . . . . . . . . . . . . . . . . 18, 22

United States v. Working, 287 F.3d 801 (9th Cir. 2002) . . . 18

GOVERNMENT'S SENTENCING MEMORANDUM

I.    INTRODUCTION

The United States submits this memorandum to address defendant Patrick Shin's claims that (1) the "loss" for Sentencing Guidelines purposes should be zero, and (2) he is entitled to a downward departure for extraordinary "post-offense rehabilitation."

The government submits that the PSR has correctly calculated the loss as $380,000. Defendant was negotiating with the United States Navy for a contract which would largely be performed by subcontractors. Defendant gave the Navy false subcontractor quotes which were inflated by $380,000. He attempted to use the quotes to obtain a higher contract price for his company. The $380,000 figure is thus a reasonable estimate of the "loss" which defendant intended, and should be accepted by this court for Guideline purposes.

Defendant's motion for a downward departure from the applicable Guideline range should be denied for two reasons. First, defendant has failed to show any nexus whatsoever between his criminal conduct and his claimed "rehabilitation." Second, even if the two were remotely related, defendant has failed to prove "an extraordinary level of rehabilitation" as required for a departure under Ninth Circuit law.

II.   FACTUAL BACKGROUND

        Defendant will be sentenced for false statements made
to the United States Navy during negotiations for a contract for
the overhaul of Pump #2, Dry Dock #4 at the Pearl Harbor Naval
Shipyard.   In order to understand those negotiations, it is
necessary first to explain earlier negotiations concerning a
contract for the overhaul of Pump #1, Dry Dock #4 at the
shipyard.

    A.   The JHL/Navy Contract for Pump #1, Dry Dock #4

        In August 2002, co-defendant JHL Construction, Inc.
(JHL), a general contracting company owned by defendant's nephew,
entered into a contract with the Navy to overhaul Pump #1, Dry
Dock #4.   See Presentence Investigative Report (PSR) ¶¶ 8-9.[1]
The contract was made outside the normal bidding process under a
"Multi-Trade Contract" between the Navy and JHL.[2]   After
negotiation, a contract price of $2,355,745 was agreed to by the
parties.   PSR ¶ 9.   During the negotiations, JHL gave the Navy a

_____

        [1]  The facts set forth in this memorandum are taken from the
final PSR unless indicated otherwise.   The PSR was prepared after
the Supreme Court rendered its decision in United States v.
Booker, 543 U.S. 220, 125 S.Ct. 738 (2005).   The PSR thus
calculates an advisory Guideline range, which incorporates
sentencing enhancements based on judicial fact-finding.

        [2]  Under Small Business Administration rules, defendant
served as a "mentor" to JHL.   PSR ¶ 8.   As the facts of this case
demonstrate, defendant was intimately involved in JHL's
operations.

2

cost estimate prepared by proposed subcontractor Civil Mechanical Contractor (CMC) in the amount of $2,054,100. Id.[3]

After the contract was issued, JHL dropped CMC as its proposed subcontractor and negotiated a lower price with Marisco, Inc. JHL thereafter switched from Marisco to two separate subcontractors - HSI Electric, Inc. (HSI) and Alfred Conhagen (Conhagen). PSR ¶ 10. HSI provided a quote to JHL for work on Pump #1 in the amount of $114,733; Conhagen provided a quote in the amount of $377,260, and signed a contract for that amount. PSR ¶ 11.[4] By changing subcontractors, JHL thereby substantially reduced its costs from the CMC price which had been submitted to the Navy to support its contract bid.

B. The JHL/Navy Contract for Pump #2, Dry Dock #4

Following the award of the contract for Pump #1, Dry Dock #4, the Navy requested JHL to submit a proposal to overhaul Pump #2, Dry Dock #4 at the Naval Shipyard. PSR ¶ 12. This contract, to be negotiated under a "Job Order Contract" with the Navy, also fell outside the normal bidding process. Id. Most

---

[3] CMC previously worked on Pumps #1 and #4 on Dry Dock #2 in the late 1990s. PSR ¶ 9. The Navy had suggested that JHL consider CMC because of its past experience. See declaration of Wesley H. Choy at ¶ 4. The PSR reflects CMC's final price as $2,137,100. See PSR ¶ 9. CMC actually reduced its quote to $2,054,100.

