FD-302 (Rev. 10-6-95)

- 1 -

### FEDERAL BUREAU OF INVESTIGATION

Date of transcription   09/23/2003

     PATRICK SHIN, Asian Male, SSAN 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, DOB 07/07/1964, was interviewed at the offices of NAN, INCORPORATED, d.b.a. OCEAN HOUSE BUILDERS, 636 Laumaka Street, Honolulu, Hawaii. After entry was made to the open and operating business office at 636 Laumaka Street, SHIN was approached by Federal Bureau of Investigation Special Agents DENSON and MCDONALD and provided with a copy of the Search Warrant with attached list of items to be seized.  SA DENSON advised SHIN that SHIN was free to leave the premises, and he was also entitled to stay and be present during the execution of the Search Warrant.  SA DENSON and SA MCDONALD advised SHIN that he could stay during the Search Warrant in order to have the opportunity to ensure that only items within the scope of the list of items to be seized were taken by the participating agents.  SHIN was advised that a Search Warrant was being executed at the business which required the participating law enforcement officers to have SHIN's employees depart the offices.  SA MCDONALD departed in order to coordinate the execution of the Search Warrant and SA BROWN entered SHIN's office.  SHIN was advised as to the identities of the interviewing agents and SHIN then provided the following information:

     SHIN, after reviewing the Search Warrant, offered to help in any way to identify and provide all of the items.  SHIN stated that certain things were located at Accounting, at 1938 Hau Street, Honolulu, Hawaii, telephone number (808)841-2970, fax number (808)841-4970, the JHL CONSTRUCTION office address.  SHIN said the Search Warrant was not necessary and SHIN would have provided the documents if the interviewing agents had asked for them.  SHIN identified and directed certain employees to assist the agents participating in the Search Warrant in locating items being sought.

     SHIN asked why the Search Warrant was being executed and the interviewing agents told SHIN it had to do with the end of year contracts being negotiated with the Navy.  The interviewing agents told SHIN that the Search Warrant resulted from a sub-contractor stating that SHIN had done something wrong.  The interviewing agents asked SHIN what he might have done wrong.

     SHIN stated that a sub-contractor named CIVIL MECHANICAL had a Dry Dock Pump job and had worked with a sub-contractor named

EXHIBIT F

Investigation on   09/23/2003   at   Honolulu, Hawaii

File #   46A-HN-17948   Date dictated

by   SA William S. Denson:wsd / SA James D. Brown, III
SA M.D. McDonald

This document contains neither recommendations nor conclusions of the FBI.  It is the property of the FBI and is loaned to your agency; it and its contents are not to be distributed outside your agency.

FD-302a (Rev. 10-6-95)

46A-HN-17948

Continuation of FD-302 of    Patrick Shin    , On    09/23/2003    , Page    2

MORISCO.  SHIN believed that CIVIL MECHANICAL was angry at SHIN
because NAN INCORPORATED (NAN) was getting the new Dry Dock Pump
job.  CIVIL MECHANICAL was involved in a Dry Dock Pump job at Dry
Dock 2 and/or Dry Dock 4.  SHIN was dealing with sub-contractors
CIVIL MECHANICAL, MORISCO, CONHAGEN, and HSI ELECTRICAL (HSI),
formerly known as AMERICAN ELECTRIC, with respect to the Dry Dock
Pump job.  These were the only sub-contractors SHIN was dealing
with.  SHIN stated that this Dry Dock Pump job was a "job for us",
referring to himself and company.  The interviewing agents asked
SHIN what roll JHL CONSTRUCTION (JHL) played and SHIN stated that
this was a JHL contract and that JHL was "mentored" by SHIN.  JHL
is a couple blocks away from NAN on Hau Street.

