SAMUEL P. KING, JR. 1396
735 Bishop Street, Suite 304
Honolulu, Hawaii 96813
Tel. No. 521-6937

Attorney for Defendant

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Cr. No. 04-00150 SOM |
| | ) |
| vs. | ) 18 USC 1001(a)(3) |
| | ) |
| PATRICK SHIN (01), | ) RESPONSE OF DEFENDANT TO GOVERN- |
| | ) MENT'S SENTENCING MEMORANDUM RE: |
| Defendant. | ) ISSUE OF "LOSS"; EXHIBIT 1; DECLARATION |
| | ) OF FRED ANAWATI; EXHIBITS A and B |
| | ) |

RESPONSE OF DEFENDANT TO GOVERNMENT'S SENTENCING
MEMORANDUM RE: ISSUE OF "LOSS"

Introduction

On December 6, 2005, Defendant submitted an extensive Memorandum regarding the issue of the "loss" calculation for Guideline purposes in this case. On February 9, 2006, the Government filed its Sentencing Memorandum in response to Defendant's Memorandum. As this Response will show, the Government's Memorandum is filled with false assumptions, inaccuracies, and absurdities apparently supplied to the Government by the engineer who was involved in the Drydock 4, Pump 1 and 2 negotiations with JHL, Wes Choy. It is apparent, as this Response will show, that Mr. Choy has no understanding of the complexities of the pump jobs at Drydock 4 or the complexities of this case, and he has led the Government far astray with his ignorance.

CERTIFICATE OF SERVICE ATTACHED

Summary of Defendant's Memorandum

Before detailing the problems with the Government's Memorandum, because of the complexities of the underlying law and negotiation process involved in this case, it is worth summarizing the issues laid out in Defendant's Memorandum. To put the matter quite simply, this is not a "Martha Stewart" case. In Martha Stewart's case, she refused to admit she did anything wrong, she refused to accept responsibility for anything, she basically thumbed her nose at the Government, and ultimately she was found guilty of taking advantage of "insider information" to gain an unfair advantage over other people. None of these elements exist in this case. Defendant fully admitted physically changing the HSI bid when the FBI came to his business. Defendant has pled guilty to changing the HSI bid in violation of 18 USC 1001, and has accepted responsibility for his conduct. As Defendant's Memorandum explained in great detail, Defendant never intended to "defraud" the Government or "steal" any money from the Government and never gained an "unfair" advantage over the Government. In fact, he reacted, admittedly in an inappropriate manner, to an unfair advantage which the Government took over JHL. It is this last point which is the real "bone of contention" between Defendant and the Government.

One of the most important issues regarding sentencing in this case is *WHY* Defendant changed the HSI bid by increasing it $200,000 (the actual conduct constituting the 18 USC 1001 violation in this case) and *WHY* Defendant asked Conhagen to increase its bid by $180,000. In Defendant's Memorandum, he explains in great detail what was on his mind, what his motivation was in the context of the negotiation process with the Government. As Defendant's Memorandum explains, Defendant's intent is crucial with respect to the Guideline "loss" calculation for two major reasons - 1) "loss" is to be determined by *intended* loss, and 2) "loss" must be determined by Defendant's *intent* with respect to the economic realities of the situation. Defendant's Memorandum

2

explains, and is supported by Declarations of the most senior Government officials who were involved in the negotiation process, that the Government improperly assigned the Drydock 4, Pump 2 job to an IDIQ JOC contract which was never intended to cover such a job. The Government made the improper assignment because it was in a rush to complete negotiations for the job before the end of the fiscal year. Worse yet, the Government assigned the job to a 0% coefficient contract which unfairly denied JHL recovery of any reasonable profit and overhead. To add insult to injury, the Government's engineer during the negotiations, Wes Choy, questioned any attempt by JHL to recover reasonable profit and overhead by holding JHL to the strict wording of the 0% coefficient contract. In essence, on the one hand, the Government was asking JHL to do the Government a favor by taking on this very risky job at the last minute (because the Government knew that Defendant would be backing up JHL as JHL's mentor, and Defendant was the Government's "go to" contractor for difficult jobs that needed to be performed with excellence according to Mr. Hokama's Declaration) so the Government would not lose its allocated funding, and on the other hand, especially in the person of Wes Choy, stuffing the contract down JHL's throat by denying JHL any chance to recover reasonable profit and overhead. To make matters even worse, the so-called "plans and specifications" (as it turns out, the "plans and specifications" were drafted by Wes Choy) were hopelessly inadequate. The inadequacy of the "plans and specifications" was discussed in Defendant's original Sentencing Statement filed December 23, 2004, at pp. 10-11, and is further outlined in the attached Declaration of Fred Anawati, the owner of Marisco as follows:

