IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) Cr. No. 04-00150 SOM |
| | ) |
| vs. | ) 18 USC 1001 |
| | ) |
| PATRICK SHIN (01), | ) DECLARATION OF FRED ANAWATI; |
| | ) EXHIBITS A and B |
| Defendant. | ) |
| | ) |

## DECLARATION OF FRED ANAWATI

I, FRED ANAWATI, declare and say:

I am personally familiar with the facts stated herein.

I was born in Alexandria, Egypt and came to the United States in 1957. I graduated from Cal Poly in 1964 with a B.S. degree in agricultural engineering. For four years, I ran my own business in California building small boats and repairing all kinds of equipment from water pumps to vehicles. I came to Hawaii in 1968 to work for Mark Watase (a construction firm), then Hawaii Crane and Rigging Company, and then Dillingham Shipyard. In 1973, I became a United States citizen and started my own company, Marisco, which is now the largest private machine shop in the State of Hawaii. Marisco facilities include complete ship repair, welding and fabrication services, precision pipe fitting and bending, sandblasting and painting, and a machine shop. Marisco also has a Agreement of Boat Repair with the Department of the Navy which includes various services and construction contracts at the Pearl Harbor Shipyard from drydock repair to ship repair.

I am very familiar with the pumps and motors at Drydock #4 at Pearl Harbor. Because the Drydock was built in the early 1940's, its various components require constant repair and/or replacement. Marisco has been involved with various repair and/or replacement contracts at

Drydock #4 since 1973. In particular, Marisco has repaired the pumps at Drydock #4 numerous times throughout the years making Marisco the most experienced contractor with respect to repairs at Drydock #4 in the State of Hawaii. Marisco has installed new hydraulic control systems for all the pumps at DD4, and is presently working on a feasibility study for replacement of all the pumps at DD4. In the mid-1990's, Marisco was hired by Okahara & Associates, a mechanical engineering firm, to write the specifications for overhauling Pump #3 at Drydock #4. Because I had written the specifications for the job, I did not bid on the job. The California company which was awarded the contract was unable to perform because the overhaul was too difficult - the company could not handle the risk of the job. After the California company declared bankruptcy and abandoned the job, Marisco was ultimately hired by the surety company to complete the overhaul which Marisco did successfully.

In August 2002, I learned that the Navy was proposing that work be performed on the Pump #1 at Drydock #4 and that JHL was the contractor. I did not see the plans and specifications for the proposed work, and I assumed it was repair work that was being proposed. Based on this assumption, I had my company, Marisco, submit to JHL an unsolicited bid to repair Pump #1, Drydock #4. A copy of the bid is attached hereto as **Exhibit A**. The price I quoted at that time was $845,000. Attached to my quotation was my proposed scope of work and the NAVSEA standard requirements for this type of work (I used the NAVSEA standards, even though I know the Navy does not use them for construction projects, because these standards are used throughout the industry and they fix the requirements of the job). My bid was submitted to JHL prior to the final award of the contract to JHL. I do not know if JHL forwarded my bid on to the Government negotiators. I did not negotiate or deal in any way with Patrick Shin with regard to this bid. The contract was finally awarded to JHL, and my bid was not accepted by

JHL.

Sometime shortly after the contract was awarded to JHL, I was contacted by Jeff Ulep of JHL to submit a bid on Drydock #2, Pumps #2 and #3. Apparently, the JHL contract had been awarded for DD4, Pump#1, and DD2, Pumps #2 and #3. I submitted Marisco's bid on DD2, Pumps #2 and #3. During this period of time, Marisco was doing repair work at all the drydocks at Pearl Harbor through J. A. Jones. Eventually, in October 2002, Marisco entered into Subcontract Agreements for DD4, Pump #1, and DD2, Pumps #2 and #3. The DD4, Pump #1 contract was for my original quote of $845,000.

Shortly after the Subcontract Agreements were awarded to Marisco by JHL, I discovered that the DD2, Pumps #2 and #3 price quotation Marisco submitted to JHL was for one pump only and that the price needed to be doubled for both pumps at DD2. I also discovered that my assumption about the work to be done on Pump #1 at DD4 was incorrect. As stated above, I had assumed that the work was for *repair* of the pump. I discovered that the work encompassed much more and was more accurately described as *upgrading and renewal* of the majority of the pump components because the specifications called for manufacture of new components (these components are not available any longer - the pump manufacturer is no longer in business and the motor manufacturer no longer has replacement parts), a job requiring much more funding, engineering, labor, and material. It was apparent that my original quote of $845,000 to do a repair job was wholly inadequate to do an upgrading and renewal job. For example, my original quotation did not include expense for new shaft bearing shells, for new water piping, for new spiders (elements that hold the shaft in place) (the "plans and specifications" do not indicate how many spider footings need to be replaced - there are eight footings total - or the extent of repair needed), for testing, for grouting and/or cutting into the concrete which housed the shaft and

3

spiders, etc. At one place, the "plans and specifications" call for a "dip and bake" of the motor, but at another place, the "plans and specifications" call for "rewinding" the motor, a much more difficult job requiring the motor to be shipped to the mainland and requiring more material, labor, time, and funding. Also, once I reviewed the "plans and specifications" which had been prepared for the job, I noted that the "plans and specifications" were wholly inadequate to describe everything that needed to done for the job. For example, there was no quantification or qualification of what needed to be done. There were no performance specifications. The "plans and specifications" prepared were completely inadequate to meet the requirements of the FAR (Federal Acquisition Regulation). Basically, the "plans and specifications" were not sufficient to permit preparation of a firm fixed price contract quotation. The plans called for "repair" of the pump, but the extent of repair could not be determined until the pump was inspected. There were no parameters set for the electrical field tests. The plans called for repair and overhaul of the motor, but the extent of repair could not be determined until after tests and inspections were completed. No operational tests specifications were provided. The plans use clearly outdated specifications for the babbiting of the bearings. Basically, the interpretation and intent of the "specifications" as written were in conflict in many areas, and to the present day, I cannot fully comprehend the intent of the "plans and specifications." Based on my concerns about the scope of the work to be performed and Marisco's inability to quote a firm fixed price without much more information, JHL decided to terminate the Subcontract Agreements with Marisco. A copy of the termination letter is attached hereto as **Exhibit B**.

I have been advised that the best and final offer made by JHL to the Government to perform the DD4, Pump #2 job (identical to Pump #1) was approximately $2,150,000. Based on my review of the "plans and specifications" for the job, my extensive knowledge of and

4

experience with the pumps in DD4, and my understanding of the scope of the job requested for the Pump #2, that is upgrading and renewal, not simply repair, the risks involved with the job, and the amount of time required to complete the job (depending as it does on the Navy's schedule, which sometimes requires stopping work in the middle of the job because the Navy needs to use the Drydock which in turn requires demobilization and remobilation every time there is a stoppage of work), I consider JHL's best and final offer of $2,150,000 for the Pump #2 job to a fair and equitable price.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

DATED: Honolulu, Hawaii, February 17, 2006.

_____
FRED ANAWATI