IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PATRICK SHIN, | ) | CRIM. NO. 04-00150 SOM |
| | ) | CIV. NO. 15-00377 SOM-RLP |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER REGARDING DISCOVERY |
| UNITED STATES OF AMERICA, | ) | APPEALS |
| | ) | |
| Respondent. | ) | |
| | ) | |
| | ) | |
| | ) | |
| | ) | |

**ORDER REGARDING DISCOVERY APPEALS**

I.        **INTRODUCTION.**

         Defendant Patrick Shin pled guilty with a plea
agreement to having made a false statement to the Government in
violation of 18 U.S.C. § 1001.  He was sentenced in 2006 to three
years of probation and a fine.  He has already completed his term
of probation and paid the applicable fine.  Shin now challenges
his conviction, over nine years after it was imposed, through the
common law writs of coram nobis and audita querela.

         In his Verified Petition for Writ of Error Coram Nobis,
or Alternatively, for Writ of Audita Querela, Shin argues that
recently discovered exculpatory evidence should have been
disclosed by the Government to Shin before he entered his guilty
plea.  Specifically, Shin contends that the Government wrongfully
withheld evidence that Wesley Choy, a Department of the Navy
engineer involved in the contracting process, could not have

testified as to an essential element of the false statement charge.  Shin says that his conviction should therefore be vacated.

Before the court are appeals from discovery orders by the Magistrate Judge.  Shin had contacted the Government about deposing Choy, as well as another Navy employee involved in the contracting process, Annette Ching.  When the Government declined to permit the depositions, Shin moved for a court order permitting them.  The Magistrate Judge issued a minute order granting Shin's request to depose Choy, but denying him leave to depose Ching.

The Government appealed the Magistrate Judge's ruling as to Choy.  Shin asked the Magistrate Judge to reconsider the denial of the request to depose Ching.  The Magistrate Judge denied reconsideration, and Shin filed his own appeal as to Ching's deposition.

For the reasons discussed below, this court affirms the Magistrate Judge's denial of leave to take Ching's deposition, but reverses the grant of leave to take Choy's deposition.

II.      **BACKGROUND.**

At all times material to the conviction, Shin was authorized to act as an agent on behalf of JHL Construction, Inc., a general contracting company owned by Shin's nephew, James

Lee.  <u>See</u> ECF No. 1, PageID # 8.[1]

In 2003, JHL was awarded a job order contract ("JOC")
by the Navy.  JOCs are based on pre-priced construction tasks.
The prices typically come from a unit price book.  <u>See id.</u>  The
Navy's unit price books list average costs that might be higher
or lower than the actual costs in a particular local economy.
<u>See id.</u>, PageID # 10.  Using the unit prices relied on by a
customer such as the Navy, a contractor proposes an appropriate
coefficient to apply to the unit prices in order to cover
overhead and profit, thereby arriving at the contract cost.  <u>See</u>
<u>id.</u>, PageID #s 10-11.

JHL anticipated that the unit prices would exceed JHL's
actual costs.  <u>See id.</u>, PageID #s 12-13.  Because JHL would make
a profit without adding any coefficient, JHL proposed a 0%
coefficient and was awarded a zero coefficient contract.  <u>See</u>
<u>id.</u>, PageID #s 8-13.

Once awarded to a contractor, a JOC allows an agency to
approach and negotiate with the contractor directly, as
construction needs come up.  <u>See id.</u>  In August 2003, the Navy
asked JHL to provide a proposal under the JOC for the overhaul of
Pump # 2, Drydock # 4, at Pearl Harbor Naval Shipyard.  <u>See id.</u>,
PageID #s 13-14.  The Navy was under pressure to award a number

---

[1]    Unless otherwise noted, the record citations are to
Shin's civil matter, Civ. No. 15-00377.

of work orders by the end of the Government's fiscal year (September 30, 2003), and assigning the Pump # 2 project to JHL's JOC was seen as a quick way to use current year funding.  See id.

JHL provided a proposal for $2,360,153, which was forwarded to the Navy's Engineering Department for a technical review of the costs.  See id., PageID # 31.  Wesley Choy, a mechanical engineer with the Navy's Engineering Department, questioned the costs, which he viewed as high.  See id., PageID #s 18-19.  The costs were not broken down, and he could not tell how the final number had been reached.  See id.  Choy asked the contract administrator, Annette Ching, to get subcontractor quotes from JHL to substantiate the proposal costs.  See id.

On August 26, 2003, JHL submitted a second proposal for the reduced amount of $2,205,138.  See id., PageID # 31.  The second proposal did not include either a line item breakdown of costs or the requested subcontractor quotes.  Choy asked Shin for the subcontractor quotes from the proposed subcontractors, HSI Electric, Inc., and Alfred Conhagen, Inc.  See id.

On September 4, 2003, Shin called HSI and asked it to mark up its quote by $100,000, but to invoice JHL the original amount without the $100,000 markup.  See Crim. No. 04-00150, ECF No. 64, ¶ 15.  HSI contacted the FBI to inform it of Shin's request.  See ECF No. 1, PageID # 23.

As directed by the FBI, HSI then gave Shin the

4

requested quote with the inflated price.  See id., PageID # 24.
However, instead of submitting this quote to the Navy, Shin
submitted HSI's quote from July 10, 2003, which concerned work on
Pump # 1.  See Crim. No. 04-00150, ECF No. 64, ¶ 17.  Shin used
white-out to alter the $114,733 price on the 2003 quote to
$314,733.  See id.

