IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PATRICK SHIN, | ) | CRIM. NO. 04-00150 SOM |
| | ) | CIV. NO. 15-00377 SOM-RLP |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | ORDER DENYING DEFENDANT'S |
| UNITED STATES OF AMERICA, | ) | PETITION FOR WRIT OF ERROR |
| | ) | CORAM NOBIS, AND INVITING |
| Respondent. | ) | SUPPLEMENTATION OF |
| | ) | ALTERNATIVE PETITION FOR WRIT |
| | ) | OF AUDITA QUERELA |
| | ) | |
| | ) | |

**ORDER DENYING DEFENDANT'S PETITION FOR WRIT OF ERROR
CORAM NOBIS, AND INVITING SUPPLEMENTATION OF ALTERNATIVE PETITION
FOR WRIT OF AUDITA QUERELA**

**I.      INTRODUCTION.**

Defendant Patrick Shin pled guilty with a plea
agreement to having made a false statement to the Government in
violation of 18 U.S.C. § 1001.  He was sentenced in 2006 to three
years of probation and a fine.  Shin now seeks to vacate his
conviction more than nine years after judgment was entered.
Having long since paid his fine and completed his term of
probation, he seeks a common law writ of coram nobis or audita
querela.

In his Verified Petition for Writ of Error Coram Nobis,
or Alternatively, for Writ of Audita Querela, Shin argues that he
has recently discovered exculpatory evidence that the Government
should have disclosed to him before he entered his guilty plea.
Specifically, Shin contends that, because the Government

wrongfully withheld evidence that a Department of the Navy engineer involved in the contracting process could not have testified as to an essential element of the false statement charge, his conviction should be vacated.

This court denies Shin's petition for a writ of coram nobis.  The court defers ruling on his petition for a writ of audita querela, giving him an opportunity to submit an optional supplemental memorandum regarding this alternative writ.

II.      BACKGROUND.

At all times material to the conviction, Shin was authorized to act as an agent on behalf of JHL Construction, Inc., a general contracting company owned by Shin's nephew, James Lee.  See ECF No. 91 in Crim. No. 04-00150 SOM, PageID # 248.

In 2003, JHL was awarded a job order contract ("JOC") by the Navy.  JOCs are based on pre-priced construction tasks. The prices typically come from a unit price book.  See id.  The Navy's unit price books list average costs that might be higher or lower than the actual costs in a particular local economy. See id., PageID # 250.  Using the unit prices relied on by a customer such as the Navy, a contractor proposes an appropriate coefficient to apply to the unit prices in order to cover overhead and profit, thereby arriving at the contract cost.  See id., PageID #s 250-51.

JHL anticipated that the unit prices would exceed JHL's

actual costs.  See id., PageID #s 253-54.  Because JHL would make a profit without adding any coefficient, JHL proposed a 0% coefficient and was awarded a zero coefficient contract.  See id., PageID #s 249-54.

Once awarded to a contractor, a JOC allows an agency to approach and negotiate with the contractor directly, as construction needs come up.  See id.  In August 2003, the Navy asked JHL to provide a proposal under the JOC for the overhaul of Pump # 2, Drydock # 4, at Pearl Harbor Naval Shipyard.  See id., PageID #s 253-54.  The Navy was under pressure to award a number of work orders by the end of the Government's fiscal year (September 30, 2003), and assigning the Pump # 2 project to JHL's JOC was seen as a quick way to use current year funding.  See id.

JHL provided a proposal for $2,360,153, which was forwarded to the Navy's Engineering Department for a technical review of the costs.  See id., PageID # 272.  Wesley Choy, a mechanical engineer with the Navy's Engineering Department, questioned the costs, which he viewed as high.  See id., PageID #s 259-60.  The costs were not broken down, and he could not tell how the final number had been reached.  See id.  Choy asked the contract administrator, Annette Ching, to get subcontractor quotes from JHL to substantiate JHL's cost proposal.  See id.

On August 26, 2003, JHL submitted a second proposal for the reduced amount of $2,205,138.  See id., PageID # 272.  The

second proposal did not include either a line item breakdown of costs or the requested subcontractor quotes.  Choy asked Shin for the subcontractor quotes from the two proposed subcontractors, HSI Electric, Inc., and Alfred Conhagen, Inc.  See id.

On September 4, 2003, Shin called HSI and asked it to increase its quote by $100,000, but to invoice JHL the original amount without the $100,000 markup.  See ECF No. 64, ¶ 15.  HSI contacted the FBI to inform it of Shin's request.  See ECF No. 91, PageID # 264.

As directed by the FBI, HSI then gave Shin the requested quote with the inflated price.  See id., PageID # 265.  However, instead of submitting this quote to the Navy, Shin submitted HSI's quote from July 10, 2003, which concerned work on Pump # 1.  See ECF No. 64, ¶ 17.  Shin used white-out to alter the $114,733 price on the July 2003 quote to $314,733.  See id.

On September 4, 2003, Shin asked Conhagen to increase its quote by $180,000, bringing Conhagen's subcontract amount from $377,260 to $557,260.  Conhagen provided Shin with the requested quote for $557,260.  See id., ¶ 18.

On September 8, 2003, Shin met with Choy and Ching to give them the altered HSI and Conhagen quotes.  Shin ultimately submitted JHL's best and final offer of $2,150,000.  See ECF No. 91, PageID # 270.

On September 23, 2003, federal agents executed a search

4

warrant at Shin's business office.  See id., PageID # 266.  Shin confessed at that time to having submitted altered and inflated figures for the Pump # 2 job, explaining that the real subcontractor quotes would not have supported JHL's cost proposal and would have caused the Navy to question the legitimacy of the proposal.  See ECF No. 64, ¶ 20.  He said that, while Conhagen had provided an inflated quote as he had requested, HSI's failure to do so right away had caused him to doctor HSI's quote from a previous job.  See id.

The Pump # 2 project did not involve pre-priced tasks listed in the Navy's unit book.  For that reason, performing work on Pump # 2 under JHL's zero coefficient JOC did not allow JHL to recover any overhead or profit.  Shin said the inflated subcontractor quotes were his way of recovering overhead and profit.  See id.

