IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PATRICK SHIN, | ) | CRIM. NO. 04-00150 SOM |
| | ) | CIV. NO. 15-00377 SOM-RLP |
| Petitioner, | ) | |
| | ) | **AMENDED ORDER DENYING** |
| vs. | ) | **DEFENDANT'S PETITION FOR WRIT** |
| | ) | **OF ERROR CORAM NOBIS; ORDER** |
| UNITED STATES OF AMERICA, | ) | **DENYING ALTERNATIVE PETITION** |
| | ) | **FOR WRIT OF AUDITA QUERELA** |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

**AMENDED ORDER DENYING DEFENDANT'S PETITION FOR
WRIT OF ERROR CORAM NOBIS; ORDER DENYING
ALTERNATIVE PETITION FOR WRIT OF AUDITA QUERELA**

I.        INTRODUCTION.

        Defendant Patrick Shin pled guilty with a plea

agreement to having made a false statement to the Government in

violation of 18 U.S.C. § 1001.  He was sentenced in 2006 to

three years of probation, which included twelve days of

intermittent confinement, and to a $100,000 fine.  Shin now

seeks to vacate his conviction more than ten years after

judgment was entered.  Having long since paid his fine and

completed his term of probation and intermittent confinement, he

seeks a common law writ of coram nobis or audita querela.

        In his Verified Petition for Writ of Error Coram

Nobis, or Alternatively, for Writ of Audita Querela, filed on

September 22, 2015, Shin argues that he has recently discovered

exculpatory evidence that the Government should have disclosed

to him before he entered his guilty plea.  Specifically, Shin

contends that the Government wrongfully withheld evidence that a Navy engineer involved in the contracting process could not have testified as to the materiality of Shin's false statements. Shin says that, because materiality is an essential element of the false statement charge, his conviction should be vacated.

Although Shin's original materiality argument was couched in terms of an alleged violation by the Government of its disclosure obligation under *Brady v. Maryland*, 373 U.S. 83 (1963), Shin has, over time, refocused his materiality analysis. In 2016, months after Shin had filed his Verified Petition, the Supreme Court discussed the materiality standard applicable to a False Claims Act charge in *Universal Health Services, Inc. v. United States ex rel. Escobar*, 136 S. Ct. 1989 (2016). Less than a month later, the Ninth Circuit examined the materiality standard without mentioning *Escobar*. Rehearing was sought, and, on rehearing, the Ninth Circuit expressly considered *Escobar*'s materiality analysis. *See United States v. Lindsey (Lindsey I)*, 827 F.3d 865 (9th Cir. 2016), *rehearing granted and opinion withdrawn by* 854 F.3d 1047 (9th Cir. 2017); *see also United States v. Lindsey (Lindsey II)*, 850 F.3d 1009 (9th Cir. 2017). This court gave the parties in the present case an opportunity to discuss the recent materiality case law.

In his optional supplemental memoranda, Shin argues that *Escobar* articulates a new standard of materiality that

should be retroactively applied to his circumstances, and that
*Lindsey II* confirms this.  Particularly with respect to his
request for a writ of audita querela, Shin says that, under
*Escobar*, he could have raised a defense to the false claim
charge that he could not have availed himself of at the time he
pled guilty.  Shin reads *Escobar* as saying that, in the context
of a false claim charge, the relevant evidence concerns whether
the particular government decision-maker was affected by (or
would have been affected by) the false statement, not whether
the statement had the propensity to influence a decision.  That
is, Shin contends that, under *Escobar*, a false statement is
material only if the particular government official in issue
subjectively relied on it (or would have relied on it), and that
materiality is not viewed objectively.  Shin adds that, under
the new subjective standard he says *Escobar* established, a jury
would have likely acquitted him of the false statement charge in
light of evidence that the Navy official with "ultimate
approving authority" for government contracts would have
approved the contract in issue even knowing that Shin had made
false statements.

     Although Shin says that these arguments also apply to
his petition for a writ of coram nobis, he does not specifically
analyze *Escobar* or *Lindsey II* in the coram nobis context,
despite this court's invitation that he do so.  Instead, Shin

asks this court to allow him to amend his Verified Petition to include a request for coram nobis relief based on *Escobar*. He signals to this court that, if denied relief in the present order and if also denied a chance to amend his petition, he will reserve these arguments for a motion for reconsideration and an appeal.

This court denies Shin's petition for a writ of coram nobis and a writ of audita querela. The court also denies Shin's motion to amend his Verified Petition to raise *Escobar* in the coram nobis context. Having allowed Shin to argue any impact *Escobar* or *Lindsey II* may have on his coram nobis argument, this court concludes that it may proceed to determine that impact on the present record. This court further concludes that Shin is not entitled to further discovery or a hearing on his petition.

The present order replaces and supersedes this court's earlier order denying coram nobis relief and reserving any decision as to audita querela relief. That earlier order, filed on September 1, 2016, preceded the issuance of the *Lindsey II* opinion and the filing of additional briefs.

## II.      BACKGROUND.

At all times material to the conviction, Shin was authorized to act as an agent on behalf of JHL Construction, Inc., a general contracting company owned by Shin's nephew,

James Lee.  *See* ECF No. 91 in Crim. No. 04-00150 SOM,

PageID # 249.  (All ECF and PageID references are to Crim No.

04-00150, rather than to the companion civil case.)

In 2003, JHL was awarded a job order contract ("JOC")

by the Navy.  JOCs are based on pre-priced construction tasks.

The prices typically come from a unit price book.  *See id.*  The

Navy's unit price books list average costs that might be higher

or lower than the actual costs in a particular local economy.

*See id.*, PageID # 250-51.  Using the unit prices relied on by a

customer such as the Navy, a contractor proposes an appropriate

coefficient to apply to the unit prices to cover overhead and

profit, thereby arriving at the contract cost.  *See id*.

JHL anticipated that the unit prices would exceed

JHL's actual costs.  *See id.*, PageID #s 253-54.  Because JHL

would make a profit without adding any coefficient, JHL proposed

a zero percent coefficient and was awarded a zero coefficient

contract.  *See id*.

Once awarded to a contractor, a JOC allows an agency

to approach and negotiate with the contractor directly, as

construction needs come up.  *See id.*, PageID # 249-54.  In

August 2003, the Navy asked JHL to provide a proposal under the

JOC for the overhaul of Pump # 2, Drydock # 4, at Pearl Harbor

Naval Shipyard.  *See id.*, PageID #s 254-55.  The Navy was under

pressure to award a number of work orders by the end of the

Government's fiscal year (September 30, 2003), and assigning the Pump # 2 project to JHL's JOC was seen as a quick way to use current year funding. *See id.*

JHL provided a proposal for $2,360,153, which was forwarded to the Navy's Engineering Department for a technical review of the costs. *See id.*, PageID # 272. Wesley Choy, a mechanical engineer with the Navy's Engineering Department, questioned the costs, which he viewed as high. *See id.*, PageID #s 259-60; ECF No. 100, PageID # 395. The costs were not broken down, and he could not tell how the final number had been reached. *See* ECF No. 100, PageID # 395. Choy asked the contract administrator, Annette Ching, to get subcontractor quotes from JHL to substantiate JHL's cost proposal. *See id.*

On August 26, 2003, JHL submitted a second proposal for the reduced amount of $2,205,138. *See id.*, PageID #s 395-96. The second proposal did not include either a line item breakdown of costs or the requested subcontractor quotes. *See id.*, PageID # 396. Choy asked Ching to get the subcontractor quotes from the two proposed subcontractors, HSI Electric, Inc., and Alfred Conhagen, Inc. *See id.*

On September 4, 2003, Shin called HSI and asked it to increase its quote by $100,000, but to invoice JHL the original amount without the $100,000 markup. *See* ECF No. 64, ¶ 15. HSI

contacted the FBI to inform it of Shin's request.  *See id.; see also* ECF No. 91, PageID # 264.

As directed by the FBI, HSI then gave Shin the requested quote with the inflated price.  *See* ECF No. 64, ¶ 17; ECF No. 91, PageID # 265.  However, instead of submitting this quote to the Navy, Shin submitted HSI's quote from July 10, 2003, which concerned work on Pump # 1.  *See* ECF No. 64, ¶ 17; ECF No. 91, PageID # 264-65.  Shin used white-out to alter the $114,733 price on the July 2003 quote to $314,733.  *See* ECF No. 64, ¶ 17.

On September 4, 2003, Shin asked Conhagen to increase its quote by $180,000, bringing Conhagen's subcontract amount from $377,260 to $557,260.  *See id.*, ¶ 18.  Conhagen provided Shin with the requested quote for $557,260.  *See id.*

On September 8, 2003, Shin met with Choy and Ching to give them the altered HSI and Conhagen quotes.  *See id.*, ¶ 19; ECF No. 91, PageID # 264.  Shin ultimately submitted JHL's best and final offer of $2,150,000.  *See* ECF No. 64, ¶ 19; ECF No. 91, PageID # 269-70.

On September 23, 2003, federal agents executed a search warrant at Shin's business office.  *See* ECF No. 91, PageID # 266.  Shin confessed at that time to having submitted altered and inflated figures for the Pump # 2 job, explaining that the real subcontractor quotes would not have supported

JHL's cost proposal and would have caused the Navy to question the legitimacy of the proposal.  *See* ECF No. 64, ¶ 20.  He said that, while Conhagen had provided an inflated quote as he had requested, HSI's failure to do so right away had caused him to doctor HSI's quote from a previous job.  *See id.*

The Pump # 2 project did not involve pre-priced tasks listed in the Navy's unit book.  For that reason, performing work on Pump # 2 under JHL's zero coefficient JOC did not allow JHL to recover any overhead or profit.  Shin said the inflated subcontractor quotes were his way of recovering overhead and profit.  *See id.*

The Government charged Shin with having made a false statement to the Government.  *See* ECF No. 1.  On April 21, 2004, pursuant to a plea agreement, Shin pled guilty to that charge. *See* ECF No. 8.  On March 8, 2006, Shin was sentenced to three years of probation, which included twelve days of intermittent confinement, and a fine of $100,000.  *See* ECF No. 62, PageID #s 140-43.