[4] CMC was to provide all of the services in Hawaii. Under the HSI and Conhagen subcontracts, the pump was to be removed and shipped to California, where Conhagen would overhaul it.

importantly, the scope of work to be performed on Pump #2 was the
same as the scope for Pump #1.  Id.  Indeed, in the plea
agreement in this case, defendant admitted that the scope of work
on the two jobs was "identical."  See April 21, 2004 plea
agreement at 4, ¶8.

On August 14, 2003, JHL submitted a proposal in the
amount of $2,360,153.  PSR ¶ 13.[5]  The proposal was reviewed by
the Navy's engineering department for technical compliance and
price.  The engineering department questioned JHL's proposal,
because it appeared to be costly and did not contain line items.
Id.  Wesley H.L. Choy, the engineer responsible for the project,
knew that JHL had switched subcontractors from CMC, and assumed
that JHL had obtained price reductions for large portions of the
work.  See Choy declaration,  ¶ 5.  Choy also anticipated that
JHL would complete the work on Pump #1 before proceeding with
Pump #2.  Choy thus believed that JHL should have offered a
reduced price on Pump #2 to reflect the increased familiarity
which it would have with the work.  PSR ¶ 14.[6]  The engineering

---

[5] This amount was more than the $2,355,745 contract price
for Pump #1, which called for the identical scope of work.
During the investigation of this case, federal agents learned
that defendant Shin had advised his employees to submit a bid for
approximately the same amount.

[6] Neither job has yet been completed.  The work on Pump #1
has not been initiated.  The contract for Pump #2 was not awarded
to JHL, and the funds were returned to the source department for
use on other projects.  PSR ¶ 22.

4

department asked the contract administrator to obtain a line item breakdown for the proposal.  The Navy contract administrator thus asked JHL to provide subcontractor quotes to substantiate its proposal.  PSR ¶ 13.

On August 26, 2003, in response to the Navy's request, JHL submitted a second proposal.  This proposal was for a reduced amount of $2,205,138.  Id.  The proposal did not, however, contain a line item breakdown of JHL's costs.  Id.

On August 29, 2003, after receiving the second proposal, Choy again asked the Navy contract administrator to obtain HSI and Conhagen's proposals.  PSR ¶ 14.  On September 3, 2003, the contract administrator advised Choy that defendant wanted to schedule a meeting to discuss the job.  Choy declaration, ¶ 8.

On September 4, 2003, in anticipation of the meeting, defendant contacted an HSI employee about the job.  Defendant said JHL was negotiating for work on Pump #2.  Defendant then asked HSI to provide a quote for work on Pump #2 which was $100,000 more than HSI's quote for Pump #1.  PSR ¶ 15.  Defendant further instructed HSI to invoice JHL for the work on Pump #2 without the $100,000 increase.  Following this conversation, HSI contacted the FBI.  Id.

At the direction of the FBI, HSI gave defendant the inflated quote which he had requested.  Defendant apparently then

determined that he needed a buffer of more than $100,000.
Defendant thus decided to alter HSI's July 10, 2003 quotation for
work on Pump #1.  Defendant used white-out to delete the true
price of $114,733, and typed in $314,733 as the HSI quote for
work described as "Dry Dock 4 Pump Motor No. 1 Rewind."  PSR ¶
17.  As a result, the quote appeared to be $200,000 higher than
it actually was.  Copies of the original HSI quote, and the
inflated quote prepared by defendant, are attached as Exhibits
"A" and "B," respectively, to the declaration of Special Agent
Lynne M. Lowe attached hereto.[7]