     In order to provide a cost proposal to the Navy for the
Dry Dock 4, Pump 2 job (DD4P2), SHIN used a previous CIVIL
MECHANICAL quote number and submitted his proposal to the Navy.
The Government said that the cost proposal was too high and
negotiations between the Government and SHIN started over the job.
Initially, SHIN stated that CONHAGEN and HSI gave quotes to the
Government in support of the cost proposal.  Then, SHIN said the
Government asked for sub-contractor quotes in order to substantiate
SHIN's cost proposal, from SHIN.

     The real sub-contractor quotes would not substantiate the
cost proposal and would raise questions with the Navy people with
the Government.  Therefore, SHIN contacted a Vice President at
CONHAGEN, FNU LNU, and asked that CONHAGEN inflate their quote by
$200,000.  CONHAGEN did this for SHIN, and provided the inflated
quote to SHIN.  SHIN contacted FNU HOSE at HSI and had HSI inflate
their quote by $200,000 to $300,000.  HSI did this and faxed the
inflated quote to SHIN.

     SHIN then said that he wanted to be completely truthful
with the interviewing agents.  SHIN said he had asked HSI to
inflate their quote but that HSI did not do this right away.  After
asking HSI to inflate their quote, SHIN obtained a previous HSI
quote for a previous Dry Dock Pump job, and personally altered the
numbers.  Then SHIN submitted both the inflated CONHAGEN quote and
the altered HSI quote to the Government in substantiation of the
high cost proposal.  SHIN used an office copy machine to increase
the numbers on the HSI quote by $200,000 to $300,000.

     SHIN submitted the inflated CONHAGEN quote and the
altered HSI quote to the Navy at a negotiation meeting at Pearl
Harbor.  SHIN recalled that both ANNETTE CHING and WESLEY CHOY, of

FD-302a (Rev. 10-6-95)

46A-HN-17948

Continuation of FD-302 of     Patrick Shin           , On 09/23/2003 , Page   3

the Navy, were at the meeting for the Government. SHIN admitted in doing this that "it's absolutely wrong, it's wrong". CHING called SHIN later because CHING could not find her copy of one of the quotes provided at the meeting and SHIN faxed a copy of the quote to CHING later.

SHIN stated that he felt he needed to do this because the previous CIVIL MECHANICAL job used a cost inflated by about 50%. SHIN learned this from MORISCO after CIVIL MECHANICAL did the earlier Dry Dock Pump motor job. SHIN found himself in a position of either correctly pricing out the job, thereby raising a red flag on the previous CIVIL MECHANICAL job, or likewise inflating the cost, so as to keep things consistent in the mind of the Navy.

SHIN believed that should the DD4P2 job be awarded at the negotiated price, $2,150,000, then SHIN's company would make approximately $500,000 in profit.

SHIN stated he has never done this before, in reference to inflating quotes and altering quotes for submission to the Government in support of cost proposals. SHIN did say that the DD4P2 job was high risk and it was possible that he would make a million dollars profit, or possibly loose money, because of the nature of the Dry Dock Pump jobs.

SHIN was one of the top 12 contractors in the State of Hawaii last year, as gauged by revenues.

The interviewing agents asked SHIN in detail how SHIN manipulated the quotes for the DD4P2 job. SHIN grabbed a white binder in his office, designated for the DD4P2 job, and showed it to the interviewing agents. SHIN showed for the CONHAGEN quote for the DD4P2 job, that the real quote was for $348,575, and that SHIN had CONHAGEN inflate the quote to $557,260. SHIN showed for the HSI quote for DD4P2 that HSI had inflated the quote to $214,733. SHIN showed a document to the interviewing agents for the HSI quote for three previous Dry Dock Pump jobs which included three line items; $327,905, $114,733, $44,706. SHIN then showed, out of the same binder, the altered HSI previous Dry Dock Pump job quote with the three line items; $727,905, $314,733, $44,706. This binder was taken into evidence at the conclusion of SHIN's explanation.