> [O]nce I reviewed the "plans and specifications" which had been prepared for the job, I noted that the "plans and specifications" were wholly inadequate to describe everything that needed to done for the job. For example, there was no quantification or qualification of what needed to be done. There were no performance specifications. The "plans and specifications" prepared were completely inadequate to meet the requirements of the FAR (Federal Acquisition Regulation). Basically, the "plans and specifications" were not sufficient to permit preparation of a firm fixed price contract quotation. The plans called for "repair" of the pump, but the extent of repair could not be determined until the pump was inspected.

3

> There were no parameters set for the electrical field tests. The plans called for repair and overhaul of the motor, but the extent of repair could not be determined until after tests and inspections were completed. No operational tests specifications were provided. The plans use clearly outdated specifications for the babbiting of the bearings. Basically, the interpretation and intent of the "specifications" as written were in conflict in many areas, and to the present day, I cannot fully comprehend the intent of the "plans and specifications."

Fred Anawati, as the most experienced contractor in Hawaii regarding the pumps at Drydock 4, finishes his Declaration by stating that, in his opinion, a $2,150,000 price to perform the Pump 2 job is reasonable. Defendant's Memorandum explains that his only intent in changing the HSI bid and asking Conhagen to increase its bid was to speed up the negotiation process to arrive at a price for the contract that was reasonable for both JHL and the Government (JHL's best and final offer of $2,150,000) - a price which Robert Hokama, the man who was in charge of the Government office with which JHL was negotiating, has stated in his Declaration was a "fair" price for both parties which he would have approved had the price been presented to him. The best summary this writer has seen of Defendant's intent in this case was set out by James Gordon in his Declaration as follows:

> I have reviewed ROICC Pearl Harbor contract N62742-03-D-2246 and the problems recently encountered by Mr. Shin in his attempt to settle a timely award of a delivery order for Dry-dock #4, Pump 2, repairs, and I do not believe that there was any intent to defraud the Government. I believe that Mr. Shin's efforts to please his customers made him seek a solution that could allow timely award of the delivery order at a price that was fair and reasonable to all parties involved. Unfortunately, his chosen solution, although good-intentioned, was obviously bad practice.

To summarize Defendant's position in his Memorandum, Defendant had no intention whatsoever to defraud the Government, and if the Government had finally awarded the Drydock 4, Pump 2 contract at JHL's best and final offer of $2,150,000, this would have been a reasonable price for both sides at no "loss" to the Government.

The Hopeless Inadequacy of the Government's Memorandum

The Government's Memorandum basically ignores all of Defendant's arguments in his

4

Memorandum. The Government refuses to accept any responsibility for the breakdown in the negotiation process. It ignores the impropriety and unfairness of assigning the Drydock 4, Pump 2 job to a 0% coefficient IDIQ JOC contract which denied JHL its reasonable profit and overhead as though these matters did not exist and are utterly irrelevant, in spite of the Ninth Circuit's declaration in *United States v. Harper*, 32 F.3d 1387 (9th Cir. 1994), that the economic realities of the situation *must* be considered and are clearly relevant in determining Defendant's *intent* which is also of ultimate importance. In fact, the Government's Memorandum does not even cite to *Harper*. It appears the Government's sentencing position is simply to ignore anything Defendant has to say about this case and assume that Defendant's arguments will simply go away by ignoring them.