On September 4, 2003, Shin asked Conhagen to increase
its quote by $180,000, bringing the contract amount from $377,260
to $557,260.  Conhagen provided Shin with the requested quote for
$557,260.  See id., ¶ 18.

On September 8, 2003, Shin met with Choy and Ching,
providing them with the altered quotes from HSI and Conhagen and
ultimately submitting JHL's best and final offer of $2,150,000.
See ECF No. 1, PageID # 29.

On September 23, 2003, federal agents executed a search
warrant at Shin's business office.  See id., PageID # 25.  Shin
confessed at that time to having submitted altered and inflated
figures for the Pump # 2 job, explaining that the real
subcontractor quotes would not have supported the cost proposal
and would have caused the Navy to question the legitimacy of the
proposal.  See Crim. No. 04-00150, ECF No. 64, ¶ 20.  He said
that, while Conhagen had provided an inflated quote as he had
requested, HSI's failure to do so right away had caused him to
doctor HSI's quote from a previous job.  See id.

5

The Pump # 2 project did not involve pre-priced tasks listed in the Navy's unit book. For that reason, performing work on Pump # 2 under JHL's zero coefficient JOC did not allow JHL to recover any overhead or profit. Shin said the inflated subcontractor quotes were requested as a way to provide for overhead and profit. See id.

The Government charged Shin with making a false statement to a federal official. On April 21, 2004, pursuant to a memorandum of plea agreement, Shin pled guilty to having made a false statement to the United States. See Crim. No. 04-00150, ECF No. 8. On March 8, 2006, Shin was sentenced to three years of probation, with twelve days in intermittent confinement, and a fine of $100,000. See Crim. No. 04-00150, ECF No. 99.

During sentencing proceedings, Shin argued that the Pump # 2 job was not pre-priced and therefore had been improperly assigned under JHL's zero coefficient JOC, depriving JHL of a chance to recover overhead and profit. See id., Page #s 22-26. Shin contended that he had altered the subcontractor quotes only to recover a reasonable profit on the job. See id., Page # 24. He denied any malicious intent, but acknowledged that the way he had handled the situation was wrong. See id., Page # 57. This court determined that "there was clearly an intent to deceive," and called the offense a "dishonesty kind[] of crime[]," see id., Page # 53, but imposed a sentence that reflected the court's

6

determination that the Government had failed to prove that Shin had intended to cause a loss.  See id., Page # 37.

Afer he was sentenced, Shin reached out to Choy several times to talk about Choy's role in the prosecution and to ask him for a written statement.  See Crim. No. 04-00150, ECF No. 91, PageID # 271.  Choy originally said that Government lawyers had told him not to provide any such written statement without approval from the U.S. Attorney's Office.  See id., PageID #s 271-72.  Ultimately, in approximately April 2014, Choy provided a typed, unsigned "clarification" statement regarding his role in the contracting process.  See id., PageID # 272.

Choy's "clarification" statement includes the following points:  1) he recalled having stated at a meeting with Shin in 2003 that he understood that Shin needed to "roll" overhead and profit into the line items, given the zero coefficient contract, but that that was a contractual rather than technical issue; 2) imposing a zero coefficient contract on JHL would not be fair or reasonable; 3) Choy was surprised to hear that the project had a zero coefficient; and 4) Choy had turned the issue over to the contracting officer as the person authorized to resolve the matter.  See Crim. No. 04-00150, ECF No. 91-2.

In May 2015, Shin spoke with Choy regarding Choy's communications with "the Prosecutor and the Prosecutor's investigators."  See Crim. No. 04-00150, ECF No. 91, PageID #

7

276.   Unbeknownst to Choy, Shin tape recorded the conversation. See ECF No. 12-3.  When Shin asked Choy whether he had communicated to the Government personnel any of the points made in his April 2014 "clarification" statement, Choy allegedly stated that he had told the Government personnel (i.e., "the Prosecutor and the Prosecutor's investigators") that he did not have the authority to decide whether JHL needed to be awarded extra money in the zero coefficient contract to cover its legitimate and reasonable overhead and profit.  See Crim. No. 04-00150, ECF No. 91, PageID #s 277-78.  Choy also allegedly told Shin:  1) the prosecuting authorities "point[ed] the gun" on him regarding his authority to decide the zero coefficient issue; 2) the prosecuting authorities "hid" the fact that Choy was not authorized to deal with the zero coefficient issue; 3) the prosecuting authorities only "hear what they want to hear . . . to make their case"; and 4) the declaration that the prosecuting authorities had Choy sign was "sneaky" and "twist[ed]" the facts he had given the Government personnel.  See id.

On September 22, 2015, Shin moved for a writ of coram nobis or, in the alternative, audita querela to:  1) vacate Shin's federal criminal conviction on one count of False Statement pursuant to 18 U.S.C. § 1001(a)(3); and 2) grant Shin leave to withdraw his prior guilty plea in this case.  See id., PageID # 243.

8

As noted earlier, Shin moved for leave to take the depositions of Choy and Ching in aid of supporting his request for a writ of coram nobis or audita querela.  See ECF No. 14. Before the Government could respond to the motion for leave to take the depositions, the Magistrate Judge issued a minute order granting Shin's request to depose Choy, but denying his request to depose Ching.  See ECF No. 15.  The Magistrate Judge explained, "Based on the factual issues raised in the United States' Opposition, Petitioner Patrick Shin has demonstrated good cause to allow him to take the deposition of Wesley Choy.  The Court finds that Petitioner Patrick Shin has failed to demonstrate good cause to take the deposition of Annette Ching." See id.