The Government charged Shin with having made a false statement to the Government.  On April 21, 2004, pursuant to a memorandum of plea agreement, Shin pled guilty to that charge. See ECF No. 8.  On March 8, 2006, Shin was sentenced to three years of probation, with twelve days of intermittent confinement, and a fine of $100,000.  See ECF No. 99.

During sentencing proceedings, Shin argued that the Pump # 2 job was not pre-priced and therefore had been improperly assigned under JHL's zero coefficient JOC, depriving JHL of a

chance to recover overhead and profit.  See id., PageID #s 263-
67.  Shin contended that he had altered the subcontractor quotes
only to recover a reasonable profit on the job.  See id., PageID
# 265.  He denied any malicious intent, but acknowledged that the
way he had handled the situation was wrong.  See id., PageID #
298.  This court determined that "there was clearly an intent to
deceive," and called the offense a "dishonesty kind[] of
crime[]," see id., PageID # 294, but imposed a sentence that
reflected the court's determination that the Government had
failed to prove that Shin had intended to cause a loss.  See id.,
PageID # 278.

Afer he was sentenced, Shin reached out to Choy several
times to talk about Choy's role in the prosecution and to ask him
for a written statement.  See id., PageID # 271.  Choy originally
said that Government lawyers had told him not to provide any such
written statement without approval from the U.S. Attorney's
Office.  See id., PageID #s 271-72.  Eventually, in approximately
April 2014, Choy provided a typed, unsigned "clarification"
statement regarding his role in the contracting process.  See
id., PageID # 272.

Choy's "clarification" statement includes the following
points:  1) he recalled having stated at a meeting with Shin in
2003 that he understood that Shin needed to "roll" overhead and
profit into the line items, given the zero coefficient contract,

but that that was a contractual rather than technical issue; 2)
imposing a zero coefficient contract on JHL was not fair or
reasonable; 3) Choy was surprised to hear that the project had a
zero coefficient; and 4) Choy had turned the issue over to the
contracting officer as the person authorized to resolve the
matter.  See ECF No. 91-2.

        In May 2015, Shin spoke with Choy regarding Choy's
communications with "the Prosecutor and the Prosecutor's
investigators."  See ECF No. 91, PageID # 276.  Without telling
Choy, Shin tape recorded the conversation.  See ECF No. 102-3.
When Shin asked Choy whether he had communicated to the
Government personnel any of the points made in his April 2014
"clarification" statement, Choy allegedly stated that he had told
the prosecutor and the prosecutor's investigators that he did not
have the authority to decide whether JHL needed to be awarded
extra money in the zero coefficient contract to cover its
legitimate and reasonable overhead and profit.  See ECF No. 91,
PageID #s 277-78.  Choy also allegedly told Shin:  1) the
prosecuting authorities "point[ed] the gun" on him regarding his
authority to decide the zero coefficient issue; 2) the
prosecuting authorities "hid" the fact that Choy was not
authorized to deal with the zero coefficient issue; 3) the
prosecuting authorities only "hear what they want to hear . . .
to make their case"; and 4) the declaration that the prosecuting

7

authorities had Choy sign was "sneaky" and "twist[ed]" the facts he had given them.  See id.

On September 22, 2015, Shin moved for a writ of coram nobis or, in the alternative, audita querela.  The motion sought (1) the vacating of Shin's federal criminal conviction on one count of False Statement pursuant to 18 U.S.C. § 1001(a)(3); and (2) leave to withdraw his prior guilty plea in this case.  See id., PageID # 243.

Shin filed a motion for leave to depose Choy and Ching. See ECF No. 105.  This court denied Shin's discovery request to the extent it supported his petition for a writ of coram nobis, but noted that it was premature for Shin to seek discovery in aid of a writ of audita querela because a writ of audita querela is a remedy of last resort and his request for a writ of coram nobis was still pending.  See ECF No. 117, PageID #s 600-01.  This court thus deferred any ruling on Shin's discovery request insofar as it was brought in aid of obtaining a writ of audita querela.  See id.

III.    ANALYSIS.

A.    Writ of Coram Nobis.

The 1946 amendments to Federal Rule of Civil Procedure 60(b) expressly abolished several common law writs, including the writ of coram nobis.  In United States v. Morgan, 346 U.S. 502 (1954), the Supreme Court held that district courts still retain

limited authority to issue common law writs such as writs of coram nobis and audita querela in collateral criminal proceedings.

These common law writs survive "only to the extent that they fill 'gaps' in the current systems of postconviction relief." United States v. Valdez-Pacheco, 237 F.3d 1077, 1079 (9th Cir. 2001).  Such writs are not available when the claims raised would be cognizable in petitions under 28 U.S.C. § 2255.

A writ of coram nobis is "a highly unusual remedy, available only to correct grave injustices in a narrow range of cases where no more conventional remedy is applicable." United States v. Riedl, 496 F.3d 1003, 1005 (9th Cir. 2007).  It is distinguishable from a habeas petition, which is available only when convicted defendants are in "custody." See Hensley v. Municipal Court, 411 U.S. 345, 349 (1973); Jones v. Cunningham, 371 U.S. 236, 243 (1963).  A writ of coram nobis allows a petitioner to attack a conviction when the petitioner has already finished his sentence and is no longer in custody.  See McKinney v. United States, 71 F.3d 779, 781 (9th Cir. 1995) (citing Telink, Inc. v. United States, 24 F.3d 42, 45 (9th Cir. 1994)).

To qualify for coram nobis relief, a petitioner must establish all of the following:  (1) a more usual remedy is not available; (2) valid reasons exist for not having attacked the conviction earlier; (3) there are adverse consequences from the

conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.  Hirabayashi v. United States, 828 F.2d 591, 604 (9th Cir. 1987).  "Because these requirements are conjunctive, failure to meet any one of them is fatal." Matus-Leva v. United States, 287 F.3d 758, 760 (9th Cir. 2002) (citing United States v. McClelland, 941 F.2d 999, 1002 (9th Cir. 1991)).

Shin satisfies three of the four requirements for the issuance of a writ of coram nobis.[1]

First, a more usual remedy is not available here. Hirabayashi, 828 F.2d at 604.  Shin has completed his sentence and cannot seek relief under § 2255.  See 28 U.S.C. § 2255 (providing that a "prisoner in custody . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence" (emphasis added)).