During sentencing proceedings, Shin argued that the Pump # 2 job was not pre-priced and therefore had been improperly assigned under JHL's zero coefficient JOC, depriving JHL of a chance to recover overhead and profit.  *See* ECF No. 99, PageID #s 337-40.  Shin contended that he had altered the subcontractor quotes only to recover a reasonable profit on the

job.  *See id.*, PageID #s 340-41.  He denied any malicious intent, but acknowledged that the way he had handled the situation was wrong.  *See id.*, PageID #s 342-43, 372.  This court determined that "there was clearly an intent to deceive," *see id.*, PageID # 352, and called the offense "one of these dishonesty kinds of crimes," *see id.*, PageID # 368, but imposed a sentence that reflected the court's determination that the Government had failed to prove that Shin had intended to cause a loss.  *See id.*

After he was sentenced, Shin reached out to Choy several times to talk about Choy's role in the prosecution and to ask him for a written statement.  *See* ECF No. 91, PageID # 271.  Choy originally said that Government lawyers had told him not to provide any such written statement without approval from the U.S. Attorney's Office.  *See id.*, PageID #s 271-72.  Eventually, in approximately April 2014, Choy provided Shin with a typed, unsigned "clarification" statement regarding his role in the contracting process.  *See id.*, PageID # 272.

Choy's "clarification" statement includes the following points:  1) he recalled having stated at a meeting with Shin in 2003 that he understood that Shin needed to "roll" overhead and profit into the line items, given the zero coefficient contract, but that that was a contractual rather

than technical issue; 2) imposing a zero coefficient contract on JHL was not fair or reasonable; 3) Choy was surprised to hear that the project had a zero coefficient; and 4) Choy had turned the issue over to the contracting officer as the person authorized to resolve the matter. *See* ECF No. 91-2, PageID # 307.

In May 2015, Shin spoke with Choy regarding Choy's communications with "the Prosecutor and the Prosecutor's investigators." *See* ECF No. 91, PageID # 276. Without telling Choy, Shin taped the conversation. *See* ECF No. 102-3, PageID #s 470-91. When Shin asked Choy whether he had communicated to the Government personnel any of the points made in his April 2014 "clarification" statement, Choy allegedly stated that he had told the prosecutor and the prosecutor's investigators that he did not have the authority to decide whether JHL needed to be awarded extra money in the zero coefficient contract to cover its legitimate and reasonable overhead and profit. *See* ECF No. 91, PageID #s 277-78. Choy also allegedly told Shin: 1) the prosecuting authorities "put the gun" on him regarding his authority to decide the zero coefficient issue; 2) the prosecuting authorities "hid" the fact that Choy was not authorized to deal with the zero coefficient issue; 3) the prosecuting authorities only "heard what they wanted to hear to make their case"; and 4) a declaration that

the prosecuting authorities had had Choy sign was "sneaky" and "twisted" the facts he had given them. *See id.*

On September 22, 2015, Shin moved for a writ of coram nobis or, in the alternative, audita querela. The motion sought (1) the vacating of Shin's federal criminal conviction on one count of False Statement pursuant to 18 U.S.C. § 1001(a)(3); and (2) leave to withdraw his prior guilty plea in this case. *See id.*, PageID # 243.

Shin filed a motion for leave to depose Choy and Ching. *See* ECF No. 105. This court denied Shin's discovery request to the extent it supported his petition for a writ of coram nobis, but noted that it was premature for Shin to seek discovery in aid of a writ of audita querela because a writ of audita querela is a remedy of last resort, and his request for a writ of coram nobis was still pending. *See* ECF No. 117, PageID #s 600-01. This court thus deferred any ruling on Shin's discovery request insofar as it was brought in aid of obtaining a writ of audita querela. *See id.*, PageID # 601.

On September 1, 2016, this court denied Shin's petition for a writ of coram nobis and invited Shin to submit an optional supplemental memorandum regarding his alternative request for a writ of audita querela. *See* Order Denying Defendant's Petition for Writ of Error Coram Nobis, and Inviting Supplementation of Alternative Petition for Writ of Audita

11

Querela, ECF No. 126, PageID # 651.  This court again deferred
any ruling on Shin's discovery request to the extent it related
to his request for a writ of audita querela.  *See id.*

Shin's optional supplemental memorandum argues that,
in *Universal Health Services, Inc. v. United States ex rel.*
*Escobar*, 136 S. Ct. 1989 (2016), the Supreme Court set forth a
new definition of materiality that is retroactive and then
provides Shin with a defense that was not available to him at
the time judgment was entered.  *See* Shin's Supplemental
Memorandum Regarding His Motion for Writ of Audita Querela and
Motion to Amend Petition, ECF No. 135, PageID #s 746-50.  Shin
asserts that, given this new definition, his conviction should
be vacated as defective.  *See id.*  Specifically, he contends
that *Escobar* creates a new subjective materiality standard for
false statement claims, replacing the former objective
materiality standard.  *See id.*, PageID #s 746-49.  Shin says
that, under this new standard, his lies were immaterial if the
Government would have awarded the contract to him even knowing
that his subcontractor quotations were inflated.  *See id.*,
PageID #s 746-47, 751-53.

The Government counters that *Escobar* did not change
the law relating to materiality and thus did not create a legal
defect in Shin's conviction.  *See* Government's Opposition to
Shin's Motion for Writ of Audita Querela, ECF No. 136,

12

PageID # 757.  The Government contends that *Escobar* "simply applied the accepted definition [of materiality] to a particular context."  *See id.*, PageID # 760.

In responding to the Government's opposition, Shin submitted a declaration by Robert Hokama, who allegedly had the "ultimate" authority to approve the contract.  Hokama "would have approved the contract even if aware of SHIN's alteration of the subcontractor bids."  *See* Responding Memorandum Regarding Shin's Motion for Writ of Audita Querela, ECF No. 139, PageID #s 776-77.  Shin points to Hokama's statement as "very strong evidence" under *Escobar* that Shin's false statements were not material.  *See id.*, PageID # 777.

From 1997 to 2004, Hokama was the Director of Procurement Operations Division at Pearl Harbor responsible for contracting activity relating to the procurement for construction and maintenance of naval facilities.  *See* Declaration of Robert T. Hokama, ECF No. 139-1, PageID # 780. He supervised Annette Ching and was responsible for negotiating and recommending the contract awarded to JHL in 2003.  *See id.*, PageID # 781.  Hokama suggests that Ching did not follow certain procedures necessary to awarding contracts and states that he was "the ultimate decision-maker regarding whether to award the Contract or not" to JHL and Shin.  *See id.*, PageID #s 781-82. Hokama further states,

> I would have considered Shin's alteration of
> the subcontractor quotes as his effort to
> put JHL's proposal in a form appropriate for
> consideration and approval by the Government
> considering the Government's choice of a JOC
> for the Contract, so his alteration of the
> subcontractor quotes would not have been
> material to me.  This way, the Contract
> would have been awarded at a fair price to
> both the Government and JHL, and the funding
> for the Contract would not have been lost.
>
> . . .
>
> [Choy's] Government Estimate was prepared
> with a contract coefficient, and JHL's best
> and final offer, including the altered
> subcontractor quotes, was very close to the
> amount of the Government Estimate.  This is
> also a reason why the altered subcontractor
> bids, which contained amounts covering
> overhead and profit because of the task
> order's out-of-scope nature, would not be
> material to my decision to award the
> Contract to JHL as its best and final offer.

*See id.*, PageID #s 782-83.

On November 9, 2016, this court stayed its ruling on the audita querela issue pending the disposition of the rehearing motion before the Ninth Circuit in *United States v. Lindsey*.  *See* ECF No. 146.  Following the issuance of the *Lindsey II* opinion, this court invited the parties to file memoranda "addressing the new *Lindsey* decision and its impact, if any on Mr. Shin's petition (whether in the coram nobis or the audita querela context, or both)."  *See* ECF No. 150.

Just as they had dueling positions as to *Escobar*, the parties disagree on how to read *Lindsey II*.  According to Shin,

14

a "subjective standard should now apply to 'materiality'"
pursuant to *Lindsey II*. ECF No. 157, PageID # 865. Shin says
that *Escobar* stands for the proposition that "if the Government
pays *a particular claim* in full despite its actual knowledge
that certain requirements were violated, that is very strong
evidence that those requirements are not material." *Id.*,
PageID # 866. Because Hokama would have approved JHL's proposal
even had he known of the inflated subcontractor quotes, Shin
says his conviction should be vacated. *Id.*, PageID #s 865, 870-
72.

    Shin submits yet another declaration from Hokama, this
one noting that Hokama's certificate of appointment "stated no
limitation on the scope of [his] authority, other than
limitations contained in applicable law or regulation." *See*
Supplemental Declaration of Robert T. Hokama, ECF No. 157-1,
PageID # 873. As the "designated contracting officer with
highest authority for NAVFAC," he says that he "enjoyed a wide
latitude to exercise business judgment." *Id.*, PageID # 874.
Hokama further states, "The U.S. Government is not one
monolithic entity which decides contracting issues uniformly
across every aspect of the procurement process." *Id.* He "would
have approved of the JHL Pump 2 contract even with knowledge
that Mr. SHIN provided altered subcontract bids and would not

have considered the alterations by Mr. Shin 'material'."  *Id.*,
PageID # 875.