        On September 4, 2003, defendant also spoke with the
general manager of Conhagen.  Defendant asked Conhagen to provide
a quote for Pump #2 which included a price increase of $180,000
over that of Pump #1.  PSR ¶ 18.  Conhagen agreed, and gave
defendant a quote for Pump #2 in the amount of $557,260.  Id.  As
a result, Conhagen's quote for work on Pump #2, which was

_____

        [7]  Ex. "A," the original quote, is missing its first page.
The document was seized in this incomplete fashion from
defendant's business records during the execution of a search
warrant on September 23, 2003.  Ex. "B," the altered bid,
contains a $200,000 increase in the price for "Dry Dock 4 Pump
No. 1 Rewind," which was changed from $114,733 to $314,733.
Defendant also used white-out and altered the price for "Dry Dock
2 Pump Motor No. 2 & No. 3 Rewind," from $327,905 to $727,905.
Although the work for "Dry Dock 2 Pump Motor No. 2 & No. 3
Rewind" was a separate job and unrelated to the negotiations for
Pump #2, Dry Dock #1, defendant later explained to the FBI that
he increased the figure from $327,905 to $727,905 so that the
increase for the cost of Pump #1 would not look out of place.  See
Ex. "F" to the Lowe declaration.

identical to the work to be performed on Pump #1, was increased from $377,260 to $557,260. Copies of Conhagen's June 23, 2003 quote for work on Pump #1, and the September 4, 2003 quote for work on Pump #2, are attached as Exs. "C" and "D" to the Lowe declaration.

On September 8, 2003, defendant met with Navy contract and engineering personnel. At the time, JHL's bid was $2,205,138. During the meeting, defendant provided the false HSI and Conhagen quotes, which had been inflated collectively by $380,000. PSR ¶ 19. Choy of Naval engineering felt the JHL bid was still too high. Choy told defendant that the subcontractor quotes covered the bulk of the work, for a total price of $916,699.[8] With a bid of $2,205,138, JHL thus appeared likely to enjoy a profit of almost $1.3 million, for doing a small portion of the overall work. Defendant responded that he had numerous other costs which should be included within the contract. Choy nonetheless continued to question the bid amount, even as supported by the altered subcontractor quotes. Defendant ultimately asked what the government felt the job should cost. Choy responded by saying defendant was the contractor, and that

---

[8] This figure -- which was already inflated -- reflected the altered quotes of $314,733 (HSI) and $557,260 (Conhagen), as well as a $44,706 line item in HSI's quote for on site electrical cables. See Exs. "B" and "D" to the Lowe declaration. The true subcontractor quotes, before alteration, was $380,000 less, or $536,699.

7

he should justify his costs and provide JHL's "best and final offer."

On September 8, 2003, the same day, JHL faxed a revised proposal for $2,150,000. See Ex. "E" to Lowe declaration.

C.  Defendant's Statement to the FBI

On September 23, 2003, federal agents executed a search warrant on defendant's business offices. During the search, defendant provided a full confession to FBI agents. A copy of the FBI report of defendant's statements is attached as Exhibit "F" to the Lowe declaration. In his statement, defendant admitted submitting to the Navy an altered and inflated quote from HSI, and an inflated quote from Conhagen, to substantiate his cost proposal for work on Pump #2:

> The real sub-contractor quotes would not substantiate the cost proposal and would raise questions with the Navy people with the Government. Therefore, SHIN contacted a Vice President at CONHAGEN, FNU LNU, and asked that CONHAGEN inflate their quote by $200,000. CONHAGEN did this for SHIN, and provided the inflated quote to SHIN. SHIN contacted FNU HOSE at HSI and had HSI inflate their quote by $200,000 to $300,000. HSI did this and faxed the inflated quote to SHIN.
>
> SHIN then said that he wanted to be completely truthful with the interviewing agents. SHIN said he had asked HSI to inflate their quote but that HSI did not do this right away. After asking HSI to inflate their quote, SHIN obtained a previous HSI quote for a previous Dry Dock Pump job, and personally altered the numbers. Then SHIN submitted both the inflated CONHAGEN quote

8

and the altered HSI quote to the Government
in substantiation of the high cost proposal.