SHIN explained that the only number from the HSI previous Dry Dock Pump job quote that mattered was the second line item, that had been increased by SHIN from $114,733 to $314,733. This is

FD-302a (Rev. 10-6-95)

46A-HN-17948

Continuation of FD-302 of ___Patrick Shin_____ , On 09/23/2003 , Page 4

the one that SHIN later used to support his cost proposal to the Government, along with the inflated CONHAGEN quote. SHIN only increased the first number from $327,905 to $727,905 so that the second line item would not look out of place.

WILLY TALION and JAMES LEE do not know anything about SHIN's directed inflation of sub-contractor quotes or SHIN's altering of the HSI quote. CONHAGEN and HSI did not know that SHIN was obtaining inflated quotes for the purpose of providing those quotes to the Government. CONHAGEN and HSI were only told that SHIN wanted the quotes inflated because SHIN's coefficient on his Government contract was zero.

The interviewing agents asked SHIN about the various entities which SHIN used to do contracting work. SHIN stated that SHIN owned and operated NAN, which does business as OCEAN HOUSE BUILDERS (OHB). LEE owns JHL, but works with SHIN. JHL is a Small Business Administration (SBA) Section 8A company which was started four to five years ago. SHIN is allowed and expected to be involved with LEE and JHL because SHIN is "mentoring" JHL. NAN was a Section 8A company from when it started in about 1989 to 1999 or 2000, when NAN's revenues exceeded the SBA cap of $28,500,000 per year. Additionally, to be in the SBA 8A program, the owner's personal assets need to be under $250,000, excluding their personal residence, and this is one of the items on the SBA 8A application.

SHIN and LEE completed the SBA 8A application for JHL three or four years ago. SHIN and LEE dealt with MICHAEL YOUTH of the SBA with respect to re-certifications. The last time SHIN and LEE dealt with YOUTH was sometime last year.

SHIN is now trying to distance himself from JHL so that JHL and OHB appear to be different companies. However, SHIN's roll as a mentor to JHL and the corresponding mentoring agreement helps out in allowing SHIN to legally have a roll in working with JHL.

The interviewing agents asked SHIN if JHL and OHB ever submitted bids on jobs purporting to be competing contractors. JHL and OHB did submit bids on an $18 million to $20 million Army contract, referred by SHIN to be numbered the 2C1 contract. SHIN said there was about $1 million in separation between JHL and OHB's bids on the Army contract. If JHL does win the contract, they would have to use OHB's resources in order to do the job. Four other contractors bid on this Army contract in addition to JHL and OHB.

FD-302a (Rev. 10-6-95)

46A-HN-17948

Continuation of FD-302 of     Patrick Shin                                      , On  09/23/2003  , Page    5

     The interviewing agents asked SHIN how SHIN came so close
to the Government Estimate on the DD4P2 cost proposal.  SHIN said
that his guess was based on the previous Dry Dock Pump job
contract.

     The interviewing agents started to interview SHIN in
SHIN's office, later in the employee break room, and then in the
NAN office conference room.  Throughout the interview, the
interviewing agents reminded SHIN that he was not under arrest, and
that SHIN would not be arrested on 09/23/2003.  SHIN had a cellular
telephone and at the request of the interviewing agents, called LEE
and TALION and asked them to cooperate fully with the Federal law
enforcement officers and provide all truthful information and sign
any consent forms provided by the law enforcement officers.  SHIN
commented during the interview after receiving a couple of
unanswered calls on his cell phone, that he believed a friend of
SHIN's was trying to contact SHIN to advise him to get an attorney.
SHIN further commented that he saw no reason for an attorney
because what he did was wrong and he just wanted to deal with it
and move on.

     The interviewing agents advised SHIN that SHIN's
cooperation would be taken into consideration by the Assistant
United States Attorney (AUSA) assigned to his case, J. MICHAEL
SEABRIGHT.  SHIN was asked if he knew of any Government employees,
public officials, contractors or subcontractors that had accepted
or solicited bribes or kickbacks.  SHIN stated that he did not know
of any.  SHIN did not receive any knowledge or information on the
Government estimate for the DD4P2 job.  LINDA LINGLE, the Governor
of Hawaii, contacted SHIN a couple weeks ago to invite SHIN to a
dinner but SHIN did not go.  SHIN did contribute legitimately to
the campaign of MAZZIE HIRONO.  SHIN would offer gift certificates
and small gifts to Government employees during the holidays, but
usually, the Government employees would decline the gift.  The gift
certificates that were offered were valued at $50 to $100, or less.