Wes Choy's Made-Up Story

Instead of addressing the issues raised by Defendant's Memorandum, the Government reintroduces Wes Choy into this case. Based on Wes Choy's major role in denying JHL a chance at fair negotiations for the Pump 2 job in this case[1], it is not surprising that he reappears now to try

---

[1] As Mr. Hokama stated in his Declaration attached to Defendant's Memorandum:
   Unfortunately, during the negotiations with JHL, the Government took a strict position regarding the fact that JHL's JOC contract was a "0 coefficient" contract. In other words, the engineer [Wes Choy] reviewing JHL's line items in its proposal was questioning any line item which included "profit and/or overhead" items which were normally part of the contract coefficient. When Mr. Shin asked his two subcontractors to increase their bids, he tells me that he was only trying to recover his profit and overhead in some way in the contract. I understand what he means when he says this, and I believe him. I do not, however, condone in any way what he did. In fact, I was extremely disappointed in him when I heard about what happened. Mr. Shin was an excellent contractor, literally our "go to" contractor when we had difficult problems that needed to be handled with excellence immediately.
   What Mr. Shin was trying to do was "shortcut" the negotiation process. What he had in mind was that if he had submitted the sub-contractors' bids as they were given to him, the negotiation process would have slowed considerably because of the engineer's position and the fact that the contracting officer working on the job would have had to seek review at higher levels of authority in our office, first with Mr. Sekiguchi, and then ultimately with me, in order to reach what she considered a fair and reasonable price. If this had happened, it might well have been true that we would not have been able to finish negotiations by the end

5

to justify his role. Unfortunately, Mr. Choy once again displays his ignorance of the issues and facts in this case.

Basically, Mr. Choy has made up a story which has no basis in fact to try to make Defendant look like a fraud. The gist of the story is as follows: In 2002, JHL first negotiated the Drydock 4, Pump 1 contract (as a part of a contract involving Drydock 4, Pump 1, and Drydock 2, Pumps 2 and 3) using Civil Mechanical (CMC) as its subcontractor. Wes Choy was the Government's engineer assigned to the job. JHL quoted a price to do the job for $2,355,745, and of this price, $2,054,100 was CMC's quote to handle the job, thereby yielding a "profit" for JHL of $301,645, the difference between the contract price and CMC's subcontractor price. JHL later dropped CMC and negotiated a lower price with Marisco which was about 50% of the CMC price, and thereafter switched from Marisco to HSI and Conhagen thereby substantially reducing its costs from the original CMC price. The HSI and Conhagen prices were $159,439 ($114,733 + $44,706) and $377,260 respectively, for a total of $536,699. Wes Choy's conclusion from these numbers is that JHL, by dropping CMC which quoted a price of $2,054,100, and renegotiating with HSI and Conhagen for a price of $536,699, increased its "profit" by the difference between $2,054,100 and $536,699, or $1,517,401, and created a total profit of $1,819,046 ($1,517,401 + $301,645).

Choy's story goes on that in August 2003, the Drydock 4, Pump 2, job was submitted for bid

---

of September. I can say that if this contract had come to my attention with the sub-contractor bids submitted as they were submitted to Mr. Shin, I would have approved the contract price of approximately $2.1 million which JHL was asking at the final negotiating conference. This price was very close to the Government estimate. Because we had assigned this job to an IDIQ contract even though the job was not within the IDIQ contract's intended scope, it would have been unfair for the Government to deny JHL reasonable profit and overhead by claiming that this was a "0 coefficient" contract. The Federal Acquisition Regulation (FAR) states in many places that the Government's job is to seek a "fair and reasonable price" with government contractors. It would not have been fair or reasonable for the Government in this case to have forced JHL into being required to live by the literal words of the contract for work that clearly was not intended or contemplated.

6

to JHL, and JHL submitted an initial bid of $2,360,153, slightly more than the identical Pump1 job contract price in 2002 of $2,355,745. Defendant told the JHL estimator to use the Pump 1 job contract price to bid on the Pump 2 job, implying that although Defendant knew JHL was already "making a profit of $1,819,046" because of the use of new subcontractors, JHL should try to trick the Government into paying a much higher price than it should be paying. Choy "assumed" that JHL had obtained price reductions for large portions of the work, and he "anticipated" that JHL would complete the Pump 1 job before proceeding with the Pump 2 job, and Choy thus "believed" that JHL "should" have offered a reduced price on the Pump 2 job "to reflect the increased familiarity which it would have with the work." Choy's estimate of $2,211,250 to perform the Pump 2 job (calculated prior to the start of negotiations with JHL on the Pump 2 job) was actually not an "estimate" at all, but only an encumbrance for funds, and he was tricked by Defendant into over-estimating the job based on the Pump 1 contract when Defendant had obtained substantial cost savings of $1,517,401 by switching from CMC to HSI and Conhagen. Defendant asked HSI and Conhagen to increase their bids solely for the purpose of hiding the fact that JHL had decreased its costs by at least 50% since the Pump 1 job was negotiated, and Defendant didn't want to raise a "red flag" about the cost savings JHL had obtained. By this trickery, Defendant was seeking to gain a profit at the expense of the Government of not just $380,000, but closer to $1.5 million.