The Government appealed the Magistrate Judge's grant of leave to depose Choy.  See ECF No. 17.  Shin sought reconsideration of the denial of his request to depose Ching. The Magistrate Judge denied Shin's reconsideration motion, see ECF No. 21, and Shin appealed the denial of leave to depose Ching, see ECF No. 23.

III.     **ANALYSIS.**

Shin sought discovery in connection with both his request for a writ of coram nobis and his request for a writ of audita querela.  See ECF No. 1.  However, as Shin is aware, a writ of error audita querela is a writ of last resort available

9

only when all other post-conviction remedies have been exhausted.
See United States v. Valdez-Pacheco, 237 F.3d 1077, 1080 (9th
Cir. 2001); see also United States v. Baptista, No. CR 10-00050
PJH, 2013 WL 4014965, at *3 (N.D. Cal. Aug. 5, 2013).  Shin seeks
a writ of audita querela only as an alternative to a writ of
coram nobis.  See ECF No. 1.  Because Shin's request for a writ
of coram nobis is still pending, it is premature at this point
for Shin to seek discovery in aid of a writ of audita querela.
Accordingly, this court addresses Shin's discovery request in the
context of only his request for a writ for coram nobis.

A.   **Applicable Standards.**

1.   **Appeal of a Nondispositive Matter.**

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 74.1,
a party may appeal to a district judge any pretrial
nondispositive matter determined by a magistrate judge.  Under 28
U.S.C. § 636(b)(1)(A), a magistrate judge's order may be reversed
by a district court only if it is "clearly erroneous or contrary
to law."

"A finding is 'clearly erroneous' when, although there
is evidence to support it, the reviewing court on the entire
evidence is left with the definite and firm conviction that a
mistake has been committed."  United States v. U.S. Gypsum Co.,
333 U.S. 364, 395 (1948).  See also Thorp v. Kepoo, 100 F. Supp.
2d 1258, 1260 (D. Haw. 2000) (stating that clearly erroneous

10

standard is "significantly deferential, requiring a definite and firm conviction that a mistake has been committed").

A magistrate judge's nondispositive order is "contrary to law" when the magistrate judge "fails to consider an element of the applicable legal standard." Durham v. Cnty. of Maui, 742 F. Supp. 2d 1121, 1127 (D. Haw. 2010).

The Magistrate Judge's minute order that is the subject of the two appeals now before this court concerns a nondispositive matter to which the "clearly erroneous or contrary to law" standard would ordinarily apply. However, the minute order was entered so promptly that the Government had no opportunity to respond to Shin's motion seeking leave to depose Choy and Ching. This court is by no means suggesting that the Magistrate Judge should never act with such alacrity. Indeed, this district judge herself has entered orders without waiting for opposition memoranda when the merits (or lack thereof) of motions appeared not subject to debate. Acting so quickly, however, does mean that if an appeal is taken, the reviewing judge is the first judge to hear the would-be respondent's position. This matters only with respect to the Choy deposition, as the Magistrate Judge's lack of a Government opposition to the Ching deposition did not prejudice any party. That is, the Government is satisfied with the Magistrate Judge's denial of leave to take the Ching deposition, and Shin cannot complain that

11

the denial was entered even without a Government brief urging
denial.  With respect, however, to the grant of leave to take the
Choy deposition, it may well be the fairer approach to consider
the matter de novo.  It happens that, in this case, the standard
of review makes no difference.  Even if this court applies the
"clearly erroneous or contrary to law" standard, Shin is not
entitled to depose Choy.

### 2.  Discovery in Coram Nobis Proceedings.

A writ of coram nobis is "a highly unusual remedy,
available only to correct grave injustices in a narrow range of
cases where no more conventional remedy is applicable."  United
States v. Riedl, 496 F.3d 1003, 1005 (9th Cir. 2007).  A petition
for writ of coram nobis is a collateral attack on a criminal
conviction.  Telink, Inc., v. United States, 24 F.3d 42, 45 (9th
Cir. 1994).  It allows an attack on a conviction when the
petitioner has already finished his sentence and is no longer in
custody.  McKinney v. United States, 71 F.3d 779, 781 (9th Cir.
1995) (citing Telink, 24 F.3d at 45).  It has been described as
"fill[ing] a very precise gap in federal criminal procedure."
Telink, 24 F.3d at 45 (explaining that coram nobis is available
when there is no statutory basis for a remedy for one who has
already served his sentence).

To qualify for coram nobis relief, a petitioner must
establish all of the following factors:  (1) a more usual remedy

12

is not available; (2) valid reasons exist for not attacking the conviction earlier; (3) adverse consequences exist from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.  Hirabayashi v. United States, 828 F.2d 591, 604 (9th Cir. 1987).

In United States v. Morgan, 346 U.S. 502 (1954), the Supreme Court noted that a coram nobis petition "is of the same general character as one under 28 U.S.C § 2255." Id. at n.4.  In so stating, the Supreme Court "in effect, made a coram nobis motion an extension of § 2255 in cases where the applicant was no longer a federal prisoner."  United States v. Balistrieri, 606 F.2d 216, 220 (7th Cir. 1979), cert. denied, 446 U.S. 917 (1980).  A coram nobis petition is, thus, a "step in a criminal proceeding yet is, at the same time, civil in nature and subject to the civil rules of procedure."  Id. at 221.