Second, Shin has suffered reputational, professional, and social consequences as a result of his criminal conviction. See ECF No. 91, PageID # 285.  He states in his verified petition

---

[1]    Shin's plea agreement included a waiver of his right to collaterally attack his sentence except when the attack is based on a claim of ineffective assistance or any upward departure by the court.  See ECF No. 8.  Although Shin's petition for a writ of coram nobis is a type of collateral attack, it does not challenge the sentence.  Instead, Shin attacks the underlying conviction, which the Government concedes was not covered by the appeal waiver.  See ECF No. 100, PageID # 402.

that he has lost business opportunities because of his conviction
and that newspaper articles published as recently as August 2015
continue to refer to his felony conviction.  See id., PageID #
297.  The Ninth Circuit has "repeatedly reaffirmed the
presumption that collateral consequences flow from any criminal
conviction."  Hirabayashi, 828 F.2d at 606.

        Third, Shin has valid reasons for not having attacked
his conviction earlier.  Although a petition for a writ of coram
nobis is not subject to a statute of limitations, the petitioner
must show that there were valid reasons that the conviction was
not attacked earlier.  See id. at 604-05.  This requirement
upholds a court's gate-keeping in barring claims that are
unjustifiably late.  Shin's petition is based on allegedly
exculpatory statements that Choy made to the Government, but that
Shin only learned of during a conversation with Choy in May 2015.
See id., PageID # 294.  Shin filed his petition in September
2015.  See ECF No. 91.  These circumstances provide valid reasons
for Shin's failure to file his petition earlier.

        The fourth factor requires an error of "the most
fundamental character."  Matus-Leva, 287 F.3d at 760.  A
fundamental error is an error that renders the underlying
proceeding itself irregular and invalid.  See Morgan, 346 U.S.
502; Hirabayashi, 828 F.2d at 604; see also United States v.
George, 676 F.3d 249, 258 (1st Cir. 2012) ("an error of the most

fundamental character must denote something more than an error simpliciter" (citation omitted)).

The Supreme Court and Ninth Circuit have identified a limited number of fundamental errors, including ineffective assistance of counsel, see United States v. Ifenatuora, 586 Fed. Appx. 303, 304 (9th Cir. 2014), cert. denied, 135 S.Ct. 1750 (2015), a federal criminal trial without defense counsel and without a competent and intelligent waiver of counsel, see Morgan, 346 U.S. at 512, a guilty plea induced by a bargain that was not kept, see Holloway v. United States, 393 F.2d 731, 732 (9th Cir. 1968), an erroneous jury instruction relieving the prosecution of proving an essential element of the offense, see McClelland, 941 F.2d at 1003, and the nondisclosure of exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83(1963), see Ikbal v. United States, 304 Fed. Appx. 604, 606 (9th Cir. 2008).

Shin fails to establish that there is a fundamental error that rendered his conviction irregular and invalid.

The only fundamental error identified by Shin is what he calls the Government's Brady violation. According to Shin, the Government failed to "disclose key evidence which was exculpatory and/or was material to the defense for impeachment purposes." See ECF No. 114, PageID # 552.

Generally, there are three components to a Brady

violation:  "The evidence at issue must be favorable to the
accused, either because it is exculpatory, or because it is
impeaching; that evidence must have been suppressed by the State,
either willfully or inadvertently; and prejudice must have
ensued."  Strickler v. Greene, 527 U.S. 263, 281-82 (1999); see
also Hamilton v. Ayers, 583 F.3d 1100, 1110 (9th Cir. 2009).

In United States v. Ruiz, 536 U.S. 622 (2002), the
Supreme Court held that "[t]he Constitution does not require the
Government to disclose material impeachment evidence prior to
entering a plea agreement with a criminal defendant."  Ruiz, 536
U.S. at 633.  See also United States v. Eltringham, 550 Fed.
Appx. 398, 399 (9th Cir. 2013).  The Supreme Court explained:

> [I]mpeachment information is special in
> relation to the fairness of a trial, not in
> respect to whether a plea is voluntary
> ("knowing," "intelligent," and
> "sufficient[ly] aware").  Of course, the more
> information the defendant has, the more aware
> he is of the likely consequences of a plea,
> waiver, or decision, and the wiser that
> decision will likely be.  But the
> Constitution does not require the prosecutor
> to share all useful information with the
> defendant.  Weatherford v. Bursey, 429 U.S.
> 545, 559, 97 S. Ct. 837, 51 L.Ed.2d 30 (1977)
> ("There is no general constitutional right to
> discovery in a criminal case").  And the law
> ordinarily considers a waiver knowing,
> intelligent, and sufficiently aware if the
> defendant fully understands the nature of the
> right and how it would likely apply in
> general in the circumstances--even though the
> defendant may not know the specific detailed
> consequences of invoking it.  A defendant,
> for example, may waive his right to remain
> silent, his right to a jury trial, or his

> right to counsel even if the defendant does
> not know the specific questions the
> authorities intend to ask, who will likely
> serve on the jury, or the particular lawyer
> the State might otherwise provide.

Ruiz, 536 U.S. at 629-30 (second alteration in original).

Therefore, under Ruiz, the withholding of impeachment evidence would not rise to the level of a Brady violation, let alone a Brady violation sufficient to justify the issuance of an extraordinary writ.  Because Shin elected to plead guilty pursuant to a plea agreement, he can only establish a Brady violation by a showing that the Government withheld exculpatory (not just impeaching) evidence from him prior to his guilty plea.

Shin was convicted under 18 U.S.C. § 1001(a)(3) for having made a false statement to the Government.  Section 1001(a)(3) imposes criminal liability for "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry."  "A conviction under § 1001 requires the government to prove (1) a statement, (2) falsity, (3) materiality, (4) knowledge, and (5) jurisdiction."  United States v. Peterson, 538 F.3d 1064, 1073 (9th Cir. 2008) (citing United States v. Atalig, 502 F.3d 1063, 1066 (9th Cir. 2007)).

Shin does not dispute that he made a false statement to

14

the Government in submitting a project bid with subcontractor quotes that were inflated by a total of $380,000.  See ECF No. 91, PageID #s 266-67.  But Shin says the Government committed a Brady violation by failing to disclose that it could not have shown that the inflated quotes were "material," as required for a conviction at trial.  See id.