The Government points out that Shin offers no evidence
of a systemic practice of ignoring the use of altered documents
or a contractor's stated costs in determining whether bid prices
are fair and reasonable.  ECF No. 156, PageID # 861.

**III.    ANALYSIS.**

**A.    Writ of Coram Nobis.**

The 1946 amendments to Federal Rule of Civil Procedure
60(b) expressly abolished several common law writs, including
the writ of coram nobis.  In *United States v. Morgan*, 346 U.S.
502, 511 (1954), the Supreme Court held that district courts
still retain limited authority to issue common law writs such as
writs of coram nobis and audita querela in collateral criminal
proceedings.

These common law writs survive "only to the extent
that they fill 'gaps' in the current systems of postconviction
relief."  *United States v. Valdez-Pacheco*, 237 F.3d 1077, 1079
(9th Cir. 2001).  Such writs are not available when the claims
raised would be cognizable in petitions under 28 U.S.C. § 2255.

A writ of coram nobis is "a highly unusual remedy,
available only to correct grave injustices in a narrow range of
cases where no more conventional remedy is applicable."  *United
States v. Riedl*, 496 F.3d 1003, 1005 (9th Cir. 2007).  It is

distinguishable from a habeas petition, which is available only when convicted defendants are in "custody." *See Hensley v. Municipal Court*, 411 U.S. 345, 349 (1973); *Jones v. Cunningham*, 371 U.S. 236, 243 (1963). A writ of coram nobis allows a petitioner to attack a conviction when the petitioner has already finished his sentence and is no longer in custody. *See McKinney v. United States*, 71 F.3d 779, 781 (9th Cir. 1995).

To qualify for coram nobis relief, a petitioner must establish all of the following: (1) a more usual remedy is not available; (2) valid reasons exist for not having attacked the conviction earlier; (3) there are adverse consequences from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character. *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987). "Because these requirements are conjunctive, failure to meet any one of them is fatal." *Matus-Leva v. United States*, 287 F.3d 758, 760 (9th Cir. 2002).

**1. Shin Satisfies the First Three of the Four Requirements for the Issuance of a Writ of Coram Nobis.**

Shin satisfies three of the four requirements for the issuance of a writ of coram nobis.[1]

---

[1]    Shin's plea agreement included a waiver of his right to collaterally attack his sentence except when the attack is based on a claim of ineffective assistance of counsel or any upward departure by the court. *See* ECF No. 8. Although Shin's

First, a more usual remedy is not available here. *Hirabayashi*, 828 F.2d at 604. Shin has completed his sentence and cannot seek relief under § 2255. *See* 28 U.S.C. § 2255 (providing that a "prisoner in custody . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence").

Second, Shin has suffered reputational, professional, and social consequences as a result of his criminal conviction. *See* ECF No. 91, PageID # 285. He states in his Verified Petition that he has lost business opportunities because of his conviction and that newspaper articles published as recently as August 2015 continue to refer to his felony conviction. *See id.*, PageID # 297. The Ninth Circuit has "repeatedly affirmed the presumption that collateral consequences flow from any criminal conviction." *Hirabayashi*, 828 F.2d at 606.

Third, Shin has valid reasons for not having attacked his conviction earlier. Although a petition for a writ of coram nobis is not subject to a statute of limitations, the petitioner must show that there were valid reasons that the conviction was not attacked earlier. *See id.* at 604-05. This requirement

petition for a writ of coram nobis is a type of collateral attack, it does not challenge the sentence. Instead, Shin attacks the underlying conviction, which the Government concedes was not covered by the appeal waiver. *See* ECF No. 100, PageID # 402.

upholds a court's gate-keeping in barring claims that are unjustifiably late. Shin's petition is based on allegedly exculpatory statements that Choy made to the Government, but that Shin only learned of during a conversation with Choy in May 2015. *See* ECF No. 91, PageID #s 294-95. Shin filed his petition in September 2015. *See id.*, PageID # 305. To the extent Shin relies on *Escobar* and *Lindsey II*, those decisions issued after Shin had filed the petition before this court. These circumstances provide valid reasons for Shin's failure to file his petition earlier.

> **2. Shin Does Not Satisfy the Fourth Factor (a Fundamental Error Rendering His Conviction Invalid) Required for the Issuance of a Writ of Coram Nobis.**

The fourth factor requires an error of "the most fundamental character." *Matus-Leva*, 287 F.3d at 760. A fundamental error is an error that renders the underlying proceeding itself irregular and invalid. *See Morgan*, 346 U.S. at 502; *Hirabayashi*, 828 F.2d at 604; *see also United States v. George*, 676 F.3d 249, 258 (1st Cir. 2012) ("[A]n error of the most fundamental character must denote something more than an error simpliciter" (citation and internal quotations omitted)).

The Supreme Court and the Ninth Circuit have identified a limited number of fundamental errors, including ineffective assistance of counsel, *see United States v.*

*Ifenatuora*, 586 F. App'x 303, 304 (9th Cir. 2014), *cert. denied*, 135 S. Ct. 1750 (2015); a federal criminal trial without defense counsel and without a competent and intelligent waiver of counsel, *see Morgan*, 346 U.S. at 512; a guilty plea induced by a bargain that was not kept, *see Holloway v. United States*, 393 F.2d 731, 732 (9th Cir. 1968); an erroneous jury instruction relieving the prosecution of the burden of proving an essential element of the offense, *see United States v. McClelland*, 941 F.2d 999, 1003 (9th Cir. 1991); and the nondisclosure of exculpatory evidence in violation of *Brady*, *see Ikbal v. United States*, 304 F. App'x 604, 606-07 (9th Cir. 2008).

The only error Shin initially identified that falls within the errors described above is what he alleges was the Government's *Brady* violation. According to Shin, the Government failed to disclose key evidence that was exculpatory and material to the defense for impeachment purposes. *See* ECF No. 91, PageID # 243-45.

Generally, there are three components to a *Brady* violation: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999); *see also Turner v. United States*, No. 15-1503, 2017 WL 2674152,

at *8-9 (U.S. June 22, 2017) (focusing on whether petitioners established prejudice and materiality of withheld evidence, including whether there was a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different"); *Hamilton v. Ayers*, 583 F.3d 1100, 1110 (9th Cir. 2009) (analyzing alleged *Brady* violation and concluding defendant was not prejudiced).

In *United States v. Ruiz*, 536 U.S. 622 (2002), the Supreme Court held that "the Constitution does not require the Government to disclose material impeachment evidence prior to entering a plea agreement with a criminal defendant." *Id.* at 633. *See also United States v. Eltringham*, 550 F. App'x 398, 399 (9th Cir. 2013). The Supreme Court explained:

> [I]mpeachment information is special in relation to the fairness of a trial, not in respect to whether a plea is voluntary ("knowing," "intelligent," and "sufficient[ly] aware"). Of course, the more information the defendant has, the more aware he is of the likely consequences of a plea, waiver, or decision, and the wiser that decision will likely be. But the Constitution does not require the prosecutor to share all useful information with the defendant. *Weatherford v. Bursey*, 429 U.S. 545, 559, 97 S. Ct. 837, 51 L. Ed. 2d 30 (1977) ("There is no general constitutional right to discovery in a criminal case"). And the law ordinarily considers a waiver knowing, intelligent, and sufficiently aware if the defendant fully understands the nature of the right and how it would likely apply in general in the circumstances--even though the defendant may not know the specific detailed consequences of invoking it. A defendant, for example, may waive

21

> his right to remain silent, his right to a jury
> trial, or his right to counsel even if the
> defendant does not know the specific questions
> the authorities intend to ask, who will likely
> serve on the jury, or the particular lawyer the
> State might otherwise provide.

*Ruiz*, 536 U.S. at 629-30 (second alteration in original)

Therefore, under *Ruiz*, the withholding of evidence that was only impeaching would not rise to the level of a *Brady* violation, let alone a *Brady* violation sufficient to justify the issuance of an extraordinary writ. Because Shin elected to plead guilty pursuant to a plea agreement, he can only establish a *Brady* violation by a showing that the Government withheld exculpatory (not just impeaching) evidence from him prior to his guilty plea.

Shin was convicted under 18 U.S.C. § 1001(a)(3) for having made a false statement to the Government. Section 1001(a)(3) imposes criminal liability for "whoever, in any matter within the jurisdiction of the executive, legislative, or judicial branch of the Government of the United States, knowingly and willfully . . . makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry." "A conviction under § 1001 requires the government to prove (1) a statement, (2) falsity, (3) materiality, (4) knowledge, and (5) jurisdiction." *United States v. Peterson*, 538 F.3d 1064, 1073

(9th Cir. 2008) (quoting *United States v. Atalig*, 502 F.3d 1063, 1066 (9th Cir. 2007)).

Shin does not dispute that he made a false statement to the Government in submitting a project bid with subcontractor quotes that were inflated by a total of $380,000. *See* ECF No. 91, PageID #s 266-67. But Shin says the Government committed a *Brady* violation by failing to disclose that it could not have shown that the inflated quotes were material, as required for a conviction at trial. *See id.*, PageID #s 279-81.

Under 18 U.S.C. § 1001(a)(3), the element of materiality is evaluated under "an objective test, which looks at 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end.'" *Peterson*, 538 F.3d at 1072 (quoting *United States v. Facchini*, 832 F.2d 1159, 1162 (9th Cir. 1987)).

"To be material a statement need only have the propensity or capacity to influence or affect an agency's decision." *United States v. Rodriguez-Rodriguez*, 840 F.2d 697, 700 (9th Cir. 1988). "The agency need not rely on the information in fact for it to be material." *Id.* "Materiality, therefore, is not measured by effect or magnitude." *Facchini*, 832 F.3d at 1162.