Ex. "F" to Lowe declaration, at 2.

Defendant then offered an explanation for his conduct.
Defendant said "he felt he needed to do this because the previous
CIVIL MECHANICAL job used a cost inflated by about 50%. . . .
SHIN found himself in a position of either correctly pricing out
the job, thereby raising a red flag on the previous CIVIL
MECHANICAL job, or likewise inflating the cost, so as to keep
things consistent in the mind of the Navy." Ex. "F" at 3.   In
short, defendant did not want the Navy to know how low his true
costs were on either job, because he knew his profit margin would
be questioned.

III. ARGUMENT

    A.   The Loss For Guideline Purposes Was Correctly
         Calculated.

         1.   Booker's Sentencing Principles May
             Be Retroactively Applied.

In his December 28, 2004 sentencing memorandum,
defendant cites Blakely v. Washington, 542 U.S. 296 (2004) for
the proposition that the government may not seek a sentencing
enhancement for the loss because it was neither charged in the
Information nor admitted by defendant.   In Booker, the Supreme
Court held that, under the mandatory Guidelines regimen, the use
of sentencing enhancements based on judicially found facts
violated the Sixth Amendment.   In its remedial opinion, however,

the Court eliminated the constitutional infirmity by rendering the Guidelines advisory.  Following Booker, the Ninth Circuit has explicitly held that the Sixth Amendment violation "arises only when extra-verdict findings are made in a mandatory guidelines system."  United States v. Ameline, 409 F.3d 1073, 1077-78 (9th Cir. 2005)(en banc).

Defendant now contends that, because his offense was committed before Booker was decided, the ex post facto principles of the due process clause prevent this court from imposing a sentence greater than the Guideline range authorized by facts admitted during his guilty plea.  This argument is foreclosed by United States v. Dupas, 419 F.3d 916, 919-921 (9th Cir. 2005).  This court is thus free to engage in judicial fact-finding to calculate the Guideline range.

2.    The Loss May Be Proved By A Preponderance Of The Evidence.

Defendant argues that the government must prove the loss by clear and convincing evidence.  Def. Sent. Memo. at 10.  Apart from excising statutory provisions which made the Guidelines mandatory, Booker left the Guidelines intact.  See Booker, 125 S.Ct. at 757.   The Guidelines contemplate the use of a preponderance of evidence standard of proof.  See United States Sentencing Guidelines (U.S.S.G.) § 6A1.3, cmt.  In United States v. Howard, 894 F.2d 1085 (9th Cir. 1990), the Ninth Circuit "adopt[ed] the 'preponderance of the evidence' standard of proof

10

on Guidelines issues." _Id._ at 1090 (citations omitted).  In

_Ameline_, the Court held that _Howard_ (and the preponderance of

evidence standard) remains good law after _Booker_.

> When a defendant contests the factual basis
> of a PSR, the district court remains
> obligated to resolve the dispute before
> exercising its sentencing discretion under
> _Booker_.  In resolving the factual dispute,
> the district court must continue to apply the
> appropriate burdens of proof, consistent with
> _Howard_.

_Id._ at 1086.  _See also_, _United States v. Dare_, 425 F.3d 634 (9th

Cir. 2005)("[a]s a general rule, the preponderance of the

evidence standard is the appropriate standard for factual

findings used for sentencing").  This court thus should apply the

preponderance of evidence standard in accordance with _Ameline_,

_Howard_ and _Dare_.

> 3.  The Guidelines Loss Was Properly
>     Calculated As $380,000.

Under the Guidelines, "loss is the greater of actual or

intended loss."  U.S.S.G. § 2B1.1, note 3(A).  "Intended loss ...

means the pecuniary harm that was intended to result from the

offense[.]" _Id._, note 3(A)(ii).  This court "need only make a

reasonable estimate of the loss."  _Id._, note 3(C).