     The interviewing agents asked SHIN to provide a written
statement in which SHIN would confess to making a false statement
to the Government with respect to the inflated and subcontractor
quotes.  The interviewing agents told SHIN that this was completely
voluntary and he was not required to do so, and SHIN was again told
he was not under arrest.  The interviewing agents further told SHIN
that should he decide to do the written statement, it would
constitute further acceptance of responsibility for SHIN's criminal
actions.  SHIN agreed to provide the written statement, read the

FD-302a (Rev. 10-6-95)

46A-HN-17948

Continuation of FD-302 of ___Patrick Shin_____ , On 09/23/2003 , Page 6

statement form, and provided the statement. The original statement has been placed in a 1A envelope and a copy has been attached to this FD-302.

Being aware of a possible current Army Criminal Investigation Division (CID) investigation relating to NAN and JHL and a $20 million Army contract, SA DENSON, contacted Special Agent J. MICK HIPSHER, of Army CID, and advised SA HIPSHER of the information provided by SHIN. SA HIPSHER expressed an interest in further interviewing SHIN. SA DENSON advised SHIN that should SHIN wish the interviewing agents to continue to consider SHIN fully cooperating, then SHIN would allow himself to be interviewed by Army CID and SHIN would be truthful with Army CID. SA HIPSHER later arrived at the NAN offices and SA DENSON introduced SA HIPSHER to SHIN. SA DENSON again advised SHIN that he was not under arrest and that SHIN's participation in an interview with HIPSHER was voluntary. SHIN agreed to participate in the Army CID interview and provided SA HIPSHER with information.

SA DENSON provided the name and number of AUSA SEABRIGHT to SHIN. SHIN asked what would happen next and asked if he should get an attorney. SA DENSON advised SHIN that he could do whatever he wished in that regard. SHIN again commented that he did not see the need for an attorney given he knew what he did wrong. SHIN asked if his crime was a felony, and SA DENSON advised SHIN that providing a material false statement to the Government was a felony, but that it was unknown by the interviewing agents whether or not prison time or just probation would be associated with SHIN's offense. SHIN wanted to deal with problems as quickly and as quietly as possible.

SA DENSON and SA BROWN departed the NAN offices, given the conclusion of the execution of the Search Warrant and the participation of Army CID in a new interview of SHIN.

## STATEMENT

DATE ___9/23/03___
TIME ___11:50 AM___
LOCATION ___Honolulu, HI___

Special Agent(s) ___William S. Denson___ and
___James D. Brown III___ advised me ___PATRICK___
___SHIN_____, of the nature of the interview.
I was advised that I was not under arrest, was free to leave at
anytime, and did not have to provide a statement. I have
completed ___4___ years of education, and can read and write the
English language. I wish to provide this signed statement
voluntarily, no threats or promises have been made to me. The
following is true and correct to the best of my knowledge:

This statement is regarding on DryDock project that I got involve in estimating with government personell. During the negociation with government, they ask me to submit the subcontractors price on pump and electrical portion. As a result, I asked subcontractors to submitted the proposal that I could cover the overhead cost & profit and their work portion for this project. However, I ask the to inflated the cost to match the previous projects that JHL construction negociated with government (year ago. In addition, I alter the HSI price by $200,000.ºº and submit to Gov't. I acknowledge in I made an false statement to the government.

SA ___James D. Brown___ III FBI-AN 01/24/03     ___[signature]___
  (Special Agent)                                (Signature)
SA ___[signature]___ FBI 9/23/03                 ___9-23-03___
  (Special Agent)                                (Date)