The Truth As Opposed to Wes Choy's Story

Wes Choy's story clearly demonstrates in every possible way his total ignorance of the facts and issues involved in this case. First, the difference of $301,645 between CMC's subcontract quote and JHL's price for the Pump 1 job is not "profit." The difference constitutes the "coefficient" for the job. CMC, as the subcontractor, quoted JHL, as the general contractor, a price ($2,054,100) to do the entire job - including "Mob" (mobilization), Confined Space Assessment, Rigging &

7

Scaffolding, Crane Services, and all of the sixteen items listed on CMC's bid spread sheet (see **Exhibit 1** attached hereto). What CMC did not agree to do, and could not agree to do, was perform the tasks required to be performed by the general contractor, JHL. These general contractor tasks included hiring of a Quality Control person, a Safety Officer, a Project Engineer, and a Project Manager for a period of over two years, including all the associated costs of hiring these four individuals (payroll taxes, TDI, unemployment, worker's comp, and health insurance). CMC also did not cover, in its bid, the cost for the Hawaii State general excise tax (4%), the bonding cost (1%), and the general liability insurance cost (0.85%). These excise tax, bonding, and general liability insurance costs alone for a project priced at over $2,000,000 amounted to about $120,000. This does not include indirect costs that should be assigned to this job by JHL as well (office rent, cost of office support staff, etc.). The $301,645 which Wes Choy refers to as "profit" was in actuality not even enough to cover JHL's costs on the job.

Second, Choy is under the misconception that JHL negotiated for the first time with Marisco *after* the Pump 1 contract was awarded. As the Declaration of Marisco's owner, Fred Anawati, states, Marisco became aware that the Pump 1 job had been assigned to JHL and submitted an unsolicited bid to JHL *before* negotiations on the Pump 1 job were completed, all the while wondering why CMC was the subcontractor with which JHL was dealing when Marisco was the most experienced contractor with Drydock 4. What Marisco did not know was that the Government contracting officer, Pam Morisaki, insisted that JHL deal with CMC and not Marisco. When JHL's agent, Jeff Ulep, received Marsico's unsolicited bid, he did not present it to the Government because the Government had made it clear that it wanted to deal with CMC. It was only after the Pump 1 job had been awarded that Jeff Ulep, JHL's negotiator, showed the Marisco bid to Defendant who had not been involved with the Pump 1 negotiations at all. When Defendant saw that Marisco's

8

$845,000 bid to do the Pump 1 job was much lower than CMC's bid, Defendant began to investigate using Marisco. After JHL dropped CMC and entered into contracts with Marisco for the Drydock 4, Pump 1 job and the Drydock 2, Pumps 2 and 3 job, it was discovered by both Marisco and JHL that the Marisco bids were wholly inadequate to do the work requested. This occurred because Mr. Anawati assumed that the Pump 1 contract called for "repair" of the pump, but he later discovered, after entering into the subcontract agreement with JHL, that the Pump 1 contract called for "upgrading and renewal" of the pump, a much more expensive proposition. This is why JHL sent a letter to Marisco terminating Marisco's contracts (see Exhibit B to Anawati's Declaration). The idea that Marisco's bid was 50% of CMC's bid to perform the same work is ridiculous to anyone who has taken the trouble to understand the facts of this case.