Based on Morgan, courts have applied the discovery standard applicable to a § 2255 petition to a discovery request in support of a motion for a writ of coram nobis.  See, e.g., Balistrieri, 606 F.2d at 221; Venkataram v. United States, No. 06 CR 102 RPP, 2013 WL 245810, at *2 (S.D.N.Y. Jan. 23, 2013); Huff v. United States, No. 1:06-CR-71, 2012 WL 3126831, at *4 (E.D. Tenn. July 31, 2012); Cueto v. United States, No. 3:96-CR-30070-DRH-1, 2012 WL 525969, at *2 (S.D. Ill. Feb. 16,

2012); <u>Thomas v. United States</u>, No. RWT 10CV2274, 2012 WL 37521, at *4 (D. Md. Jan. 6, 2012).

A "habeas petitioner does not enjoy the presumptive entitlement to discovery of a traditional civil litigant." <u>Larkin v. Yates</u>, No. CV 09-2034-DSF (CT), 2009 WL 2049991, at *13 (C.D. Cal. July 9, 2009) (citing <u>Bracy v. Gramley</u>, 520 U.S. 899, 903-05 (1997)). "It is clear that there was no intention to extend to habeas corpus, as a matter of right, the broad discovery provisions . . . of [the Federal Rules of Civil Procedure]." <u>Harris v. Nelson</u>, 394 U.S. 296, 300 (1969).

A discovery request in a § 2255 proceeding is governed by Rule 6(a) of the Rules Governing Section 2255 Proceedings for the United States District Courts. <u>See, e.g.</u>, <u>United States v. Finkel</u>, 165 Fed. Appx. 531, 533 (9th Cir. 2006). Rule 6(a) provides that a "judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery." Rules Governing Section 2255 Proceedings, Rs. 1, 6(a) (2010). Good cause is shown "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" <u>Pham v. Terhune</u>, 400 F.3d 740, 743 (9th Cir. 2005) (citing <u>Bracy</u>, 520 U.S. at 908-09) (ellipses in original)). Rule 6(a) discovery is not appropriate when the discovery requests are mere "fishing

14

expeditions" to investigate speculation or to "'explore [the movant's] case in search of its existence.'"  Calderon v. U.S. Dist. Ct. N.D. Cal., 98 F.3d 1102, 1106 (9th Cir. 1996).

Although Shin argues that his discovery requests should be governed by the broad discovery provisions of the Federal Rules of Civil Procedure that apply to a typical civil case, Shin offers no support for this contention other than to say that the Ninth Circuit has not yet addressed the particular standard for adjudicating a discovery request in support of coram nobis.  See ECF No. 14.  Shin insists that, under the Federal Rules of Civil Procedure, he is entitled to take Choy's deposition because it is "relevant to the issues raised by Shin in this coram nobis proceeding," and that he could have even deposed Choy "without leave of the court."  See ECF No. 14-1, PageID #s 197-98.  This court disagrees.

Broad discovery would be inconsistent with the Supreme Court's view that "[c]ontinuation of litigation after final judgment and exhaustion or waiver of any statutory right of review should be allowed through this extraordinary remedy only under circumstances compelling such action to achieve justice." Morgan, 346 U.S. at 511.  See also Strickler v. Greene, 527 U.S. 263, 286 (1999) ("Mere speculation that some exculpatory material may have been withheld is unlikely to establish good cause for a discovery request on collateral review.").  This court concludes

that the application of Rule 6(a)'s good cause standard here

would comport with statements by the Supreme Court, including its

pronouncement that a coram nobis petition should be treated as

being "of the same general character as [a habeas petition] under

28 U.S.C § 2255."  Morgan, 346 U.S. at 511 n.4.

Whether reviewing the Magistrate Judge's order de novo

or under the "clearly erroneous or contrary to law" standard,

this court concludes that Shin fails to establish that the

Magistrate Judge erred in concluding that the standard applicable

to a discovery request in the coram nobis context is good cause.

See ECF Nos. 14, 18, 22, 23.

### B.   Shin Has not Shown Good Cause to Take Choy's Deposition.

Shin seeks to depose Choy to obtain evidence supporting

the vacating of his conviction under 18 U.S.C. § 1001(a)(3) for

having made a false statement to the Government.  See ECF No. 1.

Shin alleges that the Government committed a Brady violation "by

failing to disclose key evidence which was exculpatory and/or was

material to the defense for impeachment purposes."  See ECF No.

22, PageID # 243 (citing Brady v. Maryland, 373 U.S. 83 (1967),

and Giglio v. United States, 405 U.S. 150 (1972)).

Section 1001(a)(3) imposes criminal liability for

"whoever, in any matter within the jurisdiction of the executive,

legislative, or judicial branch of the Government of the United

States, knowingly and willfully . . . makes or uses any false

16

writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." "A conviction under § 1001 requires the government to prove (1) a statement, (2) falsity, (3) materiality, (4) knowledge, and (5) jurisdiction." United States v. Peterson, 538 F.3d 1064, 1073 (9th Cir. 2008) (citing United States v. Ataliq, 502 F.3d 1063, 1066 (9th Cir. 2007)).

There is no dispute that Shin made a false statement to the Government in submitting a project bid with subcontractor quotes that were inflated by a total of $380,000. See ECF No. 1, PageID #s 25-26. But Shin says the Government failed to disclose that it could not have shown that the inflated quotes were "material," as required for a conviction at trial. See id.

"The element of materiality is evaluated under an objective test, in which the Court must examine 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end.'" United States v. Lindsey, No. 14-10004, 2016 WL 3536659, at *3 (9th Cir. June 28, 2016) (quoting Peterson, 538 F.3d at 1072).