Under 18 U.S.C. § 1001(a)(3), the element of materiality is evaluated under "an objective test, which looks at 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end.'" Peterson, 538 F.3d at 1072 (quoting United States v. Facchini, 832 F.2d 1159, 1162 (9th Cir. 1987)).

"To be material a statement need only have the propensity or capacity to influence or affect an agency's decision."  United States v. Rodriguez-Rodriguez, 840 F.2d 697, 700 (9th Cir. 1988) (citations omitted).  "The agency need not rely on the information in fact for it to be material."  Id. "Materiality, therefore, is not measured by effect or magnitude." Facchini, 832 F.3d at 1162.

Materiality is a question for the trier-of-fact.  See United States v. Gaudin, 515 U.S. 506, 511-15 (1995).

Specifically, Shin contends that Choy's "clarification" statement and his statements in a later conversation that Shin tape recorded show that the Government withheld exculpatory

15

evidence that Choy "was not a competent or qualified witness to testify about the issue of 'materiality.'"  See ECF No. 91, PageID # 244.  Shin argues that Choy's post-sentencing statements show that Choy, far from helping the Government prove its case, would have "negated the 'materiality' element of the False Statement charge."  See id.  Shin adds that this evidence also reveals that "Choy was an exculpatory witness regarding the issue of 'materiality'" because Choy's comments show that the false statement was not material to him.  See id.

Choy's "clarification" statement reads:

(1) Clarification as to my role in this contract.  I am not a contracting official nor do I have the authority to revise a contractual requirement.  My task was to review the contractor's proposal to ensure that the contractor scope of work is in accordance with the Governments scope of work and provide an opinion on a fair and reasonable price for the Government.

(2) On 14 August 2003 despite the fact that the contractor's proposal was with range 6% ($148,903) of the Government estimate (GE $2,211,250 vice contractor proposal $2,360,153), I was requested by the contracting administer to review the contractor's proposal for technical compliance (i.e. Contractor's scope of work) and provide an opinion of a fair and reasonable price.  Since the contractor proposal consisted of aggregated pricing it was difficulty to determine if the contractor proposal was in practicable in line eh Government scope of work, I requested to the contracting administer if the contractor can provide additional breakdown of their proposal.

16

(3) On September 8, 2003, I attended a
meeting along with the contracting administer
in which Mr. Patrick Shin explained to the
Government that based on this contractor he
had a zero coefficient for this project.  I
recall stating that I understand that Mr.
Shined needed to "roll" this overhead and
profit into the line items since he had a
zero coefficient but that is a contractual
issues and not a technical issue.

(4) My Government estimate was prepared with
a contractor coefficient.  It was my
understanding during this time that the
contractor's coefficient included their
overhead and profit so to not include a
coefficient would not be fair and would be
unreasonable.  I was surprised by the fact
that this project had a zero coefficient and
turned this issue to the contracting officer,
the authorized person, to resolve.

ECF No. 91, PageID #s 272-73 (grammar and spelling as in
original).

Shin characterizes Choy's "clarification" statement as
exculpatory, treating it as an admission by Choy that he could
not have been a materiality witness for the Government.  But this
argument assumes that the Government had no other way of proving
materiality.  As it turns out, Choy was not the only source of
materiality evidence.

The Government could have used testimony by Annette
Ching, the contracting officer for the project bid, to prove that
Shin's statement was material to the Navy in deciding whether to
award the job to JHL.  Ching's declaration indicates the type of
testimony she may have given on the Government's behalf had

17

Shin's case gone to trial.  <u>See</u> ECF No. 100-3.  Ching states that

she "was assigned responsibility for negotiating and recommending

the award of a task order contract for the overhaul of Pump # 2,

Dry Dock # 4 at the Pearl Harbor Naval Shipyard."  <u>See</u> <u>id.</u>,

PageID #s 429-30.  She adds:

> I later learned from criminal investigators
> that the HSI Electric and Conhagen quotations
> given to me by Shin had been inflated by
> $380,000, by altering the original
> quotations.  Had I known that the quotations
> were altered and inflated, I would have
> recommended against the award of the contract
> to JHL.  I would have been concerned both
> about the actual costs incurred by JHL, and
> about the integrity of the company.

<u>See id.</u>, PageID # 431.

Ching also states:

> Regardless of the coefficient on the job, I
> wanted to know the actual costs of the
> contractor for purposes of deciding whether
> to award the contract and at what price.
> Choy would be responsible for determining
> whether the proposal was technically
> acceptable.  I would be responsible for
> determining whether the price was fair and
> reasonable.  The true subcontractor costs
> charged to JHL would have been a factor Choy
> and I could have considered in making our
> decisions.

<u>See id.</u>  Testimony by Ching at trial that JHL's actual costs

would have influenced her decision as to whether the proposed

price was fair, and that she would not have recommended a

contract with JHL had she known that the costs were inflated,

could have established that the inflated quotes had the

18

propensity or capacity to influence or affect the Navy's award of the job.  See Rodriguez-Rodriguez, 840 F.2d at 700.

Even if, for some reason, the Government could not have called Ching as a fact witness, it could conceivably have called her as an expert witness regarding what the Navy considers in its decision to award such projects, and whether statements such as Shin's would normally be material to the Navy's decision-making process.  Shin himself acknowledges that materiality may be proven through an expert witness.  See ECF No. 91, PageID # 268 ("Materiality is best shown by the testimony of a witness, generally those who make the decisions on the application or statements in the particular case, concerning the influence that defendant's allegedly false statement might have had on the ultimate result of the transaction.  Such a witness may be an expert witness or a fact witness, or both." (quoting Dep't of Just. Manual Resource Manual Title 9 Number 911)).

In its earlier discovery order, this court noted that, alternatively or additionally, the Government could have relied on other witnesses like Robert Hokama to testify regarding materiality.  While not involved in the negotiations in which Shin made his false statement, Hokama was the Director of the Procurement Operations Division for Pearl Harbor and Ching's supervisor at the time Shin was negotiating the contract on behalf of JHL.  See ECF No. 48-1.