Materiality is a question for the trier-of-fact. *See United States v. Gaudin*, 515 U.S. 506, 511-15 (1995).

As noted above, Shin's focus on materiality has undergone a change during the pendency of the petition now before this court. Shin views cases like *Peterson* and *Rodriguez-Rodriguez* as undercut by the recent *Escobar* and *Lindsey II* decisions. Those decisions, issued in the course of this case, have, according to Shin, changed the law of materiality. This court is not persuaded by Shin's argument.

This court initially cited *Lindsey I* in considering the Government's appeal from a Magistrate Judge's ruling permitting Shin to depose Choy. *See* ECF No. 117, PageID # 608. The court's citation, however, was to a discussion in *Lindsey I* that relied on longstanding Ninth Circuit law on materiality, not to any new discussion unique to *Lindsey I*. That longstanding Ninth Circuit law was not, like *Lindsey I*, withdrawn and replaced by *Lindsey II*. When the Ninth Circuit withdrew *Lindsey I* and subsequently issued *Lindsey II*, which expressly addressed the Supreme Court's materiality analysis in *Escobar*, this court allowed the parties to submit briefs addressing *Lindsey II.*

Shin reads *Escobar* as having changed the well-established objective materiality standard to a subjective materiality standard. Shin also reads *Lindsey II* as acknowledging the applicability of a subjective materiality standard in false statement cases. According to Shin, *Escobar*

creates a new legal defense that was not previously available to him and thus creates a legal defect in his conviction. Notably, this "legal defect" argument goes more to the standard for a writ of audita querela, discussed later in this order, than to the standard for a writ of coram nobis.

Despite this court's invitation to address how *Lindsey II* affects either his coram nobis argument or his audita querela argument, *see* ECF No. 150, Shin provides no specifics as to how either *Escobar* or *Lindsey II* entitles him to coram nobis relief. Instead, Shin says:

> The question now becomes whether the *Escobar* decision regarding the definition of "materiality" is more appropriately raised in a coram nobis or audita querela petition. If *Escobar* is viewed as "clarifying" the definition of "materiality," then a writ of coram nobis is more appropriate to raise the *Escobar* issue. If *Escobar* is viewed as "creating a new definition" of "materiality," then audita querela applies. In a sense, it does not matter which way this Court views the situation because SHIN has pled both coram nobis and audita querela petitions.

ECF No. 157, PageID # 869. Shin had also previously stated:

> Although we believe that an argument can be made that the [*Escobar*] case is applicable to SHIN's coram nobis petition, this Court has already dismissed the coram nobis petition (apparently considering [*Escobar*] based on some of this Court['s] recent rulings), so we will reserve this argument for a motion for reconsideration if this Court dismisses SHIN's entire Petition and for possible appeal. If [*Escobar*] does not apply to SHIN's coram nobis petition, we believe, as argued above, it applies to his audita querela petition.

ECF No. 135, PageID # 753.

In his most recent supplemental memorandum, Shin notes that he has previously asked this court to allow him to amend his Verified Petition to "include allegations relating to *Escobar*," and complains that "so far, this Court has ruled based on *Lindsey I* without consideration of the applicability of *Escobar* to the Petition." ECF No. 157, PageID # 869. This court gave Shin an expanded word limit and additional time to file his most recent optional memorandum to supplement prior filings and to address the impact of recent court decisions on his coram nobis petition. *See* ECF No. 155. It is unclear to this court why Shin could not have raised specific arguments as to why and how *Escobar* and *Lindsey II* entitle him to a writ of coram nobis.

This court nevertheless considers here whether either *Escobar* or *Lindsey II* affects Shin's petition for a writ of coram nobis.

In *Escobar*, the Supreme Court discussed materiality and what types of evidence might be relevant to proving materiality depending on the specific facts of a case. *See Escobar*, 136 S. Ct. at 2003-04. *Escobar* concerned claims arising under the False Claims Act. A patient had died while being treated at a mental health clinic by various unlicensed and unsupervised staff in alleged violation of state Medicaid

regulations.  *Id.* at 1995-97.  The Supreme Court examined when

liability could be imposed under the FCA.  *Id.* at 1996.

Specifically, the Supreme Court stated,

> What matters is not the label the Government
> attaches to a requirement, but whether the
> defendant knowingly violated a requirement
> that the defendant knows is material to the
> Government's payment decision.  A
> misrepresentation about compliance with a
> statutory, regulatory, or contractual
> requirement must be material to the
> Government's payment decision in order to be
> actionable under the False Claims Act.

*Id.*

The Court noted that the FCA definition of

"materiality" used language that had been employed to define

that term in other federal fraud statutes.  *Id.* at 2002.  For

example, the Court noted that *Neder v. United States*, 527 U.S. 1

(1999), and *Kungys v. United States*, 485 U.S. 759 (1988), had

used the following definition to interpret the relevant federal

fraud statutes:  "[T]he term 'material' means having a natural

tendency to influence, or be capable of influencing, the payment

or receipt of money or property."  *Escobar*, 136 S. Ct. at 2002.

With respect to the standard that should be applied to

determining materiality in *Escobar*, the Supreme Court stated,

"Under any understanding of the concept, materiality 'look[s] to

the effect on the likely or actual behavior of the recipient of

the alleged misrepresentation.'"  *Id.* (quoting 26 R. Lord,

<u>Williston on Contracts</u> § 69:12, p. 549 (4th ed. 2003)

(Williston)).  This standard is consistent with the objective

evaluation of materiality in *Neder* and *Kungys.*

The Supreme Court then concluded that, in the FCA

context, the Government's provision of proof as to materiality

varied depending on the specific facts of the case:

> In sum, when evaluating materiality under
> the False Claims Act, the Government's
> decision to expressly identify a provision
> as a condition of payment is relevant, but
> not automatically dispositive.  Likewise,
> proof of materiality can include, but is not
> necessarily limited to, evidence that the
> defendant knows that the Government
> consistently refuses to pay claims in the
> mine run of cases based on noncompliance
> with the particular statutory, regulatory,
> or contractual requirement.  Conversely, if
> the Government pays a particular claim in
> full despite its actual knowledge that
> certain requirements were violated, that is
> very strong evidence that those requirements
> are not material.  Or, if the Government
> pays a particular type of claim in full
> despite actual knowledge that certain
> requirements were violated, and has signaled
> no change in position, that is strong
> evidence that the requirements are not
> material.

*Id.* at 2003-04.  The Court thus expressly disagreed with the

view that "any statutory, regulatory, or contractual violation

is material so long as the defendant knows that the government

would be entitled to refuse payment were it aware of the

violation."  *Id.* at 2004.

Shortly after *Escobar* was published, the Ninth Circuit decided *United States v. Lindsey (Lindsey I)*, 827 F.3d 865 (9th Cir. 2016). *Lindsey I* involved wire fraud counts arising in the mortgage loan context. The defendant had challenged the materiality of false responses to lender requests. The Ninth Circuit adopted a "bright-line test," holding "that when a lender requests specific information in its loan applications, false responses to those specific requests are objectively material for purposes of proving fraud." *Id.* at 871. The Ninth Circuit ultimately withdrew *Lindsey I*. *See United States v. Lindsey (Lindsey I)*, 854 F.3d 1047 (9th Cir. 2017) (granting rehearing and withdrawing published opinion and companion memorandum disposition in *Lindsey I*). In *United States v. Lindsey (Lindsey II)*, 850 F.3d 1009 (9th Cir. 2017), the Ninth Circuit deleted the prior reference to a "bright-line" test under which the fact of an inquiry rendered a false response material. But this deletion did not signal the adoption of a subjective standard.

In *Lindsey II*, the Ninth Circuit addressed the district court's exclusion of evidence offered by the defendant to prove that false statements in loan applications were not material to a lender's decision-making. *See id.* at 1013-18. The defendant had offered evidence at trial that specific individual lenders would have approved particular loans even

knowing about false statements on loan applications. *See id.* at 1014. The district court excluded that evidence, and the Ninth Circuit concluded that evidence about particular lending decisions, as opposed to evidence of how the lending industry typically treated statements and requirements on loan applications, were properly excluded. *Id.* at 1015-18.

Escobar does not say that a subjective standard now applies to any evaluation of the materiality of a false statement. *Escobar* actually relies on objective definitions of "materiality" that the Supreme Court observed have roots in "common-law antecedents" in the fraud context. *See Escobar*, 136 S. Ct. at 2002 (quoting *Neder* and *Kungys*).

While *Escobar* noted that, "if the Government regularly pays a particular type of claim in full despite actual knowledge that certain requirements were violated, and has signaled no change in position, that is strong evidence that the requirements are not material," *id.* at 2003-04, that statement provided an example of the kind of evidence relevant to proving the materiality of a false statement in the context of the False Claims Act. *See id.* Shin is stretching that statement when he contends that *Escobar* altered the decades-old objective standard for evaluating the materiality of a false statement. Shin's error is made clear by the Ninth Circuit in *Lindsey II.*

In *Lindsey II*, the Ninth Circuit emphasized that the "element of materiality is evaluated under an objective test, in which we must examine 'the intrinsic capabilities of the false statement itself, rather than the possibility of the actual attainment of its end." 850 F.3d at 1014. The Ninth Circuit affirmed Lindsey's conviction, noting that "[a] false statement is material if it *objectively* had a tendency to influence, or was capable of influencing, a lender to approve a loan." *Id.* at 1015 (emphasis in original) (citations omitted). Looking to some of the "common-law antecedents" relied on by the Supreme Court in *Escobar*, the Ninth Circuit stated, "In general a false statement is material if it has 'a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed.'" *Id.* at 1013-14 (alteration in original) (quoting *Neder*, 527 U.S. at 16).