Defendant here submitted inflated subcontractor

quotations to justify JHL's contract proposal.  Defendant knew

the Navy wanted a breakdown of his costs.  Defendant also knew

that the Navy would not agree to JHL's proposal if it knew JHL's

11

true subcontractor prices.  Defendant thus altered HSI's quote, and obtained an inflated quote from Conhagen, for use in his meetings with the Navy.  The fake quotes inflated JHL's purported subcontractor costs by $380,000.  Defendant obviously intended that the Navy would pay these increased costs, dollar for dollar.  The PSR's use of the $380,000 figure thus constitutes a reasonable estimate of the intended loss, and should be accepted by this court.

Defendant challenges this figure, and argues that the loss should be "zero."  Defendant claims he did not intend a pecuniary loss, but engaged in criminal misconduct only because the Navy used a flawed contracting process.  According to defendant, the Navy's use of a Job Order Contract (JOC) left defendant with a zero "co-efficient," and made it impossible for him to make a profit without lying.  In making this argument, defendant ignores the obvious: if JHL could not legitimately make a profit on a JOC basis, it could simply have declined the contract.  But defendant instead chose to bid on the job, knowing full well he had a zero co-efficient.[9]  Defendant also chose to lie about JHL's costs so that the Navy would pay more for the work.  The increased costs thus constitute the "intended loss" for Guideline purposes.

---

[9]  Defendant himself picked a zero co-efficient for his JOC, presumably to make himself more attractive as a bidder on government jobs.

12

Defendant's argument also ignores the history of the
negotiations for the two dry dock jobs. JHL's contract for Dry
Dock #4, Pump #1 job (which had an _identical_ scope of work as Dry
Dock #4, Pump #2) was for $2,355,745. This price was negotiated
under a "Multi-Trade Contract" which allowed the very type of
mark-up which defendant says was warranted here.[10] The contract
price was supported by a subcontract quotation from CMC for
$2,054,100. As bid and awarded, JHL thus stood to earn a profit
of up to $301,645, i.e., the difference between the contract
price and JHL's subcontractor costs. After the award of the
contract, however, JHL shopped for new subcontractors. By
switching from CMC to Marisco, and then from Marisco to HSI and
Conhagen, JHL reduced its subcontractor costs from $2,054,100 to
$536,699, for a savings of $1,517,401. JHL did not, however,
reduce its contract price with the Navy to pass on any portion of
the savings in subcontractor costs. JHL thus increased its
potential profit margin (the contract price less subcontractor
costs) on the job to $1,819,046.

Against this backdrop, defendant submitted a bid for a
JOC for the exact same work on Pump #2. Defendant already had
negotiated subcontractor savings of $1,517,401 from the CMC quote
used to justify JHL's $2,355,745 contract for Pump #1. On August

---

[10]    JHL was allowed a "co-efficient" of 6% on labor, 15% on
material and equipment, and 3% for "coordination and oversight."

14, 2003, defendant nonetheless bid $2,360,153 on Pump #2, <u>more</u> than the price for Pump #1.  When asked for a line item breakdown, defendant simply reduced his bid to $2,205,138.  The Navy quite understandably continued to seek the subcontractor quotes, as it knew that defendant had changed subcontractors and reduced his overall costs.  Defendant responded by submitting false quotes which were inflated by $380,000.

Defendant unquestionably made, and used, the false quotes to get more money from the Navy.  He therefore intended to inflict a pecuniary loss.  Defendant attempts to avoid this obvious truth by claiming that he simply intended to increase the price to a "reasonable" amount.  In support of this argument, defendant points out that the government estimate of the job cost was for $2,211,250.  Defendant argues that, since JHL's ultimate proposal was below the government estimate, he did not intend to inflict any pecuniary harm.