Third, Choy's analysis of JHL's supposed savings by entering into contracts with HSI and Conhagen is just plain absurd, again displaying his ignorance of the facts and issues in this case. Choy says that because JHL entered into contracts with HSI and Conhagen to do the motor and pump upgrading and renewal for a total of $536,699, JHL created a total profit of $1,819,046. A simple review of the line items for the Pump 2 job (Exhibit 7, last page, of Defendant's Memorandum) shows the absurdity of Choy's statement. The only portion of the eighteen items listed in the line item table to be performed by HSI and Conhagen are items 9, 10, and 11, a total of $874,120 out of the total contract price of $2,150,000. Who is supposed to the perform the tasks listed in the other fifteen line items - mobilization, project manager coordination, confined space assessment, rigging and scaffoldings, lead paint abatement, crane services, condition reports, assist PHNY, pump start-up and testing, shipping and insurance, refurbish seal water system, incidental (baffel, access cover, gutter, grout spider, etc.), electrical power and control work, painting, demobilization? Not HSI and Conhagen. These are all jobs that were to be performed by JHL and its other subcontractors. In

other words, when CMC bid the job, CMC agreed to take on all these responsibilities of the job, which is why its bid was over $2 million. The only tasks CMC did not take over were tasks, such as supervision of the subcontractor, which it could not take over as noted above. CMC also did not assume excise tax, bond costs, general liability insurance, etc., which were included in the difference between CMC's cost and the contract price (which, as pointed out above, Choy incorrectly refers to as "profit" being ignorant of the fact that the difference is actually the coefficient for the Pump 1 contract). When JHL dropped CMC and subcontracted with HSI and Conhagen, JHL took on most of the tasks that CMC had originally contracted to perform. Wes Choy appears to be ignorant of this fact, although he should be aware of it because he had a chance to review the scope of work provided by HSI and Conhagen which clearly did not include the fifteen line item tasks that had to be assumed by JHL and its other subcontractors. The so-called $1.8 million savings which Choy claims was gained by JHL when JHL subcontracted with HSI and Conhagen was actually $1.8 million in costs assumed by JHL and JHL's other subcontractors.

Fourth, Choy's belief that Defendant was trying to trick the Government in the Pump 2 negotiations by hiding the fact that JHL had saved over $1.5 million by contracting with HSI and Conhagen is incorrect as shown above. Choy made a bunch of "assumptions" and had a bunch of "beliefs" none of which were true. His "assumption" that JHL had saved over $1.5 million was based on his total lack of understanding that JHL had taken on fifteen of the eighteen tasks listed in the line item table for the job. His "belief" that JHL should be able to quote a lower price to do the Pump 2 based on the probability that JHL would have already completed the Pump 1 job is nothing but wishful thinking. By the time the Pump 2 contract was being negotiated, the Pump 1 job had yet to be performed. The Pump 1 job has still yet to be performed. As noted in Defendant's Memorandum, if anything, it appears that a $2,150,000 price to do the Pump 2 job is not enough

based on the experience that JHL had with the underbidding by HSI on the Pump 1 job (as explained in Defendant's Memorandum) and the problems that are already being encountered at Drydock 2 (an easier job than Drydock 4 because the pumps and motors at Drydock 2 are much more accessible than the pumps and motors at Drydock 4).

Fifth, Choy claims that his "estimate" for the Pump 2 job of $2,211,250 was based on his lack of knowledge that JHL had "saved" $1.5 million by subcontracting with HSI and Conhagen. As explained above, JHL did not "save" $1.5 million by subcontracting with HSI and Conhagen, in fact JHL and its other subcontractors undertook to perform the major portion of the work. For Choy not to understand this and claim that JHL increased its profit by $1.5 million by subcontracting with HSI and Conhagen is incredible. Choy also claims that his "estimate" is not an estimate of "value" of the job, only a number used to encumber funds with no meaning beyond this. It is difficult to imagine that Choy really believes what he is saying. In any case, the FAR clearly sets out the purpose of requiring the Government to determine its own estimate for a job before beginning negotiations, and the purpose is not merely to encumber funds. At p. 27 of Defendant's Memorandum, FAR 15.405(a) and (b) are cited along with the SBA's regulations for dealing with 8(a) contractors as follows:

> FAR 15.405(a) states the purpose of requiring the Government to determine its own estimate for a job before beginning negotiations:
>> The purpose of performing cost or price analysis is to develop a negotiation position that permits the contracting officer and the offeror an opportunity to reach agreement on *a fair and reasonable price* [emphasis added].
>
> FAR 15.405(b) goes on to state:
>> The contracting officer's primary concern is the overall price the Government will actually pay. The contracting officer's objective is to negotiate a contract of a type and with a price providing the contractor the greatest incentive for efficient and economical performance. The negotiation of a contract type and a price are related and should be considered together with the issues of risk and uncertainty to the contractor and the Government. Therefore, the contracting officer should not become preoccupied with any single element and should balance the contract type, cost, and profit or fee negotiated to achieve a total result - *a price that is fair and reasonable*

> *to both the Government and the contractor* [emphasis added].
>
> Section 19.807(a) of the Small Business Administration's regulations for dealing with 8(a) contractors like JHL states, "The contracting officer shall estimate *the fair market price* of the work to be performed by the 8(a) contractor [emphasis added]."

Note that the FAR stresses that the *primary concern* of the Government should be the *overall price* and that the Government "should not become preoccupied with any single element and should balance the contract type, cost, and profit or fee negotiated to achieve a total result - *a price that is fair and reasonable to both the Government and the contractor*." During the Pump 2 negotiations in this case, apparently in part because of his complete misunderstanding of the tasks to be undertaken by HSI and Conhagen, Choy acted in a manner completely opposite to a concern for the overall price and a fair price for JHL. Choy's only concern was to stuff the 0% coefficient down JHL's throat, as stated above. As the FAR and SBA regulations state, the purpose of the Government's estimate is to determine a "fair and reasonable price" for the job or a "fair market price" of the work to be performed. Choy admits that he completely underestimated the cost of the job during the Pump 1 negotiations. His estimate was $1,223,117 for the Pump 1 job, and he ultimately had to officially increase his estimate to conform to the final contract price for the Pump 1 job as negotiated by CMC for JHL of $2,355,745 so that the Government's contracting officer could award the Pump 1 contract.

Sixth, the Government relies on FBI S/A Bill Denson's summary of the interview he had with Defendant at the time the FBI served its warrant on Defendant's business. Again, Defendant did not try to hide what he had done. He fully admitted what he did was wrong, and he tried to explain the complicated negotiation process to S/A Denson who had no idea what Defendant was talking about because Denson did not have the background in government contracting to understand what Defendant was saying. As explained in the Defendant's Memorandum, Defendant tried to explain

the 0% coefficient problem to Denson, but Denson did not want to hear Defendant's explanation because Denson assumed he knew what this case was all about - he assumed Defendant was trying to defraud the Government, and this is the reason he directed HSI representative Ray Jose to try to get Defendant to pay Jose a "kickback" in a tape-recorded phone conversation. Of course, Defendant did not agree to pay any "kickback" (in fact, Defendant said this would be illegal, and he was not going to do any such thing) because Defendant was talking to Jose about the 0% coefficient problem and the need for JHL simply to obtain reasonable profit and overhead. As set out in detail in Defendant's Memorandum, this is exactly what Defendant said in his taped conversation with Jose. Amazingly, even though Defendant spent time with Denson discussing the 0% coefficient problem, the same problem that Denson had already heard Defendant discussing with Jose in the taped phone conversation, Denson mentions *nothing* about this problem in his summary of Defendant's statement. Of course, in typical FBI fashion, the statement made by Defendant to Denson was not tape-recorded, so we are merely left with Denson's summary about what he believed Defendant was trying to say colored completely by Denson's lack of understanding of the problems involved in this case - especially the problem of the Government's improper assignment of the Pump 2 job to a 0% coefficient IDIQ JOC contract. In Defendant's hand-written short statement that was completed at the end of the Denson interview, Defendant does mention his desire to "cover the overhead cost and profit." When Denson summarized what Defendant was trying to explain to him about the difference between the CMC and Marisco (Denson spells it "Morisco") prices, Denson completely missed what Defendant was trying to explain about the Marisco quote. As explained above, the Marisco quote of $845,000 to do the Pump 1 job was wholly inadequate and based on a misapprehension on Mr. Anawati's part as to what the Pump 1 job entailed - Anawati assumed the job was for "repair" and later discovered the job was for "upgrading and renewal," a much more expensive proposition.