"To be material a statement need only have the propensity or capacity to influence or affect an agency's decision." United States v. Rodriquez-Rodriquez, 840 F.2d 697, 700 (9th Cir. 1988) (citations omitted). "The agency need not rely on the information in fact for it to be material." Id.

"Materiality, therefore, is not measured by effect or magnitude." United States v. Facchini, 832 F.3d 1159, 1162 (9th Cir. 1987).

Materiality is a question for the trier-of-fact. See United States v. Gaudin, 515 U.S. 506, 511-15 (1995).

Shin seeks to depose Choy based on Choy's "clarification" statement, as well as on a later conversation that Shin tape recorded, allegedly showing that the Government withheld exculpatory evidence that Choy "was not a competent or qualified witness to testify about the issue of 'materiality.'" See ECF No. 1, PageID # 3.  Shin argues that Choy's post-sentencing statements show that Choy, far from helping the Government prove its case, would have "negated the 'materiality' element of the False Statement charge." See id.  Shin adds that this evidence also reveals that "Choy was an exculpatory witness regarding the issue of 'materiality'" because he showed by his comments that the false statement was not material to him. See id.

Choy's "clarification" statement reads:

(1) Clarification as to my role in this contract.  I am not a contracting official nor do I have the authority to revise a contractual requirement.  My task was to review the contractor's proposal to ensure that the contractor scope of work is in accordance with the Governments scope of work and provide an opinion on a fair and reasonable price for the Government.

(2) On 14 August 2003 despite the fact that the contractor's proposal was with range 6%

18

($148,903) of the Government estimate (GE
$2,211,250 vice contractor proposal
$2,360,153), I was requested by the
contracting administer to review the
contractor's proposal for technical
compliance (i.e. Contractor's scope of work)
and provide an opinion of a fair and
reasonable price.  Since the contractor
proposal consisted of aggregated pricing it
was difficulty to determine if the contractor
proposal was in practicable in line eh
Government scope of work, I requested to the
contracting administer if the contractor can
provide additional breakdown of their
proposal.

(3) On September 8, 2003, I attended a
meeting along with the contracting administer
in which Mr. Patrick Shin explained to the
Government that based on this contractor he
had a zero coefficient for this project.  I
recall stating that I understand that Mr.
Shined needed to "roll" this overhead and
profit into the line items since he had a
zero coefficient [1] but that is a
contractual issues and not a technical issue.

(4) My Government estimate was prepared with
a contractor coefficient.  It was my
understanding during this time that the
contractor's coefficient included their
overhead and profit so to not include a
coefficient would not be fair and would be
unreasonable.  I was surprised by the fact
that this project had a zero coefficient and
turned this issue to the contracting officer,
the authorized person, to resolve.

ECF No. 1, PageID #s 31-32 (grammar and spelling as in original).

Shin's allegations, and the evidence Shin points to in

support of these allegations, do not give this court reason to

believe that deposing Choy would enable or at least help Shin to

demonstrate that his conviction should be vacated.

Shin characterizes Choy's "clarification" statement as exculpatory, treating it as an admission by Choy that he could not have been a materiality witness for the Government. But this argument assumes that the Government had no other way of proving materiality. As it turns out, Choy was not the only source of materiality evidence.

The Government could have used testimony by Annette Ching, the contracting officer for the project bid, to prove that Shin's statement was material to the Navy in deciding whether to award the job to JHL. Ching's declaration indicates the type of testimony she may have given on the Government's behalf had Shin's case gone to trial. See ECF No. 11, PageID # 98. Ching states that she "was assigned responsibility for negotiating and recommending the award of a task order contract for the overhaul of Pump # 2, Dry Dock # 4 at the Pearl Harbor Naval Shipyard." See ECF No. 11-3, PageID # 120-21. She adds,

> I later learned from criminal investigators that the HSI Electric and Conhagen quotations given to me by Shin had been inflated by $380,000, by altering the original quotations. Had I known that the quotations were altered and inflated, I would have recommended against the award of the contract to JHL. I would have been concerned both about the actual costs incurred by JHL, and about the integrity of the company.

See id., PageID # 122.

Ching also states,

> Regardless of the coefficient on the job, I

20

> wanted to know the actual costs of the
> contractor for purposes of deciding whether
> to award the contract and at what price.
> Choy would be responsible for determining
> whether the proposal was technically
> acceptable.  I would be responsible for
> determining whether the price was fair and
> reasonable.  The true subcontractor costs
> charged to JHL would have been a factor Choy
> and I could have considered in making our
> decisions.

See id.  Testimony by Ching at trial that JHL's actual costs

would have influenced her decision as to whether the proposed

price was fair, and that she would not have recommended a

contract with JHL had she known that the costs were inflated,

could have established that the inflated quotes had the

propensity or capacity to influence or affect the Navy's award of

the job.  See Rodriguez-Rodriguez, 840 F.2d at 700.

　　　　Even if, for some reason, the Government could not have

called Ching as a fact witness, it could conceivably have called

her as an expert witness regarding what the Navy considers in its

decision to award such projects, and whether statements such as

Shin's would normally be material to the Navy's decision-making

process.  Shin himself acknowledges that materiality may be

proven through an expert witness.  See ECF No. 1, PageID # 27

("Materiality is best shown by the testimony of a witness,

generally those who make the decisions on the application or

statements in the particular case, concerning the influence that

defendant's allegedly false statement might have had on the

21

ultimate result of the transaction.  Such a witness may be an
expert witness or a fact witness, or both." (quoting Dep't of
Just. Manual Resource Manual Title 9 Number 911)).