After this court issued its order referring to possible testimony by Hokama concerning materiality, Shin filed a memorandum indicating that Hokama had recently told Shin's counsel that he would have approved JHL's proposal even had he known it included falsified subcontractor amounts.  This court recognizes that the Government would not, after all, have called Hokama as a materiality witness at trial if Government attorneys knew that he would testify to what Shin's counsel reports. Shin's counsel conceded, however, that he had no information suggesting that Hokama ever communicated his position to anyone before Shin pled guilty.  In the absence of any statement by Hokama about his hypothetical approval of a contract in the face of knowledge that it included falsities, the Government could have contemplated calling him as a materiality witness.  More importantly, Hokama's earlier silence on the subject means that the Government's failure to disclose his view could not serve as the basis of a <u>Brady</u> violation.  The Government has no duty to disclose exculpatory "evidence" that is simply an unspoken hypothetical locked in an individual's mind.

Shin says that he did not know prior to his guilty plea that the Government had any materiality witness besides Choy. Shin appears to be claiming that this somehow means that the Government may not rely on other materiality evidence.  <u>See</u> ECF No. 115-1, PageID # 578.  It is far-fetched that Shin, who, in

20

his own words, "was experienced in federal government contracting matters," see ECF No. 91, PageID # 249; see also id., PageID #s 245-46, did not know that Ching could have testified as to the materiality of his statements. But even if Shin thought Choy was the sole possible witness on materiality, the Government was not bound by Shin's assumptions. The Government was and is free to present all the evidence in its possession to establish that Shin's false statements were material.

It is not the case that, before Shin pled guilty, the Government was required to outline for Shin which person or persons might provide evidence at trial going specifically to materiality or to any other element of a false statement charge. Nor does Shin point to anything suggesting that the Government misled him into believing that its only source of materiality evidence was Choy. Cf. Ruiz, 536 U.S. at 632 ("Consequently, the Ninth Circuit's requirement could force the Government to abandon its 'general practice' of not 'disclos[ing] to a defendant pleading guilty information that would reveal the identities of cooperating informants, undercover investigators, or other prospective witnesses.'"). Indeed, Shin's counsel admitted during a telephone conference with the court on August 23, 2016, that the Government never expressly identified Choy as its materiality witness. According to Shin's counsel, Choy's role in the Navy's review of the JHL bid supported Shin's assumption that

21

Choy was the Government's materiality witness.  But any assumption that Choy was the Government's only possible materiality witness was unjustified.

It also bears noting that Shin overstates what Choy told Shin after Shin was sentenced.  Choy never admitted that he could not have testified regarding the materiality of Shin's statement.  Although Choy believed that, because he was not the contracting authority, he could not testify about contractual issues such as whether or not JHL should have been awarded the contract in spite of Shin's false statement, Choy could still have testified about a number of issues relevant to materiality.  For example, Choy could have testified as to why he asked JHL to provide subcontractor quotes; whether including the Pump # 2 work in JHL's JOC was typical or a mistake; what type of information Ching had requested in regards to the JHL bid; what type of technical assistance Choy had given Ching regarding the JHL bid; and a host of other things relevant to establishing materiality, but not requiring testimony as to how Choy might have decided whether to award the project to JHL.  Choy's insistence that he could not testify as to decision-making issues versus "technical" issues relates only to the scope of his testimony, not to whether he had anything at all to say about materiality.

Choy was a potential Government witness, not a Government lawyer.  Any so-called "admission" by him about what

he was legally able to say could not have precluded a Government lawyer from calling him to testify about materiality.

Shin also argues that statements in Choy's declaration and taped conversation indicate that Choy believed Shin's misrepresentations were immaterial.  There is no such indication.  During the taped conversation, Shin pressed Choy to admit that he had told Government prosecutors that the inflated quotes did not matter.  But Choy appears to have instead repeatedly explained that he lacked the authority to decide such contracting issues.  Shin asked, "Did you ever explain to [the Government prosecutor] about coefficient and the--he thought that--you know, roll in profit and overhead?"  See ECF No. 102-3, PageID # 481.  Choy answered, "I know that was the issue.  The issue--that's why it's a contracting issue.  That wasn't for me to decide whether, you know, he bid--Nan, Inc. [Shin's company] bid--but realized that he needed to make profit and overhead."  See id., PageID # 482.

Shin against pressed Choy:

Shin:  So when you talked to, like, [the Government prosecutor] and these government people, you explained there's no coefficient and we had to roll it in profit and overhead and--but do they still understand when you were talking to them?

Choy:  So I told them that, but I told them I think--because it's an ACQ issue, acquisition issue, that's not for me to decide whether they going let Nan, Inc. roll into the--into the--

Shin:  Roll in the coefficient?

23

> Choy:  Yeah, yeah.  That's not my call.  I
> don't have the authority to make that kind of
> call.
>
> Shin:  Uh-huh.
>
> Choy:  So I remember telling them about the
> zero percent coefficient.  I remember telling
> them, "Does it have that?"  So I kept--I
> remember telling them that it's not my job
> responsibility to do that, it's
> acquisition's.

See id., PageID #s 482-83.  See also id., PageID # 481

(discussing contract question about whether Government could give

zero coefficient contract to Nan, Inc., and noting, "I'm not the

one that--I'm not supposed to decide" and "I don't know" about

contracting issues); id., PageID # 482 ("that's not for me to

decide.  That's ACQ guys.  I just over here to review the

technical aspect and say that, oh, does this make sense kind of

deal, right").

Choy's belief that this issue fell outside his duties

is not an indication as to materiality at all.

Shin contends that the following statement by Choy also

indicates that Choy would testify that Shin's statement was not

material to him:

> It was my understanding during this time that
> the contractor's coefficient included their
> overhead and profit so to not include a
> coefficient would not be fair and would be
> unreasonable.  I was surprised by the fact
> that this project had a zero coefficient and
> turned this issue to the contracting officer,
> the authorized person, to resolve.

24

See ECF No. 91, PageID # 273 (numbers omitted).  Choy also
recalled telling prosecutors "[a]bout that zero percent
coefficient, yeah, who the contract was awarded and that--the
zero percent coefficient and it needed to go to overhead and
profit.  I mean how else he going make money, right?"  See ECF
No. 102-3, PageID # 487.