*Lindsey II* carefully distinguished the "subjective effect" on a victim from the "intrinsic capabilities of a statement to influence" a decision-maker. *Id.* at 1015-16. The Ninth Circuit observed that evidence of a particular lender's negligence or the intentional conduct of a particular lender in disregarding false statements had "little relevance to whether those statements are intrinsically able to influence a decision." *Id.* at 1015. "[M]ateriality is an objective element, and an absence of reliance does not affect its

presence." *Id.* at 1015-16.  That is, "a victim's intentional disregard of relevant information is not a defense to wire fraud and thus evidence of such disregard is not admissible as a defense to mortgage fraud." *Id.* at 1016.

*Lindsey II* indicates that it is evidence of a widespread practice, not of the individual behavior of a specific decision-maker, that may establish materiality under an objective standard.  *Id.*  When the Government is the victim of a falsehood, the Government may be seen as "represent[ing] the entire market for issuing federal government contracts." *Id.* at 1017.  "The weight the Government gives to a particular statutory, regulatory, or contractual requirement is analogous not to the weight an individual lender gives to a statement on its loan application, but rather the weight the entire mortgage industry gives to that type of statement." *Id.*  This distinction underscores the objective materiality standard under which "materiality measures natural capacity to influence, not whether the statement actually influenced any decision." *Id.*

The reasoning of *Escobar* and *Lindsey II* makes it clear that materiality continues to be measured under an objective standard.  Shin conflates this objective standard with the types of evidence that may be relevant and admissible in certain contexts.  To address what Shin argues, this court turns now to

how the objective materiality standard applies to the facts of the present case.

In focusing on materiality, Shin relies heavily on Choy's "clarification" statement and his statements in a later conversation that Shin recorded. Shin says these statements show that the Government withheld exculpatory evidence that Choy "was not a competent or qualified witness to testify about the issue of 'materiality.'" *See* ECF No. 91, PageID # 244. Shin argues that Choy's post-sentencing statements show that Choy, far from helping the Government prove its case, would have "negated the 'materiality' element of the False Statement charge." *See id.* Shin adds that this evidence also reveals that "Choy was an exculpatory witness regarding the issue of 'materiality'" because Choy's comments show that the false statement was not material to him. *See id.*

Choy's "clarification" statement reads:

(1) Clarification as to my role in this contract. I am not a contracting official nor do I have the authority to revise a contractual requirement. My task was to review the contractor's proposal to ensure that the contractor scope of work is in accordance with the Governments scope of work and provide an opinion on a fair and reasonable price for the Government.

(2) On 14 August 2003 despite the fact that the contractor's proposal was with range 6% ($148,903) of the Government estimate (GE $2,211,250 vice contractor proposal $2,360,153), I was requested by the contracting administer to review the contractor's proposal for technical

compliance (i.e. Contractor's scope of work) and provide an opinion on a fair and reasonable price. Since the contractor proposal consisted of aggregated pricing it was difficulty to determine if the contractor proposal was in practicable in line eh Government scope of work, I requested to the contracting administer if the contractor can provide additional breakdown of their proposal.

(3) On September 8, 2003, I attended a meeting along with the contracting administer in which Mr. Patrick Shin explained to the Government that based on this contractor he had a zero coefficient for this project. I recall stating that I understand that Mr. Shinn needed to "roll" this overhead and profit into the line items since he had a zero coefficient but that is a contractual issues and not a technical issue.

(4) My Government estimate was prepared with a contractor coefficient. It was my understanding during this time that the contractor's coefficient included their overhead and profit so to not include a coefficient would not be fair and would be unreasonable. I was surprised by the fact that this project had a zero coefficient and turned this issue to the contracting officer, the authorized person, to resolve.

ECF No. 91-2, PageID # 307 (grammar and spelling as in original).

Shin characterizes Choy's "clarification" statement as exculpatory, treating it as an admission by Choy that he could not have been a materiality witness for the Government. But this argument assumes that the Government had no other way of proving materiality. As it turns out, Choy was not the only source of materiality evidence.

Even assuming the materiality analysis focuses on an individual's mindset, as Shin contends it should, the Government could have used testimony by Annette Ching, the contracting officer for the project bid, on the issue of whether Shin's statement was material to the decision to award the job to JHL. Ching's declaration indicates the type of testimony she may have given on the Government's behalf had Shin's case gone to trial. *See* ECF No. 100-3. Ching states that she "was assigned responsibility for negotiating and recommending the award of a task order contract for the overhaul of Pump #2, Dry Dock #4 at the Pearl Harbor Naval Shipyard." *See id.*, PageID #s 429-30. She adds:

> I later learned from criminal investigators that the HSI Electric and Conhagen quotations given to me by Shin had been inflated by $380,000, by altering the original quotations. Had I known that the quotations were altered and inflated, I would have recommended against the award of the contract to JHL. I would have been concerned both about the actual costs incurred by JHL, and about the integrity of the company.

*See id.*, PageID # 431.

> Ching also states:

> Regardless of the coefficient on the job, I wanted to know the actual costs of the contractor for purposes of deciding whether to award the contract and at what price. Choy would be responsible for determining whether the proposal was technically acceptable. I would be responsible for determining whether the price was fair and reasonable. The true subcontractor costs charged to JHL would have been a factor

> Choy and I could have considered in making our
> decisions.

*See id.*  Assuming that, as Shin argues, an individual's reaction

is relevant to establishing materiality, testimony by Ching at

trial that JHL's actual costs would have influenced her decision

as to whether the proposed price was fair, and that she would

not have recommended a contract with JHL had she known that the

costs were inflated, could have established that the inflated

quotes had the propensity or capacity to influence or affect the

Navy's award of the job.  *See Rodriguez-Rodriguez*, 840 F.2d at

700.

Even if, for some reason, the Government could not

have called Ching as a fact witness, it could conceivably have

called her as an expert witness regarding what the Navy

considers in its decision to award such projects, and whether

statements such as Shin's would normally be material to the

Navy's decision-making process.  Shin himself acknowledges that

materiality may be proven through an expert witness.  *See* ECF

No. 91, PageID # 268 ("Materiality is best shown by the

testimony of a witness, generally those who make the decisions

on the application or statements in the particular case,

concerning the influence that defendant's allegedly false

statement might have had on the ultimate result of the

transaction.  Such a witness may be an expert witness or a fact

witness, or both." (quoting Dep't of Just. Manual Resource
Manual Title 9 Number 911)).

In its earlier discovery order, this court noted that,
alternatively or additionally, the Government could have relied
on other witnesses like Robert Hokama to testify regarding
materiality. *See* ECF No. 117, PageID # 613. While not involved
in the negotiations in which Shin made his false statement,
Hokama was the Director of the Procurement Operations Division
for Pearl Harbor and Ching's supervisor at the time Shin was
negotiating the contract on behalf of JHL. *See* ECF No. 48-1.

After this court issued its order referring to
possible testimony by Hokama concerning materiality, Shin filed
several memoranda indicating that Hokama had recently told
Shin's counsel that he would have approved JHL's proposal even
had he known it included falsified subcontractor amounts. Shin
followed up with declarations by Hokama. This court recognizes
that the Government would not, after all, have called Hokama as
a materiality witness at trial if Government attorneys had known
that he would testify in accordance with his recent
declarations. Shin's counsel conceded, however, that he had no
information suggesting that Hokama ever communicated the content
of his declarations to anyone before Shin pled guilty. In the
absence of any statement by Hokama about his hypothetical
approval of a contract in the face of knowledge that it included

falsities, the Government could have contemplated calling him as a materiality witness.  More importantly, Hokama's earlier silence on the subject means that the Government's failure to disclose his view could not serve as the basis of a *Brady* violation.  The Government has no duty to disclose exculpatory "evidence" that is simply an unspoken hypothetical locked in an individual's mind.

In any event, there is no evidence that Hokama speaks for the Government as a whole when he says he would not have been affected by Shin's statements even knowing they were false.  As a contracting officer, Hokama had decision-making authority that is more easily analogized to the decision-making authority that an individual loan officer or particular lender may have had in *Lindsey II*, not to the lending industry as a whole.  As noted earlier, *Lindsey II* counsels that it is the practice of the industry as a whole that is relevant to materiality.  850 F.3d at 1017.  Even if Hokama as an individual decision-maker would have condoned Shin's false statements, Hokama's attitude would not make the false statements material.  As the Ninth Circuit said in *Lindsey II*, "Two wrongs do not make a right, and lenders' negligence, or even intentional disregard, cannot excuse another's criminal fraud."  *Id*. at 1014.