Defendant's argument is misplaced.  The government estimate does not represent the government's opinion of the actual <u>value</u> of the job.  A government estimate is instead prepared primarily to estimate the probable <u>cost</u> of a job, so that money can be allocated.  Choy declaration, ¶ 2.  With a government estimate, a government entity (such as the Pearl Harbor Naval Shipyard) can allocate, or reserve, sufficient funds for a job.  <u>Id.</u>  The estimate does not, however, set the price of

14

a job.  It allows government officials to negotiate a fair price
with the contractor, knowing that sufficient funds have been set
aside.  If the fair price is below the estimate, the government
will pay only that price.  Id.

        In this case, Choy prepared government estimates for
the work on both Pump #1 and Pump #2.  Choy's estimate for Pump
#1 was $1,223,117.  JHL and the Navy thereafter negotiated a much
higher contract price of $2,355,745, primarily on the strength of
CMC's subcontractor quote of $2,054,100.  When asked to prepare a
government estimate for Pump #2, Choy based his figures largely
on the earlier job, which had the same scope of work.  Choy did
not know (as defendant did) that CMC's subcontractor quote on
Pump #1 was overstated.  Choy did not know (as defendant did)
that JHL had reduced its subcontractor costs to $536,699, a
savings of $1,517,401.  Had Choy known that the true
subcontractor costs on Pump #1 were only $536,699, his estimate
on Pump #2 would have been lower.  Moreover, had defendant
produced accurate subcontractor quotes, the government would have
calculated its contract price on the basis of those quotes, and
not on the amount of the contract price for the first job.

        In short, the amount of the government estimate does
not demonstrate that JHL's proposal of $2,154,000 was a fair and
reasonable price.  The estimate was inaccurate, and reflected the
false information given to the government by JHL.  Indeed, in his

                               15

statement to the FBI, defendant himself admitted that he did not

provide the government the true figures because he knew the

government would then question the contract amounts on <u>both jobs</u>.

Defendant said that CMC's original quote on Pump #1 was inflated

by about 50%, and that he did not disclose this to the Navy

because it would have raised a "red flag" on the negotiated

contract price, as the job had not been done.  <u>See</u> Ex. "F" to

Lowe declaration.  Defendant thus chose to inflate his quotes on

Pump #2, in part to conceal that his costs on Pump #1 were

inflated.  <u>Id.</u>  The fact that JHL's ultimate proposal was near

the government estimate thus does not mean that defendant did not

intend a pecuniary loss.  On the contrary, it reflects the fact

that defendant wanted to hide the fact that his price was

inflated on Pump #1, and then to obtain a similarly inflated

price on Pump #2.  In short, the government estimate was skewed,

simply because the entire process had been corrupted by

defendant's use of false figures.

        Defendant undoubtedly will return to his now familiar

refrain -- the job was risky, profits were uncertain, and thus he

needed to build in a substantial buffer.  The vagaries of any

construction job make it difficult to determine precisely what

profit JHL would have enjoyed on the job.  But that is precisely

what defendant could have discussed with the government.

Defendant instead chose to conduct negotiations on the basis of

lies and omissions.  He failed to disclose that his price on Pump #1 was inflated because it was based on a subcontractor quote which had been reduced by approximately $1.5 million.  He wanted to protect the profit on that job, and earn a similar profit on the next job on Pump #2.  Defendant thus created and used altered quotes to overstate his costs by $380,000.  There can be no question that he intended those quotes to induce the Navy to pay a higher contract price.  This court need only make a "reasonable estimate" of the loss which defendant intended.  The government submits the $380,000 figure is appropriate.[11]

    B.    Defendant's Motion For Downward Departure
          Based On Alleged Post-Offense Rehabilitation
          Should Be Denied.

    Following his guilty plea, defendant attended 12 days of classes in government contracting, and sponsored a seminar in Hawaii on "Ethics in Government Contracting."[12]  Defendant claims that these acts constitute post-offense rehabilitation justifying

_____

[11]  In fact, this figure actually understates the intended loss.  Since defendant admitted he altered quotes partly to protect his contract price on Pump #1, he plainly intended to inflict a pecuniary loss on that job as well.  For purposes of sentencing, however, the government will seek an enhancement solely on the basis of the $380,000 loss intended on Pump #2, as recommended by the PSR.