13

Again, Mr. Anawati expresses his opinion in his Declaration that a $2,150,000 price to do the Pump 2 job was reasonable. While Defendant may have stated he did not want to "raise a red flag" as to the HSI quotation, this statement was made in the context of explaining how Defendant was attempting to recover reasonable profit and overhead for JHL on a 0% coefficient contract, not in the context of admitting that he was attempting to "defraud" the Government. If it was really true that the Marisco price was 50% lower than the CMC price, then why did JHL terminate the Marisco contract? As stated above, the Marisco contract was terminated by JHL because Marisco underestimated the scope of the job in its $845,000 bid. Defendant never stated to Denson that it was his intention to defraud the Government or steal money from the Government. Defendant did freely admit to Denson that he changed the HSI number and admitted that it was wrong. Defendant did not try to hide or deny what he had done, but Denson failed totally to understand Defendant's explanation of *why* he changed the HSI number. Quite simply, Denson did not want to hear Defendant's explanation because he assumed this was a case of fraud and theft, which it was not.

Conclusion

The Government's Memorandum is based almost entirely on Wes Choy's incredible statement that by subcontracting with HSI and Conhagen, JHL saved $1.5 million and was trying to hide this saving from the Government to make an unreasonable profit. The truth is just the opposite. The Government, mostly through Wes Choy during negotiations, was stuffing a 0% IDIQ JOC contract down JHL's throat thereby denying JHL reasonable profit and overhead in total breach of the principles set out in the FAR stating that a contractor is entitled to reasonable profit and overhead. Wes Choy believed, incorrectly, that HSI and Conhagen had contracted to perform all of the eighteen line item jobs to be performed on the Pump 2 job, where the truth was that HSI and Conhagen had only contracted to do three of the eighteen line item jobs. For Wes Choy to be

14

confused about this matter is absolutely incredible and shows his complete ignorance of what this job entailed.

The Government completely failed to address the detailed explanation in Defendant's Memorandum about Defendant's state of mind and intent during the Pump 2 negotiations. Instead, the Government made up a story based on Wes Choy's complete misunderstanding about the facts of this case to make it appear that Defendant intended to "defraud" the Government rather than accept responsibility for its own wrongdoing during the negotiations. The Government suggests that Defendant and JHL could simply have refused to take on the Pump 2 job if JHL was being denied its reasonable profit and overhead. First, this is simply an unrealistic and naive view of government contracting. The Government is the sole provider of contracts for government contractors. Government contractors earn a living by accepting government jobs, especially IDIQ jobs which the Government distributes or offers for bid amongst IDIQ contractors. A contractor who says "no" to the Government, especially with respect to IDIQ jobs, will not be seeing jobs in the future. Second, the fact that Defendant and JHL chose to take on a difficult job to negotiate because it was assigned to JHL under a 0% coefficient IDIQ JOC does not mean that JHL simply had to accept an unreasonable price which denied JHL profit and overhead. The FAR still requires a fair overall contract price. This is why Mr. Hokama stated in his Declaration attached to Defendant's Memorandum that, if this matter had come to his attention, he would have approved JHL's best and final offer at $2,150,000 as a fair price for both sides in spite of the 0% coefficient in the JOC. As Mr. Gordon stated in his Declaration attached to Defendant's Memorandum, Defendant adopted "bad practice" in his attempt to rush a close to negotiations before the end of the Government's fiscal year, even though Defendant was "good-intentioned." The fact that Defendant was guilty of "bad practice," which he has fully admitted, does not mean that there was any "loss" to the Government

in this case. The truth is that there was no "loss" for Guideline calculation purposes in this case. There was no actual loss, and there was no "intended" loss. The best and final offer made by JHL in the negotiations was a fair and reasonable price, and there is no way that a price $380,000 lower could be considered to have been "fair and reasonable." Because there was no "loss" for Guideline purposes in this case, the proper Guideline Level calculation in this case is 4 before consideration of an even lower Guideline Level based on substantial rehabilitation.

DATED: Honolulu, Hawaii, February 22, 2006.

_____
SAMUEL P. KING, JR.
Attorney for Defendant