        Alternatively or additionally, the Government could
have relied on other witnesses like Robert Hokama to testify
regarding materiality.  While not involved in the negotiations in
which Shin made his false statement, Hokama was the Director of
the Procurement Operations Division for Pearl Harbor and Ching's
supervisor at the time Shin was negotiating the contract on
behalf of JHL.  See Crim. No. 04-00150, ECF No. 48-1.

        Evidence that Shin himself submitted on his behalf at
sentencing indicates the materiality testimony Hokama could have
provided.  In a declaration, Hokama stated, "[I]f this contract
had come to my attention with the sub-contractor bids submitted
as they were submitted to Mr. Shin, I would have approved the
contract price of approximately $2.1 million which JHL was asking
at the final negotiating conference."  See id.  Notably, Hokama
did not say that he would have awarded the bid to JHL had he
known that Shin had falsified the subcontractor bids.  Hokama's
declaration actually suggests otherwise.  Hokama stressed, "I do
not, however, condone in any way what [Shin] did"; "I am very
disappointed that he chose to negotiate in such a manner"; and "I
was extremely disappointed to hear what Mr. Shin had done."  See
id.  Hokama's declaration thus indicates that he was not only

qualified to testify as to the materiality of Shin's statement, but that he could have, and likely would have, provided testimony supporting the Government's efforts to establish the materiality element of the false statement charge.

In short, whether or not Choy could conceivably have been a materiality witness, he was not the Government's sole materiality witness.

Shin says that he did not know prior to his guilty plea that the Government had materiality witnesses besides Choy, and that this somehow means that the Government may not rely on other materiality evidence.  See ECF No. 23-1, PageID # 269.  It is far-fetched that Shin, who, in his own words, "was experienced in federal government contracting matters," see ECF No. 1, PageID # 8; see also id., PageID #s 4-5, did not know that Ching and Hokama, as well as other contracting officials, could have testified as to the materiality of his statements.  More importantly, however, the Government has never been bound by Shin's assumptions.  The Government was and is free to present all the evidence it has to establish that Shin's false statements were material.  It is not the case that, before Shin pled guilty, the Government was required to outline for Shin which person or persons might provide materiality evidence at trial going specifically to materiality or any other element of a false statement charge.  Nor does Shin point to anything suggesting

that the Government misled him into believing that its only
source of materiality evidence was Choy.  Cf. United States v.
Ruiz, 536 U.S. 622, 632 (2002) ("Consequently, the Ninth
Circuit's requirement could force the Government to abandon its
'general practice' of not 'disclos[ing] to a defendant pleading
guilty information that would reveal the identities of
cooperating informants, undercover investigators, or other
prospective witnesses.'").

It also bears noting that Shin overstates what Choy
told Shin after Shin was sentenced.  Choy never admitted that he
could not have testified regarding the materiality of Shin's
statement.  Although Choy believed that, because he was not the
contracting authority, he could not testify about contractual
issues such as whether or not JHL should have been awarded the
contract in spite of Shin's false statement, Choy could still
have testified about a number of issues relevant to the
materiality element.  For example, Choy could have testified as
to why he asked JHL to provide subcontractor quotes; whether
including the Pump # 2 work in JHL's JOC was typical or a
mistake; what type of information Ching had requested in regards
to the JHL bid; what type of technical assistance Choy had given
Ching regarding the JHL bid; and a host of other things relevant
to establishing materiality but not requiring testimony as to how
Choy might have decided whether to award the project to JHL.

24

Choy's insistence that he could not testify as to decision-making issues versus "technical" issues relates only to the scope of his testimony, not to whether he had anything at all to say about materiality.

Choy was a potential Government witness, not a Government lawyer.  Any so-called "admission" by him about what he was legally able to say could not have precluded a Government lawyer from calling him to testify about materiality.  See ECF No. 11-1, PageID # 116.

Shin also argues that statements in Choy's declaration and taped conversation indicate that, if deposed, Choy would say that the inflated quotes were immaterial to Choy personally. There is no such indication.

During the taped conversation, Shin pressed Choy to admit that he had told Government prosecutors that the inflated quotes did not matter.  But Choy appears to have instead repeatedly explained that he lacked the authority to decide such contracting issues.  Shin asked, "Did you ever explain to [the Government prosecutor] about coefficient and the--he thought that--you know, roll in profit and overhead?"  See ECF No. 12-3, PageID # 172.  Choy answered, "I know that was the issue.  The issue--that's why it's a contracting issue.  That wasn't for me to decide whether, you know, he bid--Nan, Inc. [Shin's company] bid--but realized that he needed to make profit and overhead."

25

See id., PageID # 173.

> Shin against pressed Choy:
>
> Shin:  So when you talked to, like, [the Government prosecutor] and these government people, you explained there's no coefficient and we had to roll it in profit and overhead and--but do they still understand when you were talking to them?
>
> Choy:  So I told them that, but I told them I think--because it's an ACQ issue, acquisition issue, that's not for me to decide whether they going let Nan, Inc. roll into the--into the--
>
> Shin:  Roll in the coefficient?
>
> Choy:  Yeah, yeah.  That's not my call.  I don't have the authority to make that kind of call.
>
> Shin:  Uh-huh.
>
> Choy:  So I remember telling them about the zero percent coefficient.  I remember telling them, "Does it have that?"  So I kept--I remember telling them that it's not my job responsibility to do that, it's acquisition's.

See id., PageID #s 173-74.  See also id., PageID # 172 (discussing contract question about whether Government could give zero coefficient contract to Nan, Inc., and noting, "I'm not the one that--I'm not supposed to decide" and "I don't know" about contracting issues); id., PageID # 173 ("that's not for me to decide.  That's ACQ guys.  I just over here to review the technical aspect and say that, oh, does this make sense kind of deal, right").