Here, too, Shin treats Choy's statements as asserting
more than they do.  Choy was expressing his understanding that it
would be unreasonable for the Navy to require a private
contractor like JHL to perform a job for free.  Choy appears to
have been telling Shin that he understood to some extent Shin's
motive for inflating the subcontractor bids.  But this is a far
cry from suggesting that falsified subcontractor prices were
immaterial to him or to the Navy, or that Choy communicated such
a thought to anyone.  Regardless of whether Choy thought a
contractor should make some profit, an inability to make a profit
absent a false statement to the Government is not a defense to a
charge under 18 U.S.C. § 1001.  Thus, whatever Choy may have said
to Government prosecutors on this subject, there is no reason
that, before Shin pled guilty, the prosecutors had to relay to
Shin Choy's belief that a contractor was entitled to make a
profit.

Even assuming that Choy had earlier told the Government
what he later told Shin in his clarification statement and the

25

taped conversation, these statements did not constitute
exculpatory evidence that the Government improperly withheld from
Shin prior to his guilty plea.  Having failed to establish the
only fundamental error he identifies, Shin is not entitled to a
writ of coram nobis.

### B.   Shin Is Not Entitled to an Evidentiary Hearing in Support of a Writ of Coram Nobis.

Shin argues that he is entitled to an evidentiary
hearing if this court does not grant his petition for writ of
coram nobis outright.  See ECF No. 91, PageID # 301.

"Whether a hearing is required on a coram nobis motion
should be resolved in the same manner as habeas corpus
petitions." United States v. Taylor, 648 F.2d 565, 573, n.25
(9th Cir. 1981) (citing Owensby v. United States, 353 F.2d 412,
417 (10th Cir. 1965)).  See also Korematsu v. United States, 584
F. Supp. 1406, 1412 (N.D. Cal. 1984) ("§ 2255 considerations
apply [in a coram nobis proceeding] in determining whether an
evidentiary hearing is required" (citing Taylor, 648 F.2d at 573
n.25)).  A petitioner "is entitled to an evidentiary hearing on
his claim '[u]nless the motion and the files and records of the
case conclusively show that the prisoner is entitled to no
relief.'" Frazer v. United States, 18 F.3d 778, 781 (9th Cir.
1994) (quoting 28 U.S.C. § 2255).  "In deciding whether to grant
an evidentiary hearing, a federal court must consider whether
such a hearing could enable an applicant to prove the petition's

factual allegations, which, if true, would entitle the applicant to federal habeas relief." <u>Schriro v. Landrigan</u>, 550 U.S. 465, 474 (2007).

This court addressed a similar inquiry in determining whether Shin had good cause to depose Choy and Ching. <u>See</u> ECF No. 117.  Under the good cause standard applicable to the discovery ruling, the court was required to examine whether the "'specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.'" <u>Id.</u>, PageID # 605 (quoting <u>Pham v. Terhune</u>, 400 F.3d 740, 743 (9th Cir. 2005)).  Consistent with the above analysis regarding whether the Government withheld exculpatory evidence regarding Choy, this court ruled that Shin's allegations, together with the evidence Shin pointed to in support of his allegations, gave this court no reason to believe that deposing Choy would lead to evidence demonstrating that the Government had withheld exculpatory evidence from Shin before he pled guilty.  <u>See id.</u>, PageID #s 607-22.  With regard to Ching, Shin never alleged that she provided any exculpatory evidence to the Government.  Thus, this court determined that Shin had failed to show good cause to depose Ching as well.  <u>See id.</u>, PageID #s 623-25.

Once it denied Shin a chance to depose Choy or Ching, this court could not discern from the record what further

27

evidence Shin might offer in support of his request for a writ of coram nobis.  The only fundamental error alleged by Shin involved the Government's purported withholding of exculpatory statements by Choy.  Nevertheless, in an abundance of caution, this court gave Shin a further opportunity to explain whether he continued to want an evidentiary hearing.  See id., PageID #s 625-26.  Shin filed a request for an evidentiary hearing that included an offer of proof regarding what would be presented at an evidentiary hearing:

> Patrick Shin will testify as set forth in his Petition that, to him, the key witness in the entire case as to "materiality" was Wes Choy because Choy was the Government employee who prepared the Government Estimate (GE) and asked for the subcontractor quotes.  Shin will testify that, had he known that once Choy found out about the zero coefficient problem, Choy "washed his hands" of the contract and turned all issues over to the contracting officers, he would not have pled guilty.
>
> Robert Hokama will testify (based on Petitioner's counsel's discussion with him yesterday) that if the Pump #2 contract had reached his desk with the information that Petitioner had changed the subcontractor bids because of the zero coefficient problem, he still would have approved the contract, i.e., the subcontractor quotes would not have been "material" to him because the JHL proposal was close to the GE.  He will also testify he was the contracting officer with final authority to approve the contract over Annette Ching and Brian Sekiguchi.  (This Court speculated at 22-23 of its Order that Mr. Hokama might be a witness for the Government on the issue of "materiality." This is clearly not the case.)

28

> Brian Sekiguchi will testify (based on
> Petitioner's counsel's discussion with him
> yesterday) about the inappropriate assignment
> of the Pump #2 contract to the JHL JOC, as he
> set out in his Declaration for sentencing.
> He will testify that if the contract had
> reached his desk with the information that
> Petitioner had changed the subcontractor
> bids, he would have passed the contract on to
> Robert Hokama for final decision.
>
> Wes Choy will testify as set forth in
> Petitioner's Petition.  To the extent that he
> tries to deny the statements he made to
> Petitioner, his tape recorded statement will
> be introduced into evidence.  Choy will also
> admit that his Government Estimate (GE)
> for the contract cost was reasonable with
> consideration of a reasonable coefficient.
>
> Annette Ching will testify that she was not
> the ultimate deciding authority regarding the
> approval of the contract.  She may testify
> that she would recommend not approving the
> contract because of Petitioner's
> falsifications, but she will have to admit
> that the final authorities were Brian
> Sekiguchi and Robert Hokama.

ECF No. 119, PageID #s 632-34.