This is consistent with *Maslenjak v. United States*, No. 16-309, 2017 WL 2674154, at *8 (U.S. June 22, 2017), in

which the Supreme Court discussed the materiality of false statements made to individual government decision-makers in the context of immigration law.  *Id*. at *8.  Divna Maslenjak, who had immigrated to the United States from Bosnia in the 1990s as a refugee and who was later naturalized, was charged with having "procure[d], contrary to law, naturalization" in violation of 18 U.S.C. § 1425(a).  *Id.* at *4.  Maslenjak was accused of having violated § 1425(a) by allegedly knowingly making a false statement under oath in a naturalization proceeding in violation of 18 U.S.C. § 1015(a).  *Id.*

With respect to false statements made to government officials, the Supreme Court said that "objective legal criteria" determine "whether a false statement sufficiently altered [] processes [so] as to have influenced an award of citizenship."  *Id*. at *8.  The Supreme Court observed that government officials must apply immigration laws "faithfully-- granting naturalization when the applicable criteria are satisfied, and denying it when they are not."  *Id.* (citing *Kungys*, 485 U.S. at 774 n.9).  "The entire system, in other words, is set up to provide little or no room for subjective preferences or personal whims.  Because that is so, the question of what any individual decisionmaker might have done with accurate information is beside the point."  *Id.*  The Supreme Court further stated that a defendant in this situation "should

39

neither benefit nor suffer from a wayward official's deviations from legal requirements." *Id.* That is, the actions of a particular individual official should not affect the analysis of whether a false statement is material. Instead, the inquiry is "framed in objective terms: To decide whether a defendant acquired citizenship by means of a lie, a jury must evaluate how knowledge of the real facts would have affected a reasonable government official properly applying naturalization law." *Id.*

In *Escobar*, the Supreme Court looked to the Government as a whole. Hokama's position was akin to that of an immigration official determining whether an applicant should or should not be granted naturalization status. Because our system of Government leaves "little or no room for subjective preferences or personal whims," what Hokama might have done if he had known of Shin's lies is "beside the point" for materiality purposes. *See id.* Under the analysis in *Maslenjak*, Shin should "neither benefit nor suffer" from Hokama's subjective preferences. The inquiry into the materiality of a false statement continues to be measured under an objective standard.

This court has read Shin's contention that he did not know prior to his guilty plea that the Government had any materiality witness besides Choy. Shin appears to be claiming that this somehow means that the Government may not rely on

other materiality evidence.  *See* ECF No. 115-1, PageID # 578.

It is far-fetched that Shin, who, in his own words, "was

experienced in federal government contracting matters," *see* ECF

No. 91, PageID # 249; *see also id.*, PageID #s 245-46, did not

know that Ching might have had something to say about Shin's

false statements.  But even if Shin thought Choy was the sole

possible witness on materiality, the Government was not bound by

Shin's assumptions.  The Government was and is free to present

all the evidence in its possession to establish that Shin's

false statements were material.

It is not the case that, before Shin pled guilty, the

Government was required to outline for Shin which person or

persons might provide evidence at trial going specifically to

materiality or to any other element of a false statement charge.

Nor does Shin point to anything suggesting that the Government

misled him into believing that its only source of materiality

evidence was Choy.  *Cf. Ruiz*, 536 U.S. at 632 ("Consequently,

the Ninth Circuit's requirement could force the Government to

abandon its 'general practice' of not 'disclos[ing] to a

defendant pleading guilty information that would reveal the

identities of cooperating informants, undercover investigators,

or other prospective witnesses.'").  Indeed, Shin's counsel

admitted during a telephone conference with the court on August

23, 2016, that the Government never expressly identified Choy as

its materiality witness.  *See* ECF No. 125.  According to Shin's counsel, Choy's role in the Navy's review of the JHL bid supported Shin's assumption that Choy was the Government's materiality witness.  But any assumption by Shin that Choy was the Government's only possible materiality witness was unjustified.

It also bears noting that, even assuming Choy's individual mindset were as critical as Shin contends, Shin overstates what Choy told Shin after Shin was sentenced.  Choy never admitted that he could not have testified regarding the materiality of Shin's statement.  Although Choy believed that, because he was not the contracting authority, he could not testify about contractual issues such as whether or not JHL should have been awarded the contract in spite of Shin's false statement, Choy might still have testified about a number of issues relevant to materiality.  For example, Choy could have testified as to why he asked JHL to provide subcontractor quotes; whether including the Pump # 2 work in JHL's JOC was typical or a mistake; what type of information Ching had requested in regards to the JHL bid; what type of technical assistance Choy had given Ching regarding the JHL bid; and a host of other things not requiring testimony as to how Choy might have decided whether to award the project to JHL.  Choy's insistence that he could not testify as to decision-making

issues versus "technical" issues relates only to the scope of his testimony. That insistence does not go to whether he had anything at all to say about materiality, assuming, as Shin contends, that Choy's individual mindset is relevant to materiality.

Choy was a potential Government witness, not a Government lawyer. Any so-called "admission" by him about what he was legally able to say could not have precluded a Government lawyer from calling him to testify about materiality.

Shin also argues that statements in Choy's declaration and recorded conversation indicate that Choy believed Shin's misrepresentations were immaterial. Even if Choy's belief were relevant here, there is no such indication. During the recorded conversation, Shin pressed Choy to admit that he had told Government prosecutors that the inflated quotes did not matter. But Choy appears to have instead repeatedly explained that he lacked the authority to decide such contracting issues. Shin asked, "Did you ever explain to [the Government prosecutor] about coefficient and the--he thought that--you know, roll in profit and overhead[?]" *See* ECF No. 102-3, PageID # 481. Choy answered, "I know that was the issue. The issue--and that wasn't for me--that's why it's a contracting issue. That wasn't for me to decide whether, you know, he bid--Nan, Inc. [Shin's

company] bid--but realized that he needed to make profit and overhead." *See id.*, PageID # 482.

> Shin again pressed Choy:
>
> Shin:  So when you talked to, like, [the Government prosecutor] and these government people, you explained there's no coefficient and we had to roll it in profit and overhead and--but do they still understand when you were talking to them?
>
> Choy:  So I told them that, but I told them I think--because it's an ACQ issue, acquisition issue, that's not for me to decide whether they going let Nan, Inc. roll into the--into the--
>
> Shin:  Roll in the coefficient?
>
> Choy:  Yeah, yeah.  That's not my call.  I don't have the authority to make that kind of call.
>
> Shin:  Uh-huh.
>
> Choy:  So I remember telling them about the zero percent coefficient.  I remember telling them, "Does it have that?"  So I kept--I remember telling them that it's not my job responsibility to--do that, it's acquisition's.

*See id.*, PageID #s 482-83.  *See also id.*, PageID # 481 (discussing contract question about whether Government could give zero coefficient contract to Nan, Inc., and noting, "I'm not the one that--I'm not supposed to decide" and "I don't know" about contracting issues); *id.*, PageID # 482 ("[T]hat's not for me to decide.  That's ACQ guys.  I just over here to review the technical aspect and say that, oh, does this make sense kind of deal, right.").

Choy's belief that this issue fell outside his duties is not an indication as to materiality at all.

Shin contends that the following statement by Choy also indicates that Choy would testify that Shin's statement was not material to him:

> It was my understanding during this time that the contractor's coefficient included their overhead and profit so to not include a coefficient would not be fair and would be unreasonable. I was surprised by the fact that this project had a zero coefficient and turned this issue to the contracting officer, the authorized person, to resolve.

See ECF No. 91, PageID # 273 (numbers omitted); see also ECF No. 91-2, PageID # 307. Choy also recalled telling prosecutors "[a]bout that zero percent coefficient, yeah, who the contract was awarded and that--the zero percent coefficient and it needed to go to overhead and profit. I mean how else he going make money, right?" See ECF No. 102-3, PageID # 487.

Here, too, Shin treats Choy's statements as asserting more than they do. Choy was expressing his understanding that it would be unreasonable for the Navy to require a private contractor like JHL to perform a job for free. Choy appears to have been telling Shin that he understood to some extent Shin's motive for inflating the subcontractor bids. But this is a far cry from suggesting that falsified subcontractor prices were immaterial to him, much less to the Navy, or that Choy

communicated such a thought to anyone.  Regardless of whether

Choy thought a contractor should make some profit, an inability

to make a profit absent a false statement to the Government is

not a defense to a charge under 18 U.S.C. § 1001.  Thus,

whatever Choy may have said to Government prosecutors on this

subject, there is no reason that, before Shin pled guilty, the

prosecutors had to relay to Shin Choy's belief that a contractor

was entitled to make a profit.

Even assuming that Choy had earlier told the

Government what he later told Shin in his clarification

statement and the recorded conversation, these statements did

not constitute exculpatory evidence that the Government

improperly withheld from Shin prior to his guilty plea.  Nor

does Shin present any reason for this court to assume that,

applying an objective materiality standard, Shin's false

statements were not material.  Having failed to establish there

was an actual fundamental error in his conviction, Shin is not

entitled to a writ of coram nobis.

### 3.  Shin Is Not Entitled to an Evidentiary Hearing in Support of a Writ of Coram Nobis.

Shin argues that he is entitled to an evidentiary

hearing if this court does not grant his petition for writ of

coram nobis outright.  *See* ECF No. 91, PageID # 301.

"Whether a hearing is required on a coram nobis motion should be resolved in the same manner as habeas corpus petitions." *United States v. Taylor*, 648 F.2d 565, 573 n.25 (9th Cir. 1981). *See also Korematsu v. United States*, 584 F. Supp. 1406, 1412 (N.D. Cal. 1984) ("§ 2255 considerations apply [in a coram nobis proceeding] in determining whether an evidentiary hearing is required"). A petitioner "is entitled to an evidentiary hearing on his claim '[u]nless the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief.'" *Frazer v. United States*, 18 F.3d 778, 781 (9th Cir. 1994) (quoting 28 U.S.C. § 2255). "In deciding whether to grant an evidentiary hearing, a federal court must consider whether such a hearing could enable an applicant to prove the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007).

Shin's request for an evidentiary hearing is deficient in failing to show how such a hearing would establish the Government's inability to prove materiality or a *Brady* violation in the form of the Government's failure to disclose such an alleged inability.