[12]  In his motion, defendant states that he has not revealed publically that he financed this seminar.  Defendant's motion at 3.  Of course, now that his sentencing is impending, defendant freely reveals his largesse.  Sponsoring the seminar presumably was not a financial burden to defendant, as he has cash and liquid assets of over $9,000,000, no liabilities, and a net worth of over $40,000,000.  PSR ¶ 57.

a downward departure from the applicable Guideline range.
Defendant's request for such a departure is unavailing, as (1)
there is no connection between his crimes and ostensible
"rehabilitation," and (2) any such "rehabilitation" was not
extraordinary.

   1. <u>Legal Principles</u>

    Post-offense rehabilitation may, under limited
circumstances, be a basis for a downward departure in sentencing.
<u>United States v. Tzoc-Sierra</u>, 387 F.3d 978, 981 (9th Cir. 2004).
To qualify, a defendant must demonstrate an "extraordinary level
of rehabilitation." <u>Id.</u> at 981, quoting <u>United States v.
Working</u>, 287 F.3d 801, 808 (9th Cir. 2002). As colorfully stated
in <u>United States v. Craven</u>, 239 F.3d 91, 99 (1st Cir. 2001),
<u>reversed on remand</u>, 358 F.3d 11 (1st Cir. 2004), "downward
departures for presentence rehabilitation are hen's teeth rare."

    The requirement for an "extraordinary" level of
rehabilitation is rooted in the built-in reduction for acceptance
of responsibility under the Guidelines:  "Because the Commission
accounted for ordinary post-offense rehabilitation under section
3E1.1, a defendant's rehabilitation must be exceptional enough to
by atypical." <u>United States v. Rogers</u>, 400 F.3d 640, 641-42 (8th
Cir. 2005); <u>United States v. Tucker</u>, 386 F.3d 273 (D.C. Cir.

2004).[13]  In fact, application note 1(g) to U.S.S.G. § 3E1.1

states that in determining if a defendant qualifies for

acceptance of responsibility, an appropriate consideration is

"post-offense rehabilitative efforts (e.g., counseling or drug

treatment)."

> 2.    Defendant Fails to Establish Any Nexus Between His
>       Offense Conduct and Claimed Post-Offense
>       Rehabilitation

Defendant claims that he attended 12 days of

educational courses "[i]n order to rehabilitate himself and

become much more conversant with the law and regulations

applicable to contracting and negotiating with the United

States. . . ."  Def. Mot. for Downward Departure at 1-2.

Defendant claims that, had he attended these classes prior to his

criminal conduct, "he would have had the tools necessary to deal

with the situation in which he found himself in the negotiations

in this case without having gone astray."  Id. at 2.

Defendant's claim is entirely unfounded.  Defendant's

criminal conduct was not, as he suggests, caused by a

"misunderstanding" of the government contracting process.  The

pleadings and PSR abundantly reflect that defendant was a highly

---

[13]  In the Eleventh Circuit, departures for post-offense
rehabilitation are limited to the horizontal axis for criminal
history.  United States v. Stuart, 384 F.3d 1243, 1248 (11th Cir.
2004).  Thus, a defendant at criminal history category I (like
defendant here) is not eligible for a post-offense rehabilitation
adjustment.

successful and experienced government contractor.  Defendant's

problem was not that he lacked familiarity with the process.  His

problem was that he chose to abuse the process.  Knowing full

well of the significance of subcontractor quotes, defendant

engaged in a prolonged and deliberate attempt to deceive the Navy

into increasing its contract award.  Defendant cannot now

credibly claim that he lied to the government because he did not

understand the contracting process.  In fact, as reflected in his

statement to the FBI, defendant "felt he needed to do this

because the previous CIVIL MECHANICAL job used a cost inflated by

about 50%. . . .  SHIN found himself in a position of either

correctly pricing out the job, thereby raising a red flag on the

previous CIVIL MECHANICAL job, or likewise inflating the cost, so

as to keep things consistent in the mind of the Navy."  In other

words, he knowingly lied to the Navy in an effort to avoid

raising a "red flag" and in an effort to obtain the second

contract.  Taking courses in contracting does not rehabilitate a

liar motivated by greed.