Choy's belief that this issue fell outside his duties
is not an indication as to materiality at all.

Shin contends that the following statement by Choy also
indicates that Choy would testify that Shin's statement was not
material to him:

> It was my understanding during this time that
> the contractor's coefficient included their
> overhead and profit so to not include a
> coefficient would not be fair and would be
> unreasonable.  I was surprised by the fact
> that this project had a zero coefficient and
> turned this issue to the contracting officer,
> the authorized person, to resolve.

See ECF No. 1, PageID # 32 (numbers omitted).  Choy also recalled
telling prosecutors "[a]bout that zero percent coefficient, yeah,
who the contract was awarded and that--the zero percent
coefficient and it needed to go to overhead and profit.  I mean
how else he going make money, right?"  See ECF No. 12-3, PageID #
178.

Here, too, Shin misrepresents Choy's statements, in
effect obfuscating what Choy attempted to clarify.  Choy was
expressing his understanding that it would be unreasonable for
the Navy to require a private contractor like JHL to perform a
job for free.  Choy appears to be telling Shin that he understood
to some extent Shin's motive for inflating the subcontractor
bids.  But this is a far cry from suggesting that falsified
subcontractor prices were immaterial to him or to the Navy, or
that Choy communicated such a thought to anyone.  Regardless of

27

whether Choy thought a contractor should make some profit, an
inability to make a profit absent a false statement to the
Government is not a defense to a charge under 18 U.S.C. § 1001.
Thus, whatever Choy may have said to Government prosecutors on
this subject, there is no reason the prosecutors had to relay
such statements to Shin prior to his guilty plea.

Shin is left with the assertion that deposing Choy
would reveal that the Government withheld impeachment evidence in
violation of Brady.  See ECF No. 22, PageID # 243.  This
assertion is premised on the belief that, before a defendant
pleads guilty, Brady requires disclosure of evidence going not
only to innocence, but also to impeachment.

Generally, there are three components to a Brady
violation:  "The evidence at issue must be favorable to the
accused, either because it is exculpatory, or because it is
impeaching; that evidence must have been suppressed by the State,
either willfully or inadvertently; and prejudice must have
ensued."  Strickler, 527 U.S. at 281–82; see also Hamilton v.
Ayers, 583 F.3d 1100, 1110 (9th Cir. 2009).

However, in United States v. Ruiz, 536 U.S. 622 (2002),
the Supreme Court reversed the Ninth Circuit's holding that a
guilty plea is involuntary unless the prosecutors have previously
disclosed whatever material impeachment information the
prosecutors would have to disclose under Brady if the defendant

28

chose to go to trial.  The Supreme Court held that the
"Constitution does not require the Government to disclose
material impeachment evidence prior to entering a plea agreement
with a criminal defendant."  Ruiz, 536 U.S. at 633.  See also
United States v. Eltringham, 550 Fed. Appx. 398, 399 (9th Cir.
2013).  The Supreme Court explained:

> [I]mpeachment information is special in
> relation to the fairness of a trial, not in
> respect to whether a plea is voluntary
> ("knowing," "intelligent," and
> "sufficient[ly] aware").  Of course, the more
> information the defendant has, the more aware
> he is of the likely consequences of a plea,
> waiver, or decision, and the wiser that
> decision will likely be.  But the
> Constitution does not require the prosecutor
> to share all useful information with the
> defendant.  Weatherford v. Bursey, 429 U.S.
> 545, 559, 97 S. Ct. 837, 51 L.Ed.2d 30 (1977)
> ("There is no general constitutional right to
> discovery in a criminal case").  And the law
> ordinarily considers a waiver knowing,
> intelligent, and sufficiently aware if the
> defendant fully understands the nature of the
> right and how it would likely apply in
> general in the circumstances--even though the
> defendant may not know the specific detailed
> consequences of invoking it.  A defendant,
> for example, may waive his right to remain
> silent, his right to a jury trial, or his
> right to counsel even if the defendant does
> not know the specific questions the
> authorities intend to ask, who will likely
> serve on the jury, or the particular lawyer
> the State might otherwise provide.

Ruiz, 536 U.S. at 629-30 (second alteration in original).

Given Ruiz, even if the Government allegedly withheld
impeachment evidence from Shin prior to Shin's guilty plea, this

would not rise to the level of a <u>Brady</u> violation, let alone a
<u>Brady</u> violation sufficient to justify the issuance of an
extraordinary writ.

Because Shin has not shown good cause entitling him to
take the deposition of Choy, this court need not address the
Government's argument that discovery of potentially exculpatory
evidence on materiality is futile because Shin's statement is
material as a matter of law under the Ninth Circuit's recent
decision in <u>United States v. Lindsey</u>, No. 14-10004, 2016 WL
3536659 (9th Cir. June 28, 2016).  This court is cognizant that
the Ninth Circuit has before it a case in which the appellant is
arguing that <u>Lindsey</u> conflicts with <u>Universal Health Services,
Inc. v. United States</u>, 136 S.Ct. 1989 (2016), decided less than
two weeks before <u>Lindsey</u> and not mentioned in <u>Lindsey</u>.  <u>See</u>
<u>United States v. Green</u>, No. 15-10554, 2016 WL 3770881 (opening
brief filed on July 8, 2016).