Even taking Shin's offer of proof as an accurate
summary of the testimony that Shin would present, this court sees
no reason to conduct an evidentiary hearing.  The offer of proof
shows that the evidence sought by Shin either duplicates evidence
already in the record, or would not entitle him to the relief he
seeks.  The offer of proof states that Shin would "testify as set
forth in his Petition," and that "Wes Choy will testify as set
forth in Petitioner's Petition."  Id.  Far from demonstrating any
inadequacy in the record with respect to Choy and Shin, Shin's

offer of proof only proposes to corroborate statements Choy made in his clarification statement and the taped conversation.  See Korematsu, 584 F. Supp. at 1412 (noting that evidentiary hearing may be afforded "when a palpable claim is raised by the petitioner and there is an inadequate record or disputed factual issues" (citing Townsend v. Sain, 372 U.S. 293, 318 (1963)).  As discussed above, however, even if the court accepted these statements as true, they would not be sufficient to show that the Government withheld exculpatory material from Shin.

Furthermore, the offers of proof for Hokama, Sekiguchi, and Ching are irrelevant for the purpose of a coram nobis petition.  During the telephone conference in which Shin's request for an evidentiary hearing was discussed, Shin's counsel admitted that he had no reason to believe that any of these witnesses had told anyone before Shin pled guilty that they would have approved the contract even had they known that Shin had falsified the subcontractor quotes.  Shin's counsel conceded that Shin's petition was focused solely on the Government's failure to disclose what Shin says were exculpatory statements by Choy.

As this court has already noted, Shin's offer of proof concerning Hokama indicates that Shin intended to present newly discovered evidence from Hokama that Shin's misrepresentations were immaterial to him.  Shin concedes that this new evidence is not probative of any fundamental error.  See Moody v. United

States, 874 F.2d 1575, 1577 (11th Cir. 1989) ("A claim of newly discovered evidence relevant only to the guilt or innocence of the petitioner is not cognizable in a coram nobis proceeding."). Although such evidence may have been relevant to the materiality element of the underlying offense, it is irrelevant to any of the legal elements for a writ of coram nobis.

With respect to Ching, it appears from Shin's offer of proof that he intended to elicit testimony that she was not the ultimate decision maker and therefore could not testify as to materiality.  If this is Shin's purpose, it is based on a misunderstanding of materiality.  Because materiality is evaluated under "an objective test, which looks at 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end,'" Peterson, 538 F.3d at 1072 (quoting Facchini, 832 F.2d at 1162), materiality evidence can be provided by individuals other than the ultimate decision maker.  In many cases, the ultimate decision maker relies on individuals like Ching and Choy to evaluate a proposal or statement and to make recommendations that guide the final decision.  See, e.g., U.S. ex rel. Longhi v. Lithium Power Techs., Inc., 513 F. Supp. 2d 866, 888 (S.D. Tex. 2007) (rejecting argument that Government could not rely on witness to establish materiality because he was not ultimate decision maker regarding award of contract).  Individuals may provide evidence

31

as to materiality to the extent that their knowledge and experience allow them to testify regarding whether a particular statement has "the propensity or capacity to influence or affect an agency's decision." Rodriguez-Rodriguez, 840 F.2d at 700 (citations omitted). As discussed above, Ching could even have testified as an expert witness regarding materiality. Shin's offer of proof with respect to Ching does not show that her testimony would somehow support the issuance of a writ of coram nobis.

Even assuming that the witnesses Shin identifies would testify in accordance with his offer of proof, none of the testimony sought from Hokama, Ching, or Sekiguchi would be relevant to the narrow issue of whether exculpatory material was withheld, creating a fundamental error in the underlying proceeding. See Ybarra v. United States, 461 F.2d 1195, 1200 (9th Cir. 1972) (affirming denial of evidentiary hearing when nothing could be gained by granting hearing). The petition, file, and records of this case conclusively show that Shin is not entitled to coram nobis relief. Shin fails to show that an evidentiary hearing would change the outcome.

C.  **Writ of Audita Querela.**

Shin alternatively seeks a writ of audita querela to vacate his conviction. See ECF No. 91, PageID #s 304-05.

"The writ of audita querela, meaning literally 'the

32

complaint having been heard,' is a common law writ used to attack a judgment that was correct when rendered, but which later became incorrect because of circumstances that arose after the fact." United States v. Fischer, No. 3:01-CR-00263-HA, 2014 WL 5473586, at *3 (D. Or. Oct. 28, 2014) (quoting Carrington v. United States, 503 F.3d 888, 890 n.2 (9th Cir. 2007)).

The Supreme Court has limited the availability of the writ to "extraordinary" cases presenting circumstances compelling its use "to achieve justice." Morgan, 346 U.S. at 511. "The writ is similar, but not identical, to the writ of error coram nobis; audita querala is directed against the enforcement, or further enforcement, of a judgment which, when rendered, was just and unimpeachable, whereas coram nobis attacks the judgment itself." Fischer, 2014 WL 5473586, at *3 (citations omitted).

In Doe v. INS, 120 F.3d 200 (9th Cir. 1997), the Ninth Circuit ruled that the writ is unavailable for parties who seek it purely for equitable relief. With audita querela unavailable on purely equitable grounds, the Ninth Circuit questioned without deciding whether any situation existed in which the writ of audita querala would be the appropriate remedy. See Doe, 120 F.3d at 204. See also United States v. Johnson, 962 F.2d 579, 583 (7th Cir. 1992) (questioning "the extent of the viability of audita querela given the availability of coram nobis and § 2255"); United States v. Reyes, 945 F.2d 862, 866 (5th Cir.

33

1991) (noting that "audita querela seems to add little, if anything, to the current scheme of postconviction relief afforded by section 2255 and the writ of coram nobis").  The Ninth Circuit noted, "with section 2255 and coram nobis available to challenge the lawfulness of conviction, several courts have questioned, without deciding, whether audita querela survives at all."  Doe, 120 F.3d at 204.