This court addressed a similar inquiry in determining whether Shin had good cause to depose Choy and Ching. *See* ECF No. 117. Under the good cause standard applicable to the

discovery ruling, the court was required to examine whether the
"'specific allegations before the court show reason to believe
that the petitioner may, if the facts are fully developed, be
able to demonstrate that he is . . . entitled to relief.'" *Id.*,
PageID # 605 (quoting *Pham v. Terhune*, 400 F.3d 740, 743 (9th
Cir. 2005)).  Consistent with the above analysis regarding
whether the Government withheld exculpatory evidence regarding
Choy, this court ruled that Shin's allegations, together with
the evidence Shin pointed to in support of his allegations, gave
this court no reason to believe that deposing Choy would lead to
evidence demonstrating that the Government had withheld
exculpatory evidence from Shin before he pled guilty.  *See id.*,
PageID #s 607-22.  With regard to Ching, Shin never alleged that
she provided any exculpatory evidence to the Government.  Thus,
this court determined that Shin had failed to show good cause to
depose Ching as well.  *See id.*, PageID #s 623-25.

          Once it denied Shin a chance to depose Choy or Ching,
this court could not discern from the record what further
evidence Shin might offer in support of his request for a writ
of coram nobis.  The only fundamental error alleged by Shin
involved the Government's purported withholding of exculpatory
statements by Choy allegedly relating to materiality.
Nevertheless, in an abundance of caution, this court gave Shin a
further opportunity to explain whether he continued to want an

evidentiary hearing.  *See id.*, PageID #s 625-26.  Shin filed a request for an evidentiary hearing that included an offer of proof regarding what would be presented at an evidentiary hearing:

> Patrick Shin will testify as set forth in his Petition that, to him, the key witness in the entire case as to "materiality" was Wes Choy because Choy was the Government employee who prepared the Government Estimate (GE) and asked for the subcontractor quotes.  Shin will testify that, had he known that once Choy found out about the zero coefficient problem, Choy "washed his hands" of the contract and turned all issues over to the contracting officers, he would not have pled guilty.

> Robert Hokama will testify (based on Petitioner's counsel's discussion with him yesterday) that if the Pump #2 contract had reached his desk with the information that Petitioner had changed the subcontractor bids because of the zero coefficient problem, he still would have approved the contract, *i.e.*, the subcontractor quotes would not have been "material" to him because the JHL proposal was close to the GE.  He will also testify he was the contracting officer with final authority to approve the contract over Annette Ching and Brian Sekiguchi.  (This Court speculated at 22-23 of its Order that Mr. Hokama might be a witness for the Government on the issue of "materiality."  This is clearly not the case.)

> Brian Sekiguchi will testify (based on Petitioner's counsel's discussion with him yesterday) about the inappropriate assignment of the Pump #2 contract to the JHL JOC, as he set out in his Declaration for sentencing.  He will testify that if the contract had reached his desk with the information that Petitioner had changed the subcontractor bids, he would have passed the contract on to Robert Hokama for final decision.

> Wes Choy will testify as set forth in
> Petitioner's Petition.  To the extent that he
> tries to deny the statements he made to
> Petitioner, his tape recorded statement will be
> introduced into evidence.  Choy will also admit
> that his Government Estimate (GE) for the
> contract cost was reasonable with consideration
> of a reasonable coefficient.
>
> Annette Ching will testify that she was not the
> ultimate deciding authority regarding the
> approval of the contract.  She may testify that
> she would recommend not approving the contract
> because of Petitioner's falsifications, but she
> will have to admit that the final authorities
> were Brian Sekiguchi and Robert Hokama.

ECF No. 119, PageID #s 632-34.

Even taking Shin's offer of proof as an accurate summary of the testimony that Shin would present, this court sees no reason to conduct an evidentiary hearing.  The offer of proof shows that the evidence sought by Shin either duplicates evidence already in the record, or would not entitle him to the relief he seeks.  The offer of proof states that Shin would "testify as set forth in his Petition," and that "Wes Choy will testify as set forth in Petitioner's Petition." *Id.*  Far from demonstrating any inadequacy in the record with respect to Choy and Shin, Shin's offer of proof only proposes to corroborate statements Choy made in his clarification statement and the taped conversation. *See Korematsu*, 584 F. Supp. at 1412 (noting that evidentiary hearing may be afforded "when a palpable claim is raised by the petitioner and there is an inadequate record or disputed factual issues").  As discussed above, however, even if

50

the court accepted these statements as true, they would not be sufficient to show that the Government withheld exculpatory information from Shin.

Furthermore, the offers of proof for Hokama, Sekiguchi, and Ching are irrelevant for the purpose of a coram nobis petition. During the telephone conference in which Shin's request for an evidentiary hearing was discussed, Shin's counsel admitted that he had no reason to believe that any of these witnesses had told anyone before Shin pled guilty that they would have approved the contract even had they known that Shin had falsified the subcontractor quotes. Shin's counsel conceded that Shin's petition was focused solely on the Government's failure to disclose what Shin says were exculpatory statements by Choy.

As this court has already noted, Shin's offer of proof concerning Hokama indicates that Shin wants to present newly discovered evidence from Hokama that Shin's misrepresentations were immaterial to him. This new evidence is not probative of any fundamental error. *See Moody v. United States*, 874 F.2d 1575, 1577 (11th Cir. 1989) ("A claim of newly discovered evidence relevant only to the guilt or innocence of the petitioner is not cognizable in a coram nobis proceeding."). With respect to Ching, it appears from Shin's offer of proof that he wants to elicit testimony that she was not the ultimate

decision-maker and therefore could not testify as to
materiality.  This court has discussed the materiality issue at
length earlier in this order.  In short, because materiality
continues to be evaluated under "an objective test, which looks
at 'the intrinsic capabilities of the false statement itself,
rather than the possibility of the actual attainment of its
end,'" *Peterson*, 538 F.3d at 1072 (quoting *Facchini*, 832 F.2d at
1162), materiality evidence can be provided by individuals other
than an ultimate decision-maker.

    In many cases, an ultimate decision-maker relies on
individuals like Ching and Choy to evaluate a proposal or
statement and to make recommendations that guide the final
decision.  *See, e.g.*, *U.S. ex rel. Longhi v. Lithium Power
Techs., Inc.*, 513 F. Supp. 2d 866, 888 (S.D. Tex. 2007)
(rejecting argument that Government could not rely on witness to
establish materiality because he was not ultimate decision-maker
regarding award of contract).  Individuals may provide evidence
as to materiality to the extent that their knowledge and
experience allow them to testify regarding whether a particular
statement has "the propensity or capacity to influence or affect
an agency's decision." *Rodriguez-Rodriguez*, 840 F.2d at 700.
As discussed above, Ching could even have testified as an expert
witness regarding materiality.  Shin does not show that
testimony by Ching would somehow support the issuance of a writ

52

of coram nobis.  Nor does Shin suggest how the evidentiary hearing he requests would show that the Government as a whole disregards false statements in circumstances analogous to those presented by this case.

In summary, Shin fails to show that an evidentiary hearing would support either a *Brady* violation or an absence of materiality.  Even assuming that the witnesses Shin identifies would testify in accordance with his offer of proof, none of the witnesses would provide evidence relevant to the narrow issue of whether exculpatory material was withheld, creating a fundamental error in the underlying proceeding.  *See Ybarra v. United States*, 461 F.2d 1195, 1200 (9th Cir. 1972) (affirming denial of evidentiary hearing when nothing could be gained by granting hearing).  And under the objective materiality standard that applies even after *Escobar* and *Lindsey II*, none of the matters Shin says he might present would show that Shin's false statements were immaterial.  *See id.*  The petition, file, and records of this case conclusively show that Shin is not entitled to coram nobis relief.  Shin fails to show that an evidentiary hearing could change that outcome.

### B.    Writ of Audita Querela

Shin alternatively seeks a writ of audita querela that vacates his conviction.  *See* ECF No. 91, PageID #s 304-05; ECF No. 135, Page ID #s 744-46.

"The writ of *audita querela*, meaning literally 'the complaint having been heard,' is a common law writ used to attack a judgment that was correct when rendered, but which later became incorrect because of circumstances that arose after the fact." *United States v. Fischer*, No. 3:01-CR-00263-HA, 2014 WL 5473586, at *3 (D. Or. Oct. 28, 2014) (quoting *Carrington v. United States*, 503 F.3d 888, 890 n.2 (9th Cir. 2007)).

The Supreme Court has limited the availability of this writ to "extraordinary" cases presenting circumstances compelling its use "to achieve justice." *Morgan*, 346 U.S. at 511. "The writ is similar, but not identical, to the writ of error coram nobis; audita quer[e]la is directed against the enforcement, or further enforcement, of a judgment which, when rendered, was just and unimpeachable, whereas coram nobis attacks the judgment itself." *Fischer*, 2014 WL 5473586, at *3.

In *Doe v. INS*, 120 F.3d 200 (9th Cir. 1997), the Ninth Circuit ruled that the writ is unavailable for parties who seek it purely for equitable relief. With audita querela unavailable on purely equitable grounds, the Ninth Circuit questioned without deciding whether any situation existed in which the writ of audita querela would be the appropriate remedy. *See id.* at 204 n.5 ("[W]ith section 2255 and coram nobis available to challenge the lawfulness of conviction, several courts have questioned, without deciding, whether *audita querela* survives at

54

all."). *See also United States v. Johnson*, 962 F.2d 579, 583 (7th Cir. 1992) (questioning "the extent of the viability of *audita querela* given the availability of *coram nobis* and § 2255"); *United States v. Reyes*, 945 F.2d 862, 866 (5th Cir. 1991) (noting that "*audita querela* seems to add little, if anything, to the current scheme of postconviction relief afforded by section 2255 and the writ of *coram nobis*").

Not every court considers the writ of audita querela to have been eliminated. In *Erickson v. United States*, 757 F. Supp. 2d 1060, 1061 (D. Or. 2010), the defendant brought a petition for writ of audita querela to set aside or invalidate a felony conviction for refusing to submit to induction into the military on the grounds that the defendant was a nonreligious conscientious objector. Erickson was no longer in custody and was therefore not eligible for relief under § 2255. Decades after his conviction, the Supreme Court had expanded the definition of and the requirements for conscientious objector status, creating a defense to the crime defendant had been charged with. *Id.* at 1064. With this newfound defense creating a legal defect in the underlying conviction, the court held that the defendant was entitled to a writ of audita querela and vacated his conviction. *Id.* Shin, however, has not made an equivalent showing justifying the issuance of the writ on the present record.