Our circumstances are somewhat analogous to those in

United States v. Kim, 313 F.Supp.2d 295 (S.D.N.Y. 2004).  Kim, a

part-time bookkeeper, embezzled money from her employer to pay

personal expenses for three-and-one-half years.  Following a

guilty plea, Kim sought a downward departure on several grounds,

including post-offense rehabilitation.  Id. at 296.  As stated

by the district court, the "core" of her motion for departure
stemmed from her troubled psychological history.  Id. at 297.

In support of her claim of extraordinary post-offense
rehabilitation, Kim argued that she underwent "extensive therapy
to address the psychological condition allegedly at the root of
her crimes."  Id. at 301.  The district court denied the motion,
finding a lack of a "casual link" between the rehabilitation and
her offense:

> . . . the Court does not find compelling the
> causal link between her rehabilitation and
> the specific offenses to which she has pled
> guilty.  Kim pled guilty to bank fraud - a
> crime of elaborate deceit - and her current
> psychotherapy regimen is more directed at
> addressing Kim's motives for that deceit
> (i.e., her troubled family relations) than
> the deceit itself.  In other words, Kim has
> not demonstrated rehabilitation in a manner
> relevant to her crimes.

Id. at 302.

The lack of a "casual link" in defendant's case is even
greater here than Kim.  Like Kim, defendant engaged in conduct
that involved a crime of elaborate deceit.  Kim, however, sought
treatment for the motive underlying the deceit.  Defendant here,
by contrast, sought education on government contracting,
something that was not the root cause of his crime.  His offense
conduct - lying to the government by providing inflated costs -
is unrelated to his claimed rehabilitation - learning more about

21

government contracting.  In short, defendant's lie was based on greed, not a need to become educated on contracting process.

> 3.    Defendant Also Fails to Prove an Extraordinary
>        Level of Post-Offense Rehabilitation

Even assuming there were some relationship between defendant's crimes and his claimed rehabilitation, defendant has failed to demonstrate "an extraordinary level of rehabilitation" as required by the Ninth Circuit.  See  United States v. Tzoc-Sierra, 387 F.3d 978, 981 (9th Cir. 2004).

Defendant attended a total of 12 days of training and funded training for businesses in Hawaii.  There is no question but that defendant is financially capable of attending and presenting such classes - he has a net worth in excess of $40,000,000.  PSR ¶ 57.  Defendant also was obviously motivated to improve his position at sentencing: he brought his defense counsel, Samuel King, to the training on government contracting, and retained his other counsel, Brian Durst, to conduct the Hawaii seminar.  With the information obtained at the training, Mr. King has presented the court with a long, discursive memorandum on government contracting, all in an attempt to mitigate defendant's deceit.  Mr. Durst, in turn, has submitted a declaration which essentially argues defendant's case.  In short, the efforts which defendant cites as "rehabilitation" appear to

consist of nothing more than the expenditure of defense costs to prepare his case for sentencing.

The government has no quarrel with defendant spending money to present the best possible defense in this case. But such expenditures should not be confused with attempts at "rehabilitation." If defendant now recognizes his conduct was wrong, that is commendable. But such an acknowledgment of wrongdoing is the type of rehabilitation which results in a reduction for acceptance of responsibility. It does not, however, constitute an extraordinary rehabilitation justifying a departure below the applicable Guidelines range. Defendant has failed to meet his burden of proving extraordinary post-offense rehabilitation.

III.    CONCLUSION

For all the foregoing reasons, defendant's motion for downward departure should be denied.

DATED:    _February 9, 2006_ , at Honolulu, Hawaii.

EDWARD H. KUBO, JR.
United States Attorney
District of Hawaii


By _____
   LAWRENCE L. TONG
   Assistant U.S. Attorney

23