Whether under de novo review or under the more
deferential "clearly erroneous or contrary to law" standard, this
court reverses the Magistrate Judge with respect to the granting
of leave to depose Choy.  In allowing Choy's deposition, the
Magistrate Judge was relying on the discrepancies between Choy's
declaration of February 2016 and his taped conversation with Shin
in May of 2015 as constituting good cause.  <u>See</u> ECF No. 15.  Even
recognizing what appear to be discrepancies, they do not

constitute good cause under Rule 6(a).

Of course, Rule 6(a) does not require Shin to show that he will ultimately prevail on his underlying claim. See Pham, 400 F.3d at 743. See also Bracy, 520 U.S. at 909 ("It may well be, as the Court of Appeals predicted, that petitioner will be unable to obtain evidence sufficient to support a finding of actual judicial bias in the trial of his case, but we hold that he has made a sufficient showing . . . to establish 'good cause' for discovery."). What Shin must show is that the requested discovery is "essential" to the full development of his claim because the discovery may demonstrate that he is entitled to the relief he seeks. See id. at 908-09. Absent this showing of good cause, a court should deny a motion for leave to conduct discovery. Rich v. Calderon, 187 F.3d 1064, 1067-68 (9th Cir. 1999); McDaniel v. U.S. Dist. Ct., 127 F.3d 886 (9th Cir. 1997). Neither the taped conversation, Choy's "clarification" statement, nor any other matter presented by Shin provides any indication that deposing Choy may lead to evidence that the Government withheld exculpatory evidence that it was required to give to Shin before he pled guilty. Shin therefore cannot be said to have made the necessary showing of good cause.

31

C.   **Shin Is not Entitled to Take the Deposition of Ching.**

This court concludes that Shin has not established good cause to depose Ching.  Again, this court reaches this conclusion under both de novo review and the "clearly erroneous or contrary to law" standard.

The Magistrate Judge denied Shin's request to depose Ching because Shin failed to prove, let alone argue, that he had good cause under Rule 6(a) for the discovery.  See ECF Nos. 15, 18, 21.  As discussed above, Shin "is not entitled to discovery as a matter of course," but must instead show good cause to take discovery pursuant to Rule 6(a).  See, e.g., Bracy, 520 U.S. at 904.

Shin argues that "now that the Government is touting Ching, through her Declaration, as a materiality witness (which is new information to Shin), Shin should be allowed to take the deposition of Ching."  ECF No. 23-1, PageID # 263.  This does not constitute good cause.  Under Shin's argument, any individual the Government relied on would be subject to deposition.  Discovery would be unfettered, and the good cause requirement would lose all meaning.

Moreover, Shin knew or should have known long ago that Ching was a potential materiality witness.  Shin repeatedly describes himself as "experienced in federal government contracting matters."  See ECF No. 1, PageID # 8; see also id.,

32

PageID #s 4-5.  He had interacted with Ching on several occasions regarding the project bid negotiations, including at a meeting on September 8, 2003, also attended by Choy and another representative from JHL, Willie Tailon, during which Shin personally submitted the subcontractor quotes to Ching.  See id., PageID #s 23-24.  Before the September 8, 2003 meeting, Choy had forwarded to JHL an e-mail that he originally sent to Ching, which provided Choy's technical comments to Ching and asked her to review the price quotes in JHL's proposal.  See ECF No. 11-2, PageID #s 118-19.  A government contractor as experienced as Shin would have known that Ching was involved in deciding whether to award the contract.  Shin should have also known that the Government might call Ching, the contract administrator, as a trial witness on the materiality of Shin's statement.

Nor is Shin entitled to depose Ching based on what he terms her "massive credibility problems" in negotiating a non-pre-paid contract with a zero coefficient.  See ECF No. 23-1, PageID #s 264-65.  Once again, Shin's argument would allow unfettered discovery, as every deposition request would assert a credibility issue.  Additionally, Shin's own Petition suggests several times that the Navy's use of a zero coefficient contract may have been nothing more than a mistake made in the Navy's haste to award the contract before the end of that fiscal year. See ECF No. 1, PageID #s 15-16 ("In its haste to award the Pump

33

# 2 delivery order using FY-03 funding, the Navy improperly
selected the JHL JOC as the vehicle under which to perform this
effort."); <u>see id.</u>, PageID # 13 (noting that the Navy "was
overwhelmed with a number of work orders assigned to PWC to be
awarded by the end of the Government's fiscal year"); <u>see id.</u>,
PageID # 15 ("the Navy had failed to timely encumber the
allocated funding and rushed to assign the Pump # 2 delivery
order to an improper contract vehicle, namely the zero
coefficient JOC").  And no matter what, Ching could not have
forced Shin to work for free.  JHL could have declined to take
the job.  This court will not infer that the Navy's use of what
was allegedly the wrong contract gives rise to "massive
credibility problems" justifying discovery.  Shin has not shown
"good cause" under Rule 6(a) for Ching's deposition.

IV.     **CONCLUSION.**

        This court addresses two appeals from the Magistrate
Judge's discovery order.  <u>See</u> ECF Nos. 17, 23.  This court
reverses the portion of the Magistrate Judge's order permitting
Choy's deposition and affirms the portion of the order denying
leave to depose Ching.

        If, given this ruling, Shin still seeks an evidentiary
hearing on the merits of his coram nobis petition, he is directed
to submit a memorandum of no more than 1000 words by August 17,
2016, explaining why an evidentiary hearing should be held and

34

what witnesses Shin anticipates presenting.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, August 15, 2016.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

Patrick Shin v. United States of America, Crim. No. 04 00150 SOM, Civ. No. 15 00377 SOM RLP; ORDER REGARDING DISCOVERY APPEALS