Not every court considers the writ of audita querela to have been eliminated.  In Erickson v. United States, 757 F. Supp. 2d 1060, 1061 (D. Or. 2010), the defendant brought a petition for writ of audita querala to set aside or invalidate a felony conviction for refusing to submit to induction into the military on the grounds that the defendant was a nonreligious conscientious objector.  Erickson was no longer in custody and was therefore not eligible for relief under § 2255.  Decades after his conviction, the Supreme Court had expanded the definition of and requirements for conscientious objector status, creating a defense to the crime defendant had been charged with. Id. at 1064.  With this newfound defense creating a legal defect in the underlying conviction, the court held that the defendant was entitled to a writ of audita querela and vacated his conviction.  Id.  Shin, however, has not made an equivalent showing justifying the issuance of the writ on the present record.

34

"Even assuming the continued vitality of audita querela, courts have ruled that it is only available where there is a legal objection to a judgment which has arisen subsequent to that judgment." Fischer, 2014 WL 5473586, at *4 (citing Doe, 120 F.3d at 204). See Doe, 120 F.3d at 204 ("a writ of audita querela, if it survives at all, is available only if a defendant has a legal defense or discharge to the underlying judgment").

Shin does not allege a post-conviction legal defect, instead arguing that the writ provides relief when an evidentiary matter arising after the conviction has rendered the conviction unfair. Shin is making an equitable, rather than a legal, claim. He is arguing that even if the prosecuting authorities did not withhold exculpatory evidence, later statements by Choy, Hokama, and Sekiguchi are "facts discovered after the judgment was rendered" that render his conviction unfair. Shin provides no authority indicating that the scope of the writ of audita querela extends to such a circumstance.

This court is cognizant that the writ of audita querela is a writ of last resort only available, if at all, when all other post-conviction remedies have been exhausted. See United States v. Valdez-Pacheco, 237 F.3d 1077, 1080 (9th Cir. 2001); see also United States v. Baptista, No. CR 10-00050 PJH, 2013 WL 4014965, at *3 (N.D. Cal. Aug. 5, 2013). In this regard, a petitioner may not challenge his conviction through the writ on

grounds that are cognizable under another form of post-conviction relief.

Shin's petition for writ of audita querela substantively is a claim that new evidence has arisen that would support his defense at trial.  See ECF No. 91, PageID # 304. Shin's assertion of new evidence is akin to what might be asserted in a motion for a new trial based upon new evidence. Fed. R. Crim. P. 33.  Shin may not now avail himself of a motion for new trial because Rule 33 requires such a motion to be filed within three years of final judgment.

But the unavailability of a Rule 33 motion does not necessarily give rise to a right to a writ of audita querela.  In Valdez-Pacheco, the petitioner attempted to use the writ of audita querela because a § 2255 habeas motion was precluded by the Antiterrorism and Effective Death Penalty Act of 1996.  237 F.3d at 1078-79.  The Ninth Circuit affirmed the dismissal of Valdez's petition, explaining:

> we reject Valdez's contention that audita querela is available in his case due to the fact that he is precluded from raising his claims in a § 2255 motion by those provisions of the Antiterrorism and Effective Death Penalty Act of 1996, Pub.L. 104-132, tit. I, § 105, 110 Stat. 1214, 1220 (AEDPA) (codified in relevant part at 28 U.S.C. §§ 2255 and 2244), that limit the rights of a prisoner to file a second or successive motion.  A prisoner may not circumvent valid congressional limitations on collateral attacks by asserting that those very limitations create a gap in the

36

> postconviction remedies that must be filled
> by the common law writs.  See Kimberlin, 675
> F.2d at 869; see also In re Davenport, 147
> F.3d 605, 608 (7th Cir. 1998) (concluding
> that, even if the limitations of AEDPA
> foreclosed the use of 28 U.S.C. §§ 2241 and
> 2255 by federal prisoners, "it would be
> senseless to suppose that Congress permitted
> them to pass through the closed door [by way
> of the All Writs Act] simply by changing the
> number 2241 to 1651 on their motions"); cf.
> Moore v. Reno, 185 F.3d 1054, 1055 (9th Cir.
> 1999) (per curiam) (concluding that § 2255 is
> not inadequate or ineffective merely because
> a particular prisoner's § 2255 motion is
> procedurally barred), cert. denied, 528 U.S.
> 1178, 120 S.Ct. 1214, 145 L.Ed.2d 1115
> (2000).

Valdez-Pacheco, 237 F.3d at 1080.  If the writ of audita querela

is available whenever new evidence is discovered, that writ will

nullify the limitations of Rule 33 and thwart society's

compelling interest in the finality of criminal convictions.  See

United States v. Hill, 878 F.2d 387 (9th Cir. 1989).  This court

therefore questions why Shin's inability to assert a timely

motion for new trial should, without more, make the writ of

audita querala available.

Notwithstanding the concerns it expresses here, this

court recognizes that it left pending Shin's request to depose

Choy and Ching in support of his petition for writ of audita

querela.  Given that pending issue, this court does not here

dispose of his petition for writ of audita querela.  Instead, if

Shin still believes he is entitled to relief under this

extraordinary writ, this court invites Shin to file an optional

supplemental memorandum no later than September 15, 2016, in support of his petition for writ of audita querela.  Otherwise, this court will enter judgment denying the entire petition.  The memorandum shall be no more than 3,000 words and must include legal authorities in support of any legal propositions advanced. Furthermore, if Shin still believes he is entitled to discovery in support of his petition for writ of audita querela, Shin must provide this court with argument and legal authority regarding the appropriate discovery standard for the writ of audita querela, and an explanation as to how the discovery he seeks would entitle him to relief under this writ.

V.        CONCLUSION.

        Shin's petition for writ of error coram nobis is denied.  This court defers ruling on Shin's petition for writ of audita querela until Shin has filed an optional supplemental memorandum in support of the petition by September 15, 2016, or the deadline has passed without such a filing.  If Shin files an optional memorandum, the Government may respond no later than September 29, 2016, in a memorandum of no more than 3,000 words. If this court does not receive a memorandum from Shin by the deadline, it will enter judgment against Shin in this action.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, September 1, 2016.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

Patrick Shin v. United States of America, Crim. No. 04 00150 SOM, Civ. No. 15
00377 SOM RLP; ORDER DENYING DEFENDANT'S PETITION FOR WRIT OF ERROR CORAM
NOBIS, AND INVITING SUPPLEMENTATION OF ALTERNATIVE PETITION FOR WRIT OF AUDITA
QUERELA