"Even assuming the continued vitality of audita querela, courts have ruled that it is only available where there is a legal objection to a judgment which has arisen subsequent to that judgment." *Fischer*, 2014 WL 5473586, at *4. *See Doe*, 120 F.3d at 204 (holding that "a writ of *audita querela*, if it survives at all, is available only if a defendant has a legal defense or discharge to the underlying judgment").

### 1. Shin Does Not Establish That He Is Entitled to Relief Under a Writ of Audita Querela.

In his Verified Petition, Shin does not allege a post-conviction legal defect, instead arguing that the writ provides relief when an evidentiary matter arising after the conviction has rendered the conviction unfair. Shin is making an equitable, rather than a legal, claim. He is arguing that even if the prosecuting authorities did not withhold exculpatory evidence, later statements by Choy, Hokama, and Sekiguchi are "facts discovered after the judgment was rendered" that render his conviction unfair. Shin provides no authority indicating that the scope of the writ of audita querela extends to such a circumstance.

This court is cognizant that the writ of audita querela is a writ of last resort only available, if at all, when all other post-conviction remedies have been exhausted. *See United States v. Valdez-Pacheco*, 237 F.3d 1077, 1080 (9th Cir.

2001); *see also United States v. Baptista*, No. CR 10-00050 PJH, 2013 WL 4014965, at *3 (N.D. Cal. Aug. 5, 2013). In this regard, a petitioner may not challenge his conviction through the writ on grounds that are cognizable under another form of post-conviction relief.

Shin's verified petition for writ of audita querela substantively presents a claim that new evidence has arisen that would support his defense at trial. *See* ECF No. 91, PageID # 304. This court recognizes that the new evidence Shin identifies was not available to him until long after he completed serving his sentence. While Shin's assertion of new evidence is akin to what might be asserted under Rule 33 of the Federal Rules of Criminal Procedure in a motion for a new trial based upon newly discovered evidence, Shin had no remedy under Rule 33 because Rule 33 is inapplicable when a defendant has pled guilty and, in any event, requires such a motion to be filed within three years of final judgment. *See United States v. Collins*, 898 F.2d 103, 104 (9th Cir. 1990) (per curiam) ("When the defendant has pled guilty, as here, no trial has occurred and the Rule 33 remedy is unavailable."); *see also United States v. Graciani*, 61 F.3d 70, 78 (1st Cir. 1995) ("A defendant who enters a guilty plea cannot thereafter use Rule 33 as a wedge to undo his acknowledgement that he committed the offense.").

But the unavailability of other relief does not
necessarily give rise to a right to a writ of audita querela.
In *Valdez-Pacheco*, the petitioner attempted to use the writ of
audita querela because a § 2255 habeas motion was precluded by
the Antiterrorism and Effective Death Penalty Act of 1996.
237 F.3d at 1078-79.  The Ninth Circuit affirmed the dismissal
of Valdez's petition, explaining:

> [W]e reject Valdez's contention that *audita
> querela* is available in his case due to the fact
> that he is precluded from raising his claims in a
> § 2255 motion by those provisions of the
> Antiterrorism and Effective Death Penalty Act of
> 1996, Pub. L. 104-132, tit. I, § 105, 110 Stat.
> 1214, 1220 (AEDPA) (codified in relevant part at
> 28 U.S.C. §§ 2255 and 2244), that limit the
> rights of a prisoner to file a second or
> successive motion.  A prisoner may not circumvent
> valid congressional limitations on collateral
> attacks by asserting that those very limitations
> create a gap in the postconviction remedies that
> must be filled by the common law writs.  *See
> Kimberlin*, 675 F.2d at 869; *see also In re
> Davenport*, 147 F.3d 605, 608 (7th Cir. 1998)
> (concluding that, even if the limitations of
> AEDPA foreclosed the use of 28 U.S.C. §§ 2241 and
> 2255 by federal prisoners, "it would be senseless
> to suppose that Congress permitted them to pass
> through the closed door [by way of the All Writs
> Act] simply by changing the number 2241 to 1651
> on their motions"); *cf. Moore v. Reno*, 185 F.3d
> 1054, 1055 (9th Cir. 1999) (per curiam)
> (concluding that § 2255 is not inadequate or
> ineffective merely because a particular
> prisoner's § 2255 motion is procedurally barred),
> *cert. denied*, 528 U.S. 1178, 120 S. Ct. 1214, 145
> L. Ed. 2d 1115 (2000).

*Valdez-Pacheco*, 237 F.3d at 1080 (footnotes omitted).  In short,
a writ of audita querela is not necessarily available whenever

new evidence is discovered and other remedies are unavailable. The unavailability of other remedies is a necessary condition in the audita querela context, but it is not, on its own, sufficient to support the issuance of the extraordinary writ.

Here, Shin tries to bolster his plea for relief with the contention that the law has recently changed. Shin does not dispute that, at least at the time he pled guilty, the materiality standard was based on an objective standard. *See* ECF No. 135, PageID # 747. Instead, Shin clarifies that he now has a legal objection to the judgment, which he claims has recently arisen through *Escobar*. *See id*. Specifically, Shin claims and makes an offer of proof that the inflated quotes were immaterial, given how Choy or Hokama would have allegedly proceeded with the contract in the face of knowledge that subcontractor quotes were false. *See id.*, PageID #s 746-49.

As explained above, Shin misreads *Escobar* and *Lindsey II*. *Escobar* does not alter the applicable objective materiality standard. Rather, *Escobar* clarifies what types of evidence may be relevant in proving materiality depending on the facts of a particular case. *Lindsey II* clearly emphasizes that materiality continues to be evaluated under an objective standard and applies that standard in the wire fraud context.

Nor does *United States ex rel. Kelly v. Serco, Inc.*, 846 F.3d 325 (9th Cir. 2017), which Shin also cites, help him.

*Kelly* involved a qui tam action under the False Claims Act.
Shin argues that *Kelly* applied *Escobar*'s purported subjective
materiality standard, which Shin contends also applies to Shin's
case. *Kelly* discusses *Escobar* and notes that under *Escobar* what
the Government "regularly" does is relevant to materiality. *See*
*id.* at 334. While *Kelly* looks at what types of evidence would
support a finding of materiality in the context of the False
Claims Act, *Kelly* nowhere indicates that a subjective standard
applies. *See id.* Similarly, Shin's expectation, *see* ECF No.
135, PageID # 747; ECF No. 152, PageID #s 847-50, that *United*
*States v. Green*, No. 15-10554 (9th Cir.) (oral argument held on
June 14, 2017), will somehow help him is misplaced. The three-
judge panel that decides *Green* will be bound not only by
*Escobar*, but also by *Lindsey II.* Only an *en banc* Ninth Circuit
or the Supreme Court can overrule *Lindsey II.*

Shin's focus on Hokama's statements reflects Shin's
mistaken belief that a subjective standard applies to the
materiality analysis. In fact, Shin himself concedes that he
"was almost certain to be convicted at a jury trial" under the
objective materiality standard, which is why, he claims, he "had
no choice but to plead guilty" at the time. *See* ECF No. 135,
PageID # 751. In seeking a writ of audita querela, Shin
misreads *Escobar* and *Lindsey II.* Shin is not entitled to a writ
of audita querela on the basis of that misreading.

### 2. Shin Is Not Entitled to Further Discovery in Support of His Request for a Writ of Audita Querela.

Notwithstanding the concerns about Shin's right to a writ of audita querela and his inability to establish that he is entitled to relief under that writ, this court recognizes that it left pending Shin's request to depose Choy and Ching in support of a writ of audita querela. This court previously invited Shin to provide further argument and legal support regarding the appropriate discovery standard for the writ of audita querela, as well as an explanation as to how the discovery he seeks would entitle him to relief under this writ, if Shin still believed he was entitled to discovery in relation to his request for a writ of audita querela. *See* ECF No. 126, PageID # 687.

Shin's supplemental memoranda provide no authority relating to the appropriate discovery standard and do not specifically address how any discovery matter might entitle him to a writ of audita querela.

While Shin argues that Ching's credibility is highly questionable, *see* ECF No. 135, PageID # 752, this court is not able to discern how Ching's credibility is relevant to Shin's audita querela petition. An objective materiality standard applies. Even if, as Shin argues, a subjective materiality standard applied, it would not help with respect to Ching. The

record reflects that Ching did not know Shin had lied prior to being informed of that by the FBI. *See* ECF No. 100-3, PageID # 431. It is thus difficult to see how Ching's attitude toward Shin's lies might help Shin.

Shin's request to depose Choy and Ching is denied. Shin has not demonstrated that he is entitled to discovery or any further hearing in relation to his request for a writ of audita querela.

**IV.     CONCLUSION.**

This court denies Shin's petition for a writ of coram nobis or alternatively for a writ of audita querela. Shin's motion to amend his petition is also denied.

Shin's request for an evidentiary hearing and further discovery is denied. This court directs the Clerk of Court to enter judgment against Shin and to close Civil No. 15-00377.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, June 28, 2017.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

Patrick Shin v. United States of America, CRIM. NO. 04-00150 SOM, CIV. NO. 15-00377 SOM-RLP; AMENDED ORDER DENYING DEFENDANT'S PETITION FOR WRIT OF ERROR CORAM NOBIS; ORDER DENYING ALTERNATIVE PETITION FOR WRIT OF AUDITA QUERELA.