IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| PATRICK SHIN, | ) | CRIM. NO. 04-00150 SOM |
| | ) | CIV. NO. 20-00390 SOM-KJM |
| Petitioner, | ) | |
| | ) | **ORDER DENYING DEFENDANT'S** |
| vs. | ) | **SECOND CORAM NOBIS PETITION** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |
| _____ | ) | |

**ORDER DENYING DEFENDANT'S
SECOND CORAM NOBIS PETITION**

I.        **INTRODUCTION.**

In 2004, with a plea agreement, Defendant Patrick Shin entered a plea of guilty to having made a false statement to the Government in violation of 18 U.S.C. § 1001.  Shin's conviction arose out of a proposal his nephew's company, JHL Construction, Inc., submitted for work on a United States Navy contract.  At the plea hearing, Shin admitted that he had used fake estimates from JHL's subcontractors to inflate JHL's estimated costs and raise the amount the Navy would pay JHL.  Shin was sentenced in 2006 to three years of probation, which included twelve days of intermittent confinement, and to a $100,000 fine.  Shin now seeks to vacate his conviction more than fifteen years after judgment was entered.  Having long since paid his fine and completed his term of probation and intermittent confinement, he is no longer in custody and cannot proceed under 28 U.S.C.

1

§ 2255.  Instead, for the second time, he seeks a common law writ of coram nobis.

Shin maintains that his conviction should be vacated because of a change in the law.  After Shin was sentenced, the Ninth Circuit, departing from its prior precedent, indicated that, to secure a conviction under § 1001, the Government had to prove that a defendant knew that his conduct was unlawful.  Shin says that, because he was not (and allegedly could not have been) aware of that element when he entered his guilty plea in 2004, his guilty plea was not "voluntary in [the] constitutional sense."  *See Henderson v. Morgan*, 426 U.S. 637, 645 (1976).

A writ of coram nobis, however, is only available to correct errors of the most fundamental character.  Even if Shin was unaware of one of the elements of the charge against him, his guilty plea was not marred by fundamental error because it is not reasonably probable that he would have maintained a not guilty plea if only he had known about that element.  Shin admitted having intentionally submitted falsified documents to the Government.  Quite apart from whether it is a common understanding that it is illegal to do such a thing, Shin, an experienced Government contractor, would not likely have risked going to trial to see whether the Government could establish beyond a reasonable doubt that he knew his conduct was unlawful.  Moreover, Shin fails to meet his burden of showing that there

2

are valid reasons for his delay in making the argument he now advances.  His petition for a writ of coram nobis is denied.

II.        BACKGROUND.

        A.    The False Statements.

        The basic facts surrounding Shin's conviction are not disputed.  At all times material to his conviction, Shin was authorized to act as an agent on behalf of JHL Construction, Inc., a general contracting company owned by Shin's nephew, James Lee.  Shin has repeatedly acknowledged that, during this time period, he was an experienced contractor who was very familiar with the process of applying for and securing federal contracts, particularly contracts involving work at Pearl Harbor.  *See, e.g.*, ECF No. 209, PageID # 1811-13.[1]  Shin estimated that, by 2003, he had completed "way over [one] hundred projects" for the Government.  *Id.* at 1869.  Shin knew that he had to be truthful and honest in his dealings with the Navy, and that he had to provide the Navy with accurate information.  *Id.* at 1869.

        In 2003, the Navy asked JHL to submit a proposal for work repairing Pump # 2, Drydock # 4, at Pearl Harbor Naval Shipyard.  It appears that JHL had previously submitted a proposal for repairing another pump (Pump # 1) at the same

---

[1]  All ECF and PageID references are to Crim No. 04-00150, rather than to the companion civil case.

drydock.  After JHL submitted the proposal for Pump # 2, Wesley
Choy, a Government official assigned to review the proposal,
felt that it was "questionable."  *See* ECF No. 100-1, PageID #
421; *see also* ECF No. 209, PageID # 1881-82.  The price that JHL
proposed exceeded Choy's own estimate of the costs of the
project.  *See* ECF No. 100-1, PageID # 421.  Choy could not even
begin to evaluate JHL's estimate of the costs, because, in the
proposal "many costs were aggregated," and Choy lacked "data
supporting the subcontractor costs."  *See id.*  Choy therefore
asked Annette Ching, the Government's contract administrator, to
obtain subcontractor quotes to substantiate JHL's proposal.  *See
id.; see also* ECF No. 209, PageID # 1882.  Specifically, Choy
asked for the prices that JHL's subcontractors had submitted for
the work on Pump #1, because Pump #2 would involve the "same
scope of work."  ECF No. 209, PageID # 1882.  Shin followed up
with a reduced cost estimate, but the new proposal still did not
include subcontractor quotes.  ECF No. 100-1, PageID # 421.
After reviewing the revised proposal, Choy again asked Ching to
get the "actual quotes" for JHL's subcontractors' work.  *Id.* at
422.

     Upon receiving Ching's request, Shin called two of
JHL's subcontractors, Conhagen and HSI, and asked them to submit
falsely inflated quotes.  Conhagen agreed.  HSI, however, called
the FBI.  See ECF No. 64, ¶ 15-17; ECF No. 91, PageID # 263-66.

Because HSI did not respond immediately, Shin decided to produce an altered quote himself. *See* ECF No. 209, PageID # 1887-1894. Shin took a copy of the quote HSI had submitted for work on Pump #1 ($114,733) and ran that through the copy machine with a piece of white paper covering the first "1" digit. *Id.* at 1889-90. That created a blank space, and he then placed a "3" digit that had been cut out from another sheet of paper into that space, changing the quote to $314,733.[2]  Shin submitted that document, along with the inflated quote he had received from Conhagen, to the Navy. *See* ECF No. 209, PageID # 1889-1897.

## B.   Shin's Justification For His Conduct.

According to Shin, his intent in falsifying the quotes was not to harm the Government or unfairly increase his profits. That assertion is central to Shin's present coram nobis motion. Shin maintains that he was correcting an error by the Navy, which had put him in an impossible position by choosing the wrong contract vehicle for the work on Pump # 2, Drydock # 4.

Shin says that the Navy was using a contract process under which JHL would not have been able to cover its overhead or to earn any profit.  Shin was concerned that there was not enough time for the Navy to correct its error before the fiscal year ended.  Any funds not obligated by the end of the fiscal

---

[2] Prior documents in this case referred to the use of "whiteout" to alter the HSI document, but Shin has testified that "whiteout" was not actually used.

year would lapse, meaning that the Navy would lose the ability to use those funds, which would go back to the general United States Treasury account.  Agencies could compete for those funds to be allocated to them for the next fiscal year, but the Navy would have no guarantee that it would recover the amount of the lapsed funds in a subsequent allocation.  In terms of the Pump # 2 contract, the Navy was at risk of losing its funding for the work, and JHL stood to lose the chance to do any work at all on Pump # 2 if the funds lapsed.  Shin claims that he submitted the altered documents to solve this "problem" and "make the numbers work."

Shin testified that the Navy uses different categories of contracts in soliciting work.  *See* ECF No. 209, PageID # 1813-20.  One category involves an "invitation for bid" or "IFB" contract.  *Id.* at 1814; *see also id.* at 1702.  Under an IFB contract, the Navy's engineers hire an outside company to design the project, and then, once the design is completed, the Navy invites contractors to bid on the project.  *Id.* at 1814.  The IFB process takes approximately two years to complete.  *Id.*

Because that process is lengthy and cumbersome, the Navy created a different contracting vehicle that could handle smaller projects more quickly.  That contracting vehicle is called "indefinite delivery, indefinite quantity," or "IDIQ." *Id.* at 1817; *see also id.* at 1702.  Under an IDIQ contract, the

6

Navy hires a contractor for a three-year or five-year period and can assign the contractor multiple projects during that period without soliciting competitive bids for the projects. *Id.* at 1817. For reasons discussed below, during the times relevant to this case, it appears that IDIQ contracts were only supposed to be used for construction contracts. *See* ECF No. 91, PageID # 250.

The price that contractors are able to charge under IDIQ contracts is determined by two factors: the Means Book and the contracting coefficient. *See* ECF No. 209, PageID # 1818. The Means Book contains estimated line-item prices for most components or costs that a contractor might incur while working on a small construction contract. *See id.* at 1819. Those estimates are based off of the average national cost for an item, with an adjustment for local conditions. *Id.* at 1818-1821. In Hawaii, the costs listed in the Means Book are approximately 30 to 40 percent higher than the national average. *Id.* at 1821.

The second relevant factor is the contracting coefficient. The coefficient is a multiplier applied to prices in the Means Book to ensure that contractors can cover their overhead and earn a profit. For instance, a coefficient of 1.20, or 120 percent, means that the Navy pays a contractor 120

percent of the price listed in the Means Book for every task the contractor completes.  *See id.* at 1821-22.

JHL had an IDIQ contract with the Navy with a coefficient of 1.00, or 100 percent.  *Id.* at 822.  It thus agreed to do work at the prices listed in the Means Book for Hawaii.  JHL agreed to that coefficient because it believed that it could do work more cheaply than the prices listed in the Means Book.  *See id.* at 1820-22.  That is, JHL believed that it could still "make [a] profit and [cover] overhead because [it] actually could do the work for less."  *Id.* at 1822.

The system assumes that an IDIQ project involves matters listed in the Means Book.  It appears that, if an item is not found in the Means Book, that item is simply listed in an IDIQ estimate at actual cost, meaning that, with respect to that particular task, a contractor cannot rely on being efficient to outperform the Means Book and earn a profit.  *See* ECF No. 91, PageID # 251-52.  For a contractor like JHL, which had agreed to a 1.00 coefficient, there would therefore be no way to cover overhead and make a profit in performing a task not listed in the Means Book.  *See* ECF No. 209, PageID # 1823.  Shin says that is why in 2003 the Navy's manual stated that a contract could only be awarded under an IDIQ contract if at least 80 percent of the work could be found in the Means Book.  *See* ECF No. 91, PageID # 252.

The work on the Pump # 2 project did not fit into the Means Book.  As Shin explained, because the project involved the overhaul of an existing pump, rather than the construction of a new pump, none of the work called for by the contract could be found in the Means Book.  *See id.* at 255-56; *see also* ECF No. 209, PageID # 1827.  Thus, if JHL had performed the work under its existing IDIQ contract, it would have only been able to recoup its actual costs, and it would not have earned any profit or been able to cover its overhead.  *See* ECF No. 91, PageID # 256.

Because *none* of the work on Pump # 2 could be found in the Means Book, Shin believed that the Navy knew that the IDIQ contract was an inappropriate vehicle for the job.  *See* ECF No. 209, PageID # 1898 ("And I mean I think Annette Ching knew it, Wes Choy knew it.").  He believed that the Navy had nevertheless chosen that vehicle because the Navy had extra money in its budget towards the end of the fiscal year and wanted to execute the contract before the money lapsed.  *See* ECF No. 209, PageID # 1824-28.  According to Shin, if he had raised the problem with the Navy, there would not have been time for the Navy to reclassify the contract and get it signed before the end of the fiscal year.  *Id.* at 1823.  In short, Shin felt that the Navy was "coming to him with a problem that they wanted [his] help with."  *Id.* at 1829.

9

Shin's solution was to inflate the subcontractors'
estimates beyond the subcontractors' actual charges, allowing
him to earn what he believed was a fair profit[3] under the
improper IDIQ contract.  In other words, as Shin would later
say, he wanted to "hide" the profit that he believed that he was
entitled to in the inflated subcontractor quotes.

Shin could have simply declined the contract on the
ground that it would not have allowed JHL to earn a profit.
That is, nothing in JHL's agreement with the Navy obligated JHL
to take every job offered by the Navy.  At the coram nobis
evidentiary hearing, Shin stated that he nevertheless felt
obliged to accept the contract because of his "loyalty" to the
Navy.  ECF No. 209, PageID # 1899.  Although Shin has since
admitted that he knew that doing this was wrong, he claims that
he did not intend to defraud the Government.[4]

The record indicates that Shin first discussed the
legality of submitting the fake quotes when he tried to convince
HSI to go along with his scheme.  *See* Def's Ex. 1.[5]  During his

---

[3] Shin told FBI agents that JHL would have earned approximately
$500,000 at his proposed price of $2,150,000.  Government's Ex.
6, at 3.

[4]  The funds ended up lapsing despite Shin's efforts, and the
Navy ultimately had to invite bids for the work on Pump # 2.

[5]  In this district, exhibits received in evidence at a trial or
evidentiary hearing are retained by counsel, whose
responsibility it is to provide them if notified by the Clerk of
Court that the appellate court has requested them.  Those

conversation with HSI on September 5, 2003, Shin said that the contract was a "special case" because the work was not reflected in the Means Book, and that he therefore needed to "hide" the profit and overhead in his paperwork. *Id.* at 6, 10. Shin was unaware that, with HSI's knowledge, the FBI was recording the conversation. HSI asked for a kickback in return for doing what Shin was asking. Shin refused. *Id.* He said that he "wasn't creating something illegal," and that what he was asking HSI to do was "legitimate." *Id.* at 14. He explained that the "government knows that . . . I gotta come up with some other way to make up [the profit and overhead]."[6] *Id.*

However, after the the FBI executed a search warrant at his office on September 23, 2003, Shin repeatedly admitted in interviews with investigators that what he had done was wrong. In his first FBI interview, for instance, Shin stated on more than one occasion that what he had done was "absolutely wrong." Government's Ex. 6, at 3, 5. Shin made similar statements in subsequent meetings with FBI agents and with an Assistant United States Attorney. *See, e.g.*, Government's Exs. 7, 10. In those meetings, Shin also explained that he had asked subcontractors

---

exhibits are therefore usually not available on the electronic docket unless counsel has deliberately filed them.

[6] Shin made these statements while trying to convince HSI to falsify its quote. Shin tried to pressure HSI to agree to his scheme. For instance, when the subcontractor expressed hesitation, Shin told him that if "you wanna make friends with me you can help me." Def's Ex. 1, at 15.

to falsely inflate their quotes because his "profit coefficient
. . . was zero."  Government's Ex. 10 at 1.

### C.    The Guilty Plea.

Even before the Government had filed any charge
against him, Shin's attorney engaged in plea negotiations with
the Government on his behalf.  *See* ECF No. 209, PageID # 1736.
Ultimately, Shin agreed to plead guilty to a single-count
Information charging him and JHL with having violated 18 U.S.C.
§ 1001, which prohibits the making of false statements to the
United States Government.  The charge was based on Shin's
physical alteration of the quote from HSI.  *See generally* ECF
No. 8.  In return, the Government agreed "not to bring any other
criminal charges of which it is aware as of the date of this
plea agreement against defendant relating to his negotiations
with the United States Navy for work to be performed on Pump #2,
Drydock #4."  *Id.* at 1007.  Several other charges might have
been available to the Government.  For instance, the Government
certainly could have brought a second 18 U.S.C. § 1001 charge
based on Shin's submission of the inflated Conhagen quote.  The
Government has stated in connection with the present coram nobis
motion that it might also have brought charges of wire fraud,
conspiracy to defraud, or major fraud.  *See* ECF No. 203, PageID
# 1673; *see also* ECF No. 203-1.

At a hearing on May 10, 2004, in which Shin entered his guilty plea, the magistrate judge asked the Government to summarize the essential elements of the § 1001 charge.  ECF No. 179-1, PageID # 1518.  The Government responded:

> As to both Mr. Shin and JHL Construction the government would have to prove, first, that the defendants knowingly and willfully made and used a false writing or document in a manner within the jurisdiction of the executive branch of the United States government, that is the United States Navy.
>
> Second, the defendants acted *knowingly and willfully, that is deliberately and with knowledge that the statement in the document was untrue, that is, the document contains a material false, fictitious . . . and fraudulent entry.*
>
> And third, the statement was material to the U.S. Navy's activities or decisions.

*Id.* at 1518-19 (emphasis added).  As discussed in greater detail below, at the time, that summary was consistent with Ninth Circuit precedent.  Shin did not object to the Government's description of the elements of the offense.

The magistrate judge then asked Shin to describe, in his own words, "what [he] did that constitutes the crime charged."  ECF No. 179-1, PageID # 1520.  Shin explained that, when he submitted JHL's final proposal to the Navy, he "wrongfully changed the number" that reflected the cost of the subcontractor's work.  *Id.*

After the Government expressed concern that Shin was
attempting to minimize the seriousness of his crime, Shin again
indicated that he knew that changing the document he submitted
was wrong:

> DEFENDANT SHIN: Well, I change the document,
> I know that it's wrong, but I have every
> right to believe that the subcontractor
> price is not -- is not what taken to the
> (indiscernible).  I have to -- I have to
> have a contract with them and -- and if they
> don't perform, then it's my responsibility
> to deliver the good to the government.  So I
> have every right to believe that the number
> doesn't reflect what they can do.  That's --
> but -- but what I did is wrong.  I really --
> way I -- way I present the price is wrong
> and it is wrong.
>
> THE COURT: Mr. Shin, let me ask you the
> question directly.  When you changed the
> number on the HISE document from 114,000 to
> 314,000, you knew that was wrong? You knew
> that was incorrect?
>
> DEFENDANT SHIN: Well, it is wrong to -- to -
> - to -- to -- it is wrong to change the
> document, yes, it is wrong.
>
> THE COURT: All right. And you did that for
> the purpose or with the intent to benefit
> JHL?
>
> DEFENDANT SHIN: Of course it is to benefit
> the JHL, but it benefits the government,
> too, by -- by protects the project.

*Id.* at 1523-24.  At that point, the Government expressed concern
that the court should not accept Shin's plea because of Shin's
insistence that his actions benefitted the Government.  *Id.* at
1524.  While the court discussed that issue with counsel, Shin

14

volunteered, "Your honor, I -- *I know what I did was wrong and it is wrong what I did.*"  *Id.* at 1525 (emphasis added). Ultimately, the court accepted Shin's guilty plea.[7]

###    D.   Sentencing.

During sentencing, one of the primary areas of disagreement was whether Shin had intended to create a loss on the Government's part.  The initial draft presentence report, prepared on December 3, 2004, recommended finding that because Shin had asked his subcontractors to inflate their quotes by $380,000, he had intended to cause the Government to lose that amount.  ECF No. 64, ¶ 27.  The Government agreed with that position.  *See generally* ECF No. 54.

On December 23, 2004, Shin filed his first sentencing statement in response to the draft presentence report.  In his first sentencing statement, Shin argued that the Government had

---

[7] Shin's plea agreement contained a waiver of the right to collaterally attack his sentence, but that waiver included an exception for claims of ineffective assistance of counsel. During the evidentiary hearing on his second coram nobis motion, Shin characterized his position as raising an ineffectiveness claim.  In any event, in its opposition to Shin's first coram nobis petition, the Government conceded that, given the Ninth Circuit's decision in *United States v. Spear*, 753 F.3d 964 (9th Cir. 2013), the language in the collateral attack waiver did not apply to the type of challenge Shin was bringing.  ECF No. 100, PageID # 402.  The same rationale applies to Shin's second coram nobis motion.  For that reason, the Ninth Circuit's recent decision in *United States v. Goodall*, which involved a collateral attack waiver with different language, does not preclude Shin's present motion.  *See* 2021 WL 4768103, at *3 (9th Cir. Oct. 13, 2021).

inappropriately assigned the Pump # 2 job to an IDIQ contract
with a zero coefficient.  *See* ECF No. 32, PageID # 1170-78.
Shin admitted that he "chose a completely inappropriate method
of responding to the difficult situation into which JHL had been
placed" and that "what he did was wrong."  *Id.* at 1178.
However, he also argued that he was not trying to steal money
from the Government, but instead was seeking to use the
subcontractors' quotes to "budget for [the] real costs of the
job."  *Id.* at 1176-77.  He therefore argued that he had not
intended to cause a loss to the Government.  *Id.* at 1178-79.  On
December 30, 2004, Shin also filed a motion for downward
departure based on his post-offense rehabilitation.  ECF No. 34.

On December 6, 2005, after Shin's sentencing hearing
had been continued several times, Shin filed a second sentencing
memorandum that addressed the issue of whether Shin had intended
to cause the Government a loss in much greater detail.  In that
memorandum, Shin again asserted that he had submitted the
altered quotes because he was trying to solve the problems
caused by the Navy's use of an improper contracting vehicle, and
that he was not trying to cheat the Government or earn money
that he was not entitled to.  *See generally* ECF No. 48-1.  He
claimed that he had been "reacting to an 'unfair' situation,"
and "trying to recover reasonable profit and overhead for JHL
while accommodating the Government's desire to rush the Drydock

16

4, Pump 2 negotiations to completion at the end of the Government's fiscal year." *Id.* at 1252.  He said that he had had no "intent whatsoever to 'defraud' the Government or cause any 'loss' to the Government." *Id.*

Shin also attached declarations from several high-ranking Pearl Harbor officials to his sentencing memorandum. One of those officials was Robert Hokama, the Director of the Procurement Operations Division at Pearl Harbor.  ECF No. 48-2, PageID # 1257.  Hokama acknowledged that the Pump # 2, Drydock # 4 job had been a last-minute job that was assigned to an IDIQ contractor because that vehicle allowed the contract to be negotiated rapidly.  *Id.* at 1259.  He also noted that the Navy should not have assigned that job under an IDIQ contract because "the work consisted of substantially non-prepriced work." *Id.* at 1259.  He therefore said that he believed Shin's statement that he was only trying to arrive at a fair and reasonable price, and that Shin was "put in a difficult situation by the way the Government chose to negotiate this contract." *Id.*

Nevertheless, Hokama made it clear that, even if Shin had not intended to cheat the Government, he certainly had acted illegally:

> I do not, however, condone in any way what he did. In fact, I was extremely disappointed in him when I heard about what happened.

17

.  .  .  .

> To reiterate, I was extremely disappointed
> to hear what Mr. Shin had done.
> Unfortunately, the Government has lost a
> contractor who I considered to be one of the
> best and one of the most responsive to
> Government requests and contracts.  Mr. Shin
> chose to deal with a difficult situation in
> an inappropriate manner, although I do
> understand why he acted the way he did.

ECF No. 48-2, PageID # 1259-61.

Other Pearl Harbor officials expressed similar sentiments.  *See, e.g.*, ECF No. 48-3, PageID # 1263 ("I was very disappointed to learn he chose to prepare his proposal in such a manner, but I also realize some of the factors driving his actions."); *id.* at 1265 ("Mr. Shin accepted the work to assist the ROICC office in dealing with an overwhelming fiscal year end workload, but he made a serious mistake by dealing with a difficult situation, caused by the Government's improper use of the 0% JOC, in an improper manner."); ECF No. 48-4, PageID # 1268 ("Unfortunately, his chosen solution, although good-intentioned, was obviously bad practice.  Mr. Shin did do something wrong when he changed a subcontractor proposal prior to submission to the Navy, and he freely admits this.").

After reviewing Shin's second submission, the probation officer assigned to the case revised the draft presentence report.  In those revisions, the probation officer explained that "it appears that [Shin] was only trying to

18

recover his overhead and profit," and that, even after his deception, Shin had "submitted a 'fair and reasonable' contract proposal that would have been accepted by the Government." ECF No. 64, at 4A–5A. The revised report therefore concluded that "the facts in this case do not clearly indicate that the defendant desired to cause an intended loss to the government." *Id.*

At a hearing on March 8, 2006, this court addressed the issue of whether Shin had intended to cause a loss to the Government. This court noted that while the issue was a "close call," and while Shin "clearly [had] an intent to deceive," the Government had "not met its burden of showing that the Defendant intended the loss of hundreds of thousands of dollars." ECF No. 99, PageID # 352. The Government strenuously objected to that ruling. That decision substantially reduced Shin's guideline range from 18 to 24 months to 0 to 6 months. *See* ECF No. 66, at 6A. Ultimately, this court imposed a sentence at the bottom of even that lesser range. This court sentenced Shin to three years of probation, a sentence that included twelve days of intermittent confinement, and a fine of $100,000. *See* ECF No. 62.

E.    **Subsequent Decisions Addressing the Elements of § 1001.**

After Shin was sentenced, a series of Ninth Circuit decisions addressed the second element of a § 1001 charge: that the defendant "willfully" deceived the Government.[8]  At the time of Shin's guilty plea, the controlling Ninth Circuit decision on the issue was *United States v. Carrier*, which had held that, in § 1001, "[t]he word 'willfull' means no more than that the forbidden act is done 'deliberately and with knowledge."  654 F.2d 559, 561 (9th Cir. 1981) (internal quotation marks omitted).

However, even before Shin was sentenced, the Supreme Court's 1998 decision in *Bryan v. United States* called *Carrier* into question.  In *Bryan*, a case that did not involve § 1001, the Supreme Court held that to find a defendant guilty of acting willfully, "[t]he jury must find that the defendant acted with an evil-meaning mind, that is to say, that he acted with knowledge that his conduct was unlawful."  *Id.* at 193.  Thus, to establish willful conduct, the Government must prove that, as a general matter, the defendant knew that his conduct violated the law.  *Id.* at 192-96.  The Government does not have to prove that

---

[8] Those decisions have retroactive effect.  *See Bousley v. United States*, 523 U.S. 614, 620-21 (1998).

the defendant knew about a specific law or legal obligation. *Id.* at 196-97.

The Ninth Circuit initially resisted applying that definition to § 1001.  In its first post-*Bryan* case, *United States v. Tatoyan*, the Ninth Circuit reaffirmed that, under § 1001, "willfully" means "no more than acting deliberately and with knowledge."  474 F.3d 1174, 1182 (9th Cir. 2007) (internal quotation marks omitted).  And in *United States v. Ajoku* (*Ajoku I*), the Ninth Circuit considered *Bryan* but concluded that it did not apply to 18 U.S.C. § 1035, a statute that is extremely similar to 18 U.S.C. § 1001.  718 F.3d 882, 889 (9th Cir. 2013).

The defendant in *Ajoku* sought a writ of certiorari. In its response to the certiorari petition, the Government reversed its position and conceded that, based on *Bryan*, 18 U.S.C. § 1035 required the Government to prove that a defendant knew that his conduct was unlawful to establish willfulness.  On April 21, 2014, the Supreme Court therefore granted the petition and "remanded to the United States Court of Appeals for the Ninth Circuit for further consideration in light of the confession of error by the Solicitor General in his brief for the United States filed on March 10, 2014."  *Ajoku v. United States*, 572 U.S. 1056, 1056 (2014).

In a second decision (*Ajoku II*), the Ninth Circuit noted that, "[a]s conceded by the government in its opposition

21

brief to Ajoku's petition for certiorari, the district court erred by giving an instruction on the element of 'willfulness' that does not comply with [*Bryan*]."   584 F. App'x 824, 824 (9th Cir. 2014).   The Ninth Circuit reversed the defendant's conviction because it was "undisputed that [the defendant's] jury received an erroneous instruction."   584 F. App'x 824 (9th Cir. 2014).   The *Ajoku II* ruling issued on September 23, 2014.

Even before *Ajoku II*, the Ninth Circuit's § 1001 model jury instruction was revised.   As reflected in an online amendment to model instruction 8.73 in June 2014 and at present, the instruction states that the Government must prove that "the defendant acted willfully; that is, the defendant acted deliberately and with knowledge both that the statement was untrue *and that his or her conduct was unlawful*."   Ninth Circuit Model Criminal Jury Instruction 8.73 (emphasis added).[9]   District

---

[9] The parties have referred to a version of the instruction that was updated in 2016.   That, however, was not when the knowledge-of-illegality element was first reflected in the model instruction.   The Ninth Circuit's Jury Instructions Committee meets quarterly to amend, add, or delete model jury instructions in response to recent Supreme Court and Ninth Circuit decisions. By June 2014, the committee had reacted to the Supreme Court's remand of *Ajoku I* by amending the model § 1001 instruction even before the *Ajoku II* unpublished decision was filed on September 23, 2014.   The comment to the June 2014 model instructions notes "the requirement that the defendant knew that his or her conduct was unlawful is based on the Supreme Court's decision vacating and remanding the Ninth Circuit's decision in [*Ajoku I*] after the Solicitor General confessed error."   The committee's quarterly adjustments to model jury instructions are promptly

courts in the Ninth Circuit have similarly acknowledged that "to violate section 1001, a person must act with knowledge that their conduct is unlawful." *See, e.g.*, *Harris v. United States*, 2017 WL 3443207, at *6 (C.D. Cal. Aug. 9, 2017).

### F.   Post-Conviction Motions.

On September 22, 2015, Shin filed his first petition for a writ of coram nobis, or, in the alternative, audita querela. *Shin*, 2017 WL 2802866 at *4.  He did not discuss *Ajoku II* or argue that he was unaware that knowledge of unlawfulness was an element of § 1001 when he pleaded guilty.  Instead, he contended that, after he was sentenced, the Supreme Court set forth a new definition of "materiality" that was retroactive and provided him with a defense that was not available to him at the time judgment was entered.  *Id.* at *5.  This court denied the motion on June 28, 2017, *id.* at *23, and the Ninth Circuit affirmed the denial on July 26, 2019.  *Shin v. United States*, 782 F. App'x 595 (9th Cir. 2019).

Shin has now filed a second petition for a writ of coram nobis.  In the present petition, he contends that his guilty plea was involuntary "in a constitutional sense," *see Henderson*, 426 U.S. at 645, because he was not aware of one of the essential elements of a § 1001 offense at the time of his

_____

posted on the Ninth Circuit's website, which is accessible to the public.

plea.  ECF No. 172, PageID # 1389-1401.  Specifically, he
asserts that, in pleading guilty, he was unaware that the
Government had to prove that he knew that his conduct was
unlawful.  *Id.*  He also maintains that, if he had known about
that element, he would not have entered a guilty plea.  ECF No.
188, PageID # 1586-87.  Because the latter assertion presents a
factual question, this court held an evidentiary hearing on
August 13, 2021, and September 3, 2021.

> ### G.   **Evidentiary Hearing.**

Two witnesses testified at the evidentiary hearing:
Samuel King Jr., who represented Shin during his guilty plea and
sentencing and during proceedings on his first coram nobis
petition, and Shin himself.  Both King and Shin testified that,
if Shin had been aware of the knowledge-of-unlawfulness element
in 2004, he would not have entered a guilty plea.

Neither witness was persuasive on the issue of whether
Shin would have entered a guilty plea.  Both witnesses based
their testimony on a misunderstanding of the law.  At the heart
of the testimony by both witnesses was the implicit assumption
that, to establish a § 1001 violation, the Government would have
had to prove that Shin intended to somehow harm or defraud the
Government.  As discussed in greater detail later in this order,
that is not the case.  To prove that Shin knew he was acting

24

unlawfully, the Government only would have had to prove that Shin knew that he was breaking the law.

That misunderstanding is clear from both witnesses' testimony.  King, for instance, stated:

> Well, you know, he wasn't happy because – let's put it this way: *He always said that what he did was wrong, but he never -- he never said that what he did was in any way trying to hurt the government.*  He used the word "wrong."  You mentioned the word "unlawful."  He never said that.  He just said what he did was wrong.  He could have done it better.  But -- so he wasn't happy about it, but he understood the reality of him to deal with the federal government, prosecutor.
>
> . . . .
>
> And that would have been -- well, that would have been fatal to any kind of a plea.  We would have had to go to trial basically.  Because he couldn't -- he couldn't and wouldn't admit to unlawfulness and I couldn't advise him that what he did was, quote/unquote, unlawful as opposed to material, which is a lot lower standard.
>
> . . . .
>
> [W]e had discussed many times, you know, in effect whether *what he did was unlawful as opposed to just technically a violation of 18 U.S.C. 1001,* **in other words, whether he did anything to hurt the government**.  And I would have told him that he wouldn't be able to get through the plea colloquy.  So There's no way we could have taken a plea.

ECF No. 209, PageID # 1740-42 (emphases added).

King's reference to something that was "just technically a violation of 18 U.S.C. § 1001" is particularly troublesome.  The court is unaware of any principle in the law excusing a "technical" violation of § 1001.  In any event, King admitted that Shin "understood that he should not have lied," and that "he knew it was wrong."  *Id.* at 1791.

Similarly, Shin testified that he did not think that what he was doing was illegal because he had not intended to steal from the Government:

> Q:   Eventually you're told the government was going to charge you with a 1001 false statement charge. What were you told about back then what the elements to the false statement offense was?  What were you told, let's start first by Mr. King, before you accepted the plea agreement?
>
> A:   Yes, I mean I was -- I had no idea I mean what was going on.  And what *I knew -- know -- knew was I was -- I was wrong about how I changed the numbers*.  So when FBI raided, I told them everything because I -- because I know that it was broken vehicle and I -- *there was no intent to, like, steal money or anything to evil mind of trying to make more money*.  There's absolute[ly] nothing to do with it.  So I told the FBI everything.
>
> . . . .
>
> Q:   Now, did you eventually make a decision with that in mind, did you make a -- what did you decide to do with regards to the plea agreement?
>
> A:    Well, I decide[d] to plead guilty.

26

Q:   Okay.  Now, was -- how did you feel
about the decision that you had to do that?

A:   It was painful because how can the --
how can the guy that I had to lose
everything and my intent was broken
government system and trying to make it work
for them, you know, and -- and they just put
the fingers on me that because I altered the
document you got to plead guilty and you got
to have a felony record . . . .   It's just
not right.  *I mean government initiated,
they knew, and the government went to the
process, they knew*.  And then when it comes
to me, they were dealing with my JHL manager
and then when it comes to me, all I tried to
do was make it work. . . .

Q:   Okay.

A:   And then -- and then -- then they only
want to – accusing me of what I did and want
to send me to jail. It was tough, it's not
easy.

Q:   Did you believe that what you were
doing was illegal?

A:   No, of course not. I mean, you know,
and it's the – that's the line that -- that
I wanted to make sure that you guys
understand that ***I'm wrong, but I never had
the evil intent and to trying to steal the
money***. *It was just reaction of what
government put me into the position to be
fail.*

*Id.* at 1842-47 (emphases added).

Shin repeatedly admitted that he knew what he did was

wrong.  *See id.* at 1850 ("I did the wrong.  I mean I change the

number.  It's wrong. "); *id.* at 1859 ("I'm not saying I did

anything right.  I mean, changing the number is wrong, but why .

. . cannot he see it, what the government did wrong, right?");
*see also id.* at 1901-03.

In rejecting testimony by King and Shin, this court is
not finding that either was being deliberately untruthful.  In
particular, King is an experienced attorney who, in this court's
view, did not seek to mislead the court.  But credibility may be
an issue even without active lying.  Testimony based on a
misunderstanding can be unpersuasive because of the
misunderstanding.  In addition, Shin was so driven during the
evidentiary hearing to justify his actions that he appeared to
repeatedly shape his testimony toward that end, further making
portions of his account unbelievable to this court.

III.    **ANALYSIS.**

A.    **Writ of Coram Nobis.**

The 1946 amendments to Federal Rule of Civil Procedure
60(b) expressly abolished several common law writs, including
the writ of coram nobis.  In *United States v. Morgan*, 346 U.S.
502, 511 (1954), the Supreme Court held that district courts
still retain limited authority to issue common law writs such as
writs of coram nobis and audita querela in collateral criminal
proceedings.

These common law writs survive "only to the extent
that they fill 'gaps' in the current systems of postconviction
relief."  *United States v. Valdez-Pacheco*, 237 F.3d 1077, 1079

(9th Cir. 2001).  Such writs are not available when the claims raised would be cognizable in petitions under 28 U.S.C. § 2255.

A writ of coram nobis is "a highly unusual remedy, available only to correct grave injustices in a narrow range of cases where no more conventional remedy is applicable." *United States v. Riedl*, 496 F.3d 1003, 1005 (9th Cir. 2007).  It is distinguishable from the ancient writ of habeas corpus, available only to convicted defendants in "custody." *See Hensley v. Municipal Court*, 411 U.S. 345, 349 (1973); *Jones v. Cunningham*, 371 U.S. 236, 243 (1963).  The statutory remedy in 28 U.S.C. § 2255 similarly applies only to those in custody.  A writ of coram nobis, by contrast, allows a petitioner to attack a conviction when the petitioner has already finished his sentence and is no longer in custody.  *See McKinney v. United States*, 71 F.3d 779, 781 (9th Cir. 1995).

To qualify for coram nobis relief, a petitioner must establish all of the following: (1) a more usual remedy is not available; (2) valid reasons exist for not having attacked the conviction earlier; (3) there are adverse consequences from the conviction sufficient to satisfy the case or controversy requirement of Article III; and (4) the error is of the most fundamental character.  *Hirabayashi v. United States*, 828 F.2d 591, 604 (9th Cir. 1987).  "Because these requirements are

29

conjunctive, failure to meet any one of them is fatal." *Matus-Leva v. United States*, 287 F.3d 758, 760 (9th Cir. 2002).

The Government concedes that Shin has satisfied the first and third requirements because he has no other remedy available to him and because, under Ninth Circuit law, "there is an 'irrefutable presumption' that 'collateral consequences result from an criminal conviction.'"  ECF No. 179, PageID # 1479 (quoting *Chaker v. Crogan*, 428 F.3d 1215, 1219 (9th Cir. 2005)).  It appears that Shin has suffered reputational and economic consequences from his conviction.  Thus, only the second and fourth elements are in dispute.

### B. Shin Does Not Satisfy the Fourth Factor, Requiring a Fundamental Error Rendering His Conviction Invalid.

The primary flaw in the present coram nobis petition is Shin's failure to satisfy the fourth factor, which requires a showing of error of "the most fundamental character." *Matus-Leva*, 287 F.3d at 760.  A fundamental error is one that renders the underlying proceeding itself irregular and invalid.  *See Morgan*, 346 U.S. at 509 n.15; *Hirabayashi*, 828 F.2d at 604; *see also United States v. George*, 676 F.3d 249, 258 (1st Cir. 2012) ("[A]n error of the most fundamental character must denote something more than an error simpliciter" (citation and internal quotations omitted)).  Shin contends that such an error occurred because his guilty plea was involuntary.  He maintains that at

the time of his plea, he did not know that one of the elements
the Government had to prove to establish a § 1001 offense was
his knowledge that his conduct was unlawful.  ECF No. 172,
PageID # 1389-1401.  He therefore maintains that his guilty plea
was "invalid."  *Id.* at 1398-1401.

The Supreme Court has held that a guilty plea is not
"voluntary in a constitutional sense" unless the defendant was
informed, either by the court or by his attorney, of the
essential elements of the charge against him.  *Henderson v.
Morgan*, 426 U.S. 637, 646 (1976).  Neither the court nor Shin's
attorney informed Shin that knowledge of unlawfulness was an
element of a § 1001 charge, because, at the time of his guilty
plea, the Ninth Circuit had not yet decided *Ajoku II*.  Thus,
Shin's guilty plea was involuntary.[10]

But to establish fundamental error, Shin must also
demonstrate that he suffered prejudice.  *Greer v. United States*,
141 S. Ct. 2090, 2097 (2021).  He must show that "but for the .
. . error during the plea colloquy, there is a reasonable
probability that he would have gone to trial rather than plead
guilty."[11]  *Id.*  That inquiry, which "focuses on a defendant's

---

[10] The Government does not dispute that knowledge of unlawfulness
is an element of an 18 U.S.C. § 1001 offense and that Shin was
not aware of this element at the time of his guilty plea.

[11] At times, the Government raises arguments that address other
issues.  For instance, the Government asserts that there was no

decisionmaking," requires a "case-by-case examination of the totality of the evidence." *Lee v. United States*, 137 S. Ct. 1958, 1966 (2017) (internal quotation marks omitted).[12]

The issue of whether that test involves objective or subjective considerations has divided courts. *Heard v. Addison*, 728 F.3d 1170, 1184 (10th Cir. 2013) (noting that this issue has "caused some confusion among the circuits"). The Supreme Court has held that "a petitioner must convince the court that a decision to reject [or accept] the plea bargain would have been rational under the circumstances." *Padilla*, 559 U.S. at 372; *see also Lee*, 137 S. Ct. at 1968 (discussing whether it would have been rational for the defendant to reject a plea).

Several circuits have concluded that the Supreme Court's focus on what would have been rational for someone in

---

fundamental error because, during Shin's plea colloquy, he admitted that he knew that what he did was illegal. *See, e.g.*, ECF No. 179, PageID # 1491-93. Shin's argument is that he made no such admission. In any event, the essential issue before this court is whether, if informed that the Government would have had to prove that he knew his conduct was illegal, there is a reasonable probability that Shin would not have entered a guilty plea.

[12] In *Greer*, the defendant argued that "the District Court failed to advise him" of one of the elements of the offense "during the plea colloquy," 141 S. Ct. at 2096, while in *Lee,* the defendant argued that his plea was involuntary because his attorney was ineffective. *Lee*, 137 S. Ct. at 1964. In both situations, however, the test is the same: whether there was a "reasonable probability that . . . [the defendant] would not have pleaded guilty and would have insisted on going to trial." *Lee*, 137 S. Ct. at 1965; *see also Greer*, 141 S. Ct. at 2098; *Hill v. Lockhart*, 474 U.S. 52, 56 (1985).

the defendant's circumstances makes the test an objective one.
*See United States v. Akinsade*, 686 F.3d 248, 261 (4th Cir. 2012)
("[T]his is an objective test."); *Pilla v. United States*, 668
F.3d 368, 373 (6th Cir. 2012) ("The test is objective, not
subjective."); *see also Dupree v. Warden*, 2008 WL 1944144, at
*11 (C.D. Cal. Apr. 30, 2008) ("This analysis does not turn on
Petitioner's subjective state of mind but on objective
considerations."); *cf. Sanchez v. United States*, 50 F.3d 1448,
1454 (9th Cir. 1995) ("[T]he issue in a case involving a guilty
plea is whether there is a reasonable probability that but for
the failure to disclose the *Brady* material, the defendant would
have refused to plead and would have gone to trial . . . . [T]he
test for whether the defendant would have chosen to go to trial
is an objective one.").

      Other circuits have disagreed.  The Tenth Circuit, for
instance, has interpreted the requirement that a defendant
convince the court that a decision to change his plea would have
been rational as setting an "objective *floor*, somewhere below
[the] more demanding requirement that the defendant show a
*reasonable probability* that he would have gone to trial absent
counsel's errors."  *Heard*, 728 F.3d at 1184 (emphases in
original) (internal brackets and quotation marks omitted).
However, once a defendant overcomes that "objective floor," the
Tenth Circuit conducts a subjective inquiry into "whether *the*

                                    33

*defendant* would have changed his plea." *Id.* (emphasis in original); *see also United States v. Chan*, 732 F. App'x 501, 503 (9th Cir. 2018) (remanding a coram nobis case to the district court to determine whether a defendant's statement that she actually would have changed her plea was credible); *accord Lozano v. United States*, 802 F. App'x 651, 654 (2d Cir. 2020) ("[T]he Supreme Court requires a district court to apply a subjective standard and determine whether there is a reasonable probability that the particular complaining defendant would not have pleaded guilty had he known of his plea's deportation consequences.").  That inquiry turns in large part on objective factors, such as the strength of the prosecution's case, *see Lee*, 137 S. Ct. at 1966, but the defendant ultimately must make a credible showing that he himself would have changed his plea.

In *Lee*, the most recent Supreme Court decision on this issue, the Supreme Court analyzed whether the defendant, who had initially accepted a plea offer, could have rationally rejected the plea and taken his chances at trial.  137 S. Ct. at 1968-69. But the Court also "ask[ed] what [the] individual defendant *would have done*," 137 S. Ct. at 1966-68 (emphasis added), an inquiry that suggests that the Court also required the defendant to show that he actually would have changed his mind and gone to trial.  *See also id.* at 1966 (stating that the inquiry "focuses on a defendant's decisionmaking").  The Tenth Circuit's approach

34

in *Heard*, which requires a defendant to show that it would have been rational for the defendant to change his mind *and* that he would have done so, best captures that analysis. In an unpublished opinion, the Ninth Circuit has similarly suggested that a defendant's credibility was part of the analysis, remanding the case to the district court. *Chan*, 732 F. App'x at 503. There would have been no reason for the Ninth Circuit to remand to the district court to make a credibility determination under a completely objective test. *See id.*

In any event, Shin cannot prevail under either interpretation of the test. First, given how unlikely an acquittal would have been based on the knowledge-of-unlawfulness element, Shin cannot establish that it would have been rational for him to reject the Government's proposed plea deal. *See generally Lee*, 137 S. Ct. at 1966 ("Where a defendant has no plausible chance of an acquittal at trial, it is highly likely that he will accept a plea if the Government offers one."); *Hill v. Lockhart*, 474 U.S. 52, 59 (1985) ("[W]here the alleged error of counsel is a failure to advise the defendant of a potential affirmative defense to the crime charged, the resolution of the 'prejudice' inquiry will depend largely on whether the affirmative defense likely would have succeeded at trial.").

At trial, the Government would have had to prove that Shin "acted with knowledge that his conduct was unlawful."

35

*Bryan*, 524 U.S. at 193.  In other words, the Government would not have had to prove that Shin intended to harm or defraud the Government.  The Government would have had to prove that, as a general matter, Shin knew that he was breaking the law.  *See Dixon v. United States*, 548 U.S. 1, 5–6 (2006) (holding that to prove willfulness, "the Government bore the burden of proving beyond a reasonable doubt that petitioner knew she was making false statements in connection with the acquisition of firearms and that she knew she was breaking the law when she acquired a firearm while under indictment").

In trying to meet its burden, the Government would have appealed to common sense.  A jury would have been unsurprised to be told that it is illegal to attempt to deceive the Government by submitting forged or altered documents.  Shin himself admitted that he was an experienced federal contractor who understood the process of applying for and securing federal contracts.  ECF No. 209, PageID # 1869.  In light of his background, the jury could have inferred that Shin knew that it was illegal to lie and to submit forged or altered documents during the bidding process.  A reasonable jury would not have been likely to believe Shin if he had said otherwise on the witness stand.  Indeed, Shin has explicitly admitted that he knew he had to be truthful and honest in his dealings with the

36

Navy, and that he had to provide the Navy with accurate information.  *Id.* at 1869.

Moreover, the very nature of the contracting process makes it obvious that what Shin did was illegal.  The Navy was asking Shin for estimates so that *the Navy* could determine what Shin was entitled to earn on the contract.  By lying to the Navy, Shin effectively *decided for himself* what a reasonable profit was.  And if Shin could do that, there would have been no reason for the Government to review estimates in the first place.

Several pieces of circumstantial evidence lend additional weight to the inference that Shin knew he was breaking the law.  Shin's own actions demonstrate a consciousness of guilt.  To create the altered HSI estimate, Shin spent 20 minutes carefully altering the document by removing the "1" digit from the second subcontractor's estimate and replacing it with a "3."  *See* ECF No. 209, PageID # 1887-1894.  Shin took those steps to conceal his alteration of the document, which indicates that he knew that he was doing something that he was not allowed to do.

When Shin approached one of his subcontractors with this proposal, the subcontractor immediately called the FBI.  In other words, it was obvious to the subcontractor, based on the subcontractor's experience, that Shin was asking him to do

37

something illegal.  Why Shin would not have been equally aware
of the illegality is unclear.

Shin has also repeatedly admitted that what he did was
"wrong."  In his conversations with the FBI and an Assistant
United States Attorney, he acknowledged that what he had done
was "absolutely wrong," and that there was no excuse for his
conduct.  Government's Exs. 6, 7, 10.  At the plea hearing, he
similarly admitted that "I know what *I did* was wrong and it is
wrong what *I did*."  ECF No. 179-1, PageID # 1525 (emphasis
added).  Shin's references to what he "did" suggest that he was
referring to the wrongfulness of his conduct.

In telling the FBI or a federal prosecutor that what
he did was "wrong," Shin knew that he was speaking with
individuals whose jobs were focused on investigating and
prosecuting crimes.  FBI agents and federal prosecutors are not
searching to convict people who have committed sins or immoral
acts that may be frowned on by one's religion or by family and
friends but that are not prohibited by criminal statutes.  Shin
knew he was not confessing to a priest.  Similarly, when Shin
told this court that what he did was wrong, he did so in the
context of pleading guilty to the crime he was charged with.  In
other words, saying that something was "wrong" in the context of
an FBI investigation or a guilty plea colloquy is difficult to
interpret as anything other than an admission of knowledge of

38

illegality.  This court assumes that, had he testified at trial, Shin would not have committed perjury.  Thus, his own testimony also would have incriminated him.[13]

Finally, this court notes that Shin benefitted from accepting the plea agreement.  If a defendant is likely to receive a significantly harsher sentence if he rejects the plea, it becomes less reasonable to risk a conviction at trial, particularly if the defendant is almost certain to be convicted. *See Lee*, 137 S. Ct. at 1967 ("The decision to plead guilty also involves assessing the respective consequences of a conviction after trial and by the plea.").  In this case, it appears that the deal the Government offered Shin was a favorable one.  By pleading guilty, Shin earned credit for acceptance of responsibility in his guidelines calculation.  Thus, the plea made it much more likely that Shin would receive a reduced sentence on the false statement charge, and, indeed, Shin was sentenced to three years of probation, with only twelve days of intermittent confinement, and a $100,000 fine.  ECF No. 62.

The Government also agreed not to "bring any other criminal charges" against Shin.  ECF No. 8, PageID # 1007.  Had the Government not bound itself through the plea agreement, it

---

[13]  Of course, Shin might not have testified.  But without his testimony, the jury would have been limited to the Government's evidence, including evidence that an experienced contractor would have known that it was illegal to submit false documents to the Government.

certainly could have charged Shin with making a second false statement in violation of 18 U.S.C. § 1001(a)(3).  That charge would have been based on Shin's submission of an estimate from Conhagen, another contractor, that Shin knew was falsely inflated.

The Government also could have charged Shin with wire fraud and major fraud.  ECF No. 203, PageID # 1672.  At the coram nobis evidentiary hearing, Shin's attorney argued that Shin would not have been afraid of a fraud charge, because, under *United States v. Miller*, 953 F.3d 1095 (9th Cir. 2020), the Government would have had to prove that Shin intended to "cheat" the Government.  That is, the Government would have had to prove that Shin intended to deprive the Navy of something of value.  *Id.* at 1102.  Shin's counsel maintained that because this court found at sentencing that there was no intended loss to the Government, Shin also would have prevailed at trial if the Government had charged him with fraud.

That does not mean that Shin would have had no reason to be worried that the Government would bring fraud charges if he rejected the Government's plea offer.  The Government disagreed with this court's sentencing decision on intended loss and clearly believed it could establish that Shin intended to deprive the Navy of money, even if that money was only to cover JHL's overhead and reasonable profit.  Plea negotiations

40

obviously had to occur before sentencing, and it was not until sentencing that the Government, to its great dismay, was faced with this court's "no intended loss" guideline determination. Before then, the Government would have been confident that it could prove an intent to cheat the Government had it brought a fraud charge, which carries with it no requirement that the Government establish a defendant's knowledge of illegality.  *See Miller*, 953 F.3d at 1101-03; *United States v. Holden*, 908 F.3d 395, 399 (9th Cir. 2018); *see also* Ninth Circuit Model Criminal Jury Instruction 8.124 (stating that the elements of wire fraud are (1) knowing participation in a plan to defraud, (2) materiality, (3) intent to defraud, and (4) use of a wire communication).

Moreover, at sentencing, this court remarked that the intended loss issue presented a "close call," ECF No. 99, PageID # 352.  Notwithstanding the heavier burden of proof at trial, Shin could not have been sure that a jury considering guilt would engage in the kind of analysis involved in the court's guideline decision.  He therefore would have had to consider the possibility that if he rejected the plea deal and went to trial, he might have ultimately been convicted of submitting false statements *and* of fraud.

In sum, by agreeing to the plea deal, Shin was able to reduce his legal exposure.  In light of the risk of conviction

41

and the clear benefits Shin obtained from the plea deal, it would have been irrational for Shin to reject the deal and to go to trial.

Shin's assertions that he did not have an "evil intent" because he did not mean to harm the Government do not change that conclusion. Shin appears to believe that because he did not intend to receive more than he thinks he was entitled to, he could not have intended to break the law. The two concepts are not the same. Even if Shin did not intend to steal, the issue on the present motion is the Government's obligation to prove that Shin acted willfully in that he knew that the law *prohibited what he did*. *Dixon*, 548 U.S. at 5. Shin cannot evade that requirement by stating that he was not seeking more than fair payment.

Shin has never professed shock that there was a law that prohibited altering documents and submitting them to the Government. Instead, he has consistently said that he did what he did because he was put in a bad position. That is, he is saying that because the Government used an improper contracting vehicle, he felt compelled to lie to the Government and submit a falsified quote.[14] He is saying that his actions were justified.

---

[14] At the coram nobis evidentiary hearing, Shin and his attorney repeatedly claimed that several of the top Pearl Harbor officials were "with him." While those officials may have sympathized with Shin's intent, they also made it clear that he

The distinction between knowing an act is illegal and
thinking it is justified is easiest to illustrate with an
example.  Consider a woman who discovers that her husband is
embezzling money from the federal government.  Horrified, she
convinces him to return the money before anyone notices that it
is missing.  If the FBI later questions the woman about the
situation, she may think that she is justified in lying to
protect her husband, because he has already returned the money.
She may even think that she is benefitting the Government by
saving it from the time and expense of a trial when there has
been no actual loss.  But even if she thinks that she has a good
reason to lie, that does not erase her knowledge that, by lying
to the FBI, she is breaking the law.

The same is true here.  Shin's very actions
demonstrated his knowledge of illegality.  He initially covered
up his wrongdoing, using paper to alter a document in what he
hoped was an imperceptible manner.  He then admitted wrongdoing
to law enforcement.  He is arguing here that his actions were
justified and that he was trying to make the best of a bad
situation, but such reasons do not constitute a defense under

acted improperly.  *See, e.g.*, ECF No. 48-2, PageID # 1259-61;
ECF No. 48-3, PageID # 1263; ECF No. 48-4, PageID # 1268.  The
briefs and the rulings relating to Shin's first coram nobis
petition focused on the effect of certain particularly
sympathetic comments (including post-sentencing comments) on the
materiality of Shin's false statements.

§ 1001.  *See Dixon*, 548 U.S. at 5.  It would not have been rational for Shin to proceed to trial when the only defense he has identified by no means ensured an acquittal.  That defense is based on a fundamental misunderstanding of what the law requires.

For the same reasons, this court finds that Shin has not met his burden of proving that, subjectively, there was a reasonable probability that he would have rejected the Government's proposed plea deal if he had known about the knowledge-of-unlawfulness element.  Of course, at the coram nobis evidentiary hearing, both Shin and his former attorney, Samuel King Jr., testified that if Shin had known about that element, he would have proceeded to trial.  That testimony does not win the day for Shin because both Shin and King mistakenly assumed that a lack of proof of an intent to "hurt the Government" or to "steal" would have defeated the § 1001 charge at trial.  *See, e.g.*, ECF No. 209, PageID # 1740-42, 1842-47.  That understanding was incorrect.  Before Shin rejected the plea deal, any competent attorney would have explained to Shin the risk that he could be convicted even if he had not intended to hurt the Government or to steal, as long as he knew that he was breaking the law.  Shin has failed to offer persuasive evidence that meets his burden of showing that he would have rejected the plea deal if he had known *that*.

At the coram nobis evidentiary hearing, Shin displayed and expressed his frustration.  He said multiple times that he had only been trying to help the Government, but nevertheless is the only one involved with the contract who ended up with a felony conviction.  This court understands Shin's frustration.  However, in our system of justice, there are two distinct phases.  The first is the guilt phase, in which the defendant either pleads guilty or is tried before a jury.  During that phase, the only question is whether the Government proves (or the defendant admits) that the defendant in fact committed the charged offense.  Shin admitted his guilt.  The second phase is the penalty phase.  During sentencing, a court can consider a defendant's justification for his conduct as mitigation in fashioning a sentence.

That is exactly what happened here.  Shin entered a guilty plea.  Even under the law as it now stands, Shin remains in fact guilty, because, as he has acknowledged, he knew that it was wrong to lie to the Government.  As explained in this order, that knowledge of wrongdoing equates to knowledge of illegality under the circumstances of this case.  However, this court could and did consider Shin's intent during the penalty phase, when it issued a sentence that included only 12 days of intermittent confinement.  Shin was able to raise the arguments he is now making during sentencing, and this court took those arguments

45

into account.  There was no error of the most fundamental
character that justifies vacating Shin's conviction.

### C.  Shin Does Not Satisfy the Second Requirement for the Issuance of a Writ of Coram Nobis.

Even if Shin could be said to have shown a fundamental
error warranting coram nobis relief, his present petition would
be denied because he does not meet his burden on the second
coram nobis requirement.  Under the second requirement, Shin
must "'provide valid or sound reasons explaining why [he] did
not attack [his conviction] earlier.'"  *United States v.
Kroytor*, 977 F.3d 957, 961 (9th Cir. 2020) (quoting *United
States v. Kwan*, 407 F.3d 1005, 1012 (9th Cir. 2005)).
"[W]hether a petitioner can *reasonably* raise a claim is
determinative of whether delay is justified."  *Id.* (emphasis in
original).  "That is, where petitioners reasonably could have
asserted the basis for their coram nobis petition earlier, they
have no valid justification for delaying pursuit of that claim."
*Id.*  "If, however, petitioners did not have a reasonable chance
to pursue their claim earlier due to the specific circumstances
they faced, delay during the time when such circumstances
existed may be justified."  *Id.*  Thus, Shin must demonstrate
that he could not have reasonably advanced his claim that his
guilty plea was involuntary in earlier proceedings, including on
direct appeal or as a part of an earlier postconviction

46

petition. *See United States v. Riedl*, 496 F.3d 1003, 1006 (9th Cir. 2007) (holding that the petitioner could not satisfy the second requirement because she conceded she could have asserted her claims on direct appeal or in a 28 U.S.C. § 2255 motion). Shin had the opportunity years ago to advance the claims he now raises in the motion filed in 2020. He therefore cannot justify his failure to raise the arguments in his present coram nobis petition earlier.

> 1. **Shin Possibly Could Have Raised His Knowledge-of-Illegality Argument on Direct Appeal, But this Court Declines to Rule on that Ground, Given Shin's Ineffective Assistance of Counsel Claim.**

Shin first contends that he could not have argued that his guilty plea was involuntary on direct appeal because the law did not support his present claim until well after the deadline for bringing a direct appeal had passed. This court entered judgment against Shin on March 9, 2006, more than fifteen years ago. ECF No. 62. According to Shin, he did not have a viable claim that knowledge of unlawfulness was an element of a § 1001 claim until at least 2014 (when the Ninth Circuit decided *Ajoku II* and when the model jury instructions were updated). *See* ECF No. 172, PageID # 1402-03.

The Supreme Court addressed a similar argument in *Bousley v. United States*, 523 U.S. 614 (1998). In *Bousley*, the defendant had entered a guilty plea to having used a firearm in

47

violation of 18 U.S.C. § 924(c)(1).  *Id.* at 616.  Five years

after his conviction, the Supreme Court held that the "use"

prong of § 924(c)(1) required the Government to show "active

employment of the firearm."  *Id.*  The defendant challenged his

conviction under 28 U.S.C. § 2255.  As in this case, the

defendant argued that his guilty plea had been involuntary

because, at the time of his guilty plea, he was not aware of one

of the elements of the charged offense.  *See id.* at 617-19.

In reviewing that challenge, the Supreme Court held

that, even though the law had changed, a guilty plea could only

be collaterally attacked under certain circumstances:

> We have strictly limited the circumstances
> under which a guilty plea may be attacked on
> collateral review.  It is well settled that
> a voluntary and intelligent plea of guilty
> made by an accused person, who has been
> advised by competent counsel, may not be
> collaterally attacked.  And *even the
> voluntariness and intelligence of a guilty
> plea can be attacked on collateral review
> only if first challenged on direct review.*
> Habeas review is an extraordinary remedy and
> will not be allowed to do service for an
> appeal.  Indeed, the concern with finality
> served by the limitation on collateral
> attack has special force with respect to
> convictions based on guilty pleas.  In this
> case, petitioner contested his sentence on
> appeal, but did not challenge the validity
> of his plea.  *In failing to do so,
> petitioner procedurally defaulted the claim
> he now presses on us.*
>
> . . . .

> Where a defendant has procedurally defaulted a claim by failing to raise it on direct review, the claim may be raised in habeas only if the defendant can first demonstrate either "cause" and actual "prejudice" or that he is "actually innocent."
>
> . . . .
>
> Petitioner offers two explanations for his default in an attempt to demonstrate cause. First, he argues that "the legal basis for his claim was not reasonably available to counsel" at the time his plea was entered. This argument is without merit. *While we have held that a claim that is so novel that its legal basis is not reasonably available to counsel may constitute cause for a procedural default, petitioner's claim does not qualify as such. The argument that it was error for the District Court to misinform petitioner as to the statutory elements of § 924(c)(1) was most surely not a novel one.* Indeed, at the time of petitioner's plea, the Federal Reporters were replete with cases involving challenges to the notion that "use" is synonymous with mere "possession." Petitioner also contends that his default should be excused because, before *Bailey,* any attempt to attack [his] guilty plea would have been futile. This argument, too, is unavailing. As we clearly stated in *Engle v. Isaac,* 456 U.S. 107 (1982), "futility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time.'" Therefore, petitioner is unable to establish cause for his default.

*Id.* at 621-23 (emphases added) (internal citations and quotation marks omitted).

In other words, in *Bousley*, the Supreme Court held that a defendant can attack a guilty plea on collateral review

only if (1) he raised the same challenge on direct appeal; (2) he can demonstrate cause (by, for instance, showing that the "legal basis for his claim was not reasonably available to counsel") and prejudice; or (3) he demonstrates innocence.  *Id.*

As an initial matter, *Bousley*, a § 2255 decision, also applies to coram nobis petitions.  The Supreme Court's statement that a defendant cannot collaterally attack a conviction without first raising the same arguments in a direct appeal was not limited to any particular type of collateral challenge.  Nor is there any reason to limit *Bousley* to § 2255 petitions.  To the contrary, "the logic of the procedural default rule applies with even greater force in the context of coram nobis, because coram nobis is a more limited remedy."  *United States v. Lynch*, 807 F. Supp. 2d 224, 229–30 (E.D. Pa. 2011); *see also United States v. Pearl*, 288 F. App'x 651, 655 (11th Cir. 2008) ("While coram nobis relief is available in some circumstances to those who have pleaded guilty, it is not available to challenge the knowledge and voluntariness of the plea itself when that issue has not been raised in an earlier proceeding."); *Senyszyn v. United States*, 2016 WL 6662692, at *2 (D.N.J. Nov. 10, 2016).

Shin might be unable to satisfy any of *Bousley*'s three prongs.  He did not raise his present arguments on a direct appeal.  Of course, he did not take an appeal at all, having entered a guilty plea and having received a lenient sentence.

In any event, as in *Bousley*, the basis for the arguments that
Shin is now making were hardly hidden in 2006.  *Bryan*, the
Supreme Court decision that eventually caused the Ninth Circuit
to reverse itself, was decided in 1998.  Moreover, it appears
that, in 2006, no Ninth Circuit decision had specifically held
that the court's 1981 *Carrier* decision survived *Bryan*.  Thus, at
the time of any hypothetical appeal, the argument that § 1001's
willfulness element required knowledge of unlawfulness
certainly would have been available to Shin's attorney.  In
short, Shin might have procedurally defaulted on the arguments
in his present petition.

　　　　Nor can Shin establish actual innocence.  As discussed
in greater detail earlier in this order, Shin argues that a
fundamental error marred his conviction because, if he had known
that knowledge of unlawfulness was an element under § 1001, he
would not have entered a guilty plea.  A crucial part of that
argument is that the reason he would not have entered a guilty
plea would have been because he was innocent.  For the reasons
discussed earlier, Shin has not established that he was
innocent.  Under *Bousley*, Shin's failure to raise these claims
on direct appeal therefore might arguably prevent him from
raising them in his present coram nobis petition.

　　　　However, this court, recognizing that Shin is
asserting ineffective assistance of counsel, does not base its

denial of coram nobis relief on Shin's failure to make his knowledge-of-illegality argument on direct appeal.  Ineffective assistance of counsel may establish cause for a procedural default.  *See generally Murray v. Carrier*, 477 U.S. 478, 488 (1986).  Given the court's discussion of Shin's delay even after *Ajoku II* was decided, this court need not and does not rule on whether Shin should have raised his present argument before the 2014 *Ajoku II* decision.

> **2.    Shin Fails to Satisfy the Second Coram Nobis Requirement Because He did not Raise His Claims Within a Reasonable Time After *Ajoku II* was Decided in 2014.**

The Ninth Circuit decided *Ajoku II* in 2014.  The model jury instruction on § 1001 charges was amended to reflect the change in the law in June 2014.  Shin waited until 2020 to raise his knowledge-of-illegality argument in his second coram nobis motion.

Highlighting the unreasonableness of his six-year delay is Shin's filing of a first coram nobis petition in 2015. In addressing his delay, Shin points to his reliance on his attorneys to discover *Ajoku II* and the changes to the model jury instruction, and to include a discussion of *Ajoku II* in a timely filing.  ECF No. 172, PageID # 1402-04.  Faced with the absence of any discussion of *Ajoku II* in his first coram nobis petition,

Shin contends that his attorneys' failure to discover *Ajoku II* should not be imputed to him.

Two Ninth Circuit decisions are particularly instructive: *Kwan* and *Kroytor*.  In *Kwan*, the defendant admitted to having committed bank fraud in 1996.  407 F.3d at 1008. Before pleading guilty, the defendant asked his attorney whether a guilty plea would cause him to be deported.  *Id.*  His attorney assured him that deportation "was not a serious possibility." *Id.*

In 1997, however, the Immigration and Naturalization Service concluded that Kwan had been convicted of an aggravated felony and moved to deport him.  *Id.* at 1009.  Kwan retained a different attorney, who advised him that it was unlikely that the Government would succeed in arguing that he had been convicted of an aggravated felony.  *Id.* at 1013-14.  At least initially, his attorney proved correct.  An immigration judge ruled that Kwan's conviction was not an aggravated felony.  *Id.* at 1009.  In 2000, however, the Government filed a second motion to deport Kwan based on a different subsection of the statute defining the term "aggravated felony."  *Id.*  This time, the immigration judge agreed with the Government.  *Id.*  After that ruling, Kwan filed a coram nobis motion.  *Id.*  Because Kwan had not filed the petition in 1997, when the INS first moved to

deport him, the district court ruled that Kwan's petition was untimely.  *Id.* at 1013.

The Ninth Circuit disagreed.  It held that Kwan's decision not to challenge his underlying conviction in 1997 was reasonable because trial counsel had told him that there was little chance that his conviction would result in deportation, and his immigration attorney had reinforced that advice by (wrongly) advising him to focus on challenging the INS's deportation motion.  *Id.* at 1013-14.  "Only after the INS re-initiated removal proceedings . . . did Kwan have reason to conclude that his criminal defense counsel had in fact erred and affirmatively misled him[.]"  *Id.*  *Kwan* therefore held that good-faith reliance on an attorney's advice is a valid reason for not having filed a coram nobis petition earlier.

The second Ninth Circuit decision, *Kroytor*, limited *Kwan*'s reach.  The defendant in *Kroytor*, like the defendant in *Kwan*, entered a plea of guilty to an offense that subjected him to deportation after his attorney failed to advise him of that collateral consequence.  977 F.3d at 958-59.  In 2014, after learning that he was likely to be deported, Kroytor retained an immigration attorney (having had several earlier immigration attorneys who had failed to act) to investigate whether he had grounds to challenge his conviction.  *Id.* at 960.  This attorney apparently recognized that a prior attorney's ineffective

assistance could provide a basis for vacating Kroytor's conviction. There was then a delay. Kroytor did not file a coram nobis petition until two years after learning that "his only chance to avoid removal was to vacate his conviction." *Id.* The attorney who filed the petition explained that he did not file it immediately because "he was uncertain about whether [a controlling Ninth Circuit decision] applied retroactively." *Id.* Once the Ninth Circuit held that the decision was indeed retroactive, Kroytor's counsel waited ten months before filing a coram nobis petition. *Id.* The district court ruled that Kroytor should have filed his petition earlier. *Id.* at 961.

This time, the Ninth Circuit affirmed. It first reaffirmed its conclusion in *Kwan*: a delay is justified if "a petitioner delayed taking action due to misadvice from his attorney that he had no reason to know was erroneous." *Id.* at 962. The Ninth Circuit also appeared to recognize that Kroytor's purported delay was actually his attorney's fault, not his own. The court stated that his second attorney "did not act with the necessary expediency." *Id.* at 963. Nevertheless, the Ninth Circuit held that Kroytor's petition was untimely because "a lack of clarity in the law is not itself a valid reason to delay filing a coram nobis petition." *Id.* at 962.

*Kroytor* appears to hold that, while counsel's "affirmative misadvice" justifies a petitioner's delay,

counsel's failure to "act with the necessary expediency" does not.[15]  Shin's case cannot be characterized as one that involves affirmative misadvice.  Shin has not identified a specific piece of bad information that he received from his attorney.  Instead, what happened here is straightforward: Shin's attorney failed to find *Ajoku II* and raise it in a timely manner.  Even though the model jury instructions were amended in June 2014 and the Ninth Circuit decided *Ajoku II* soon after that amendment, Shin did not raise his present arguments until he filed the present coram nobis petition in *2020*.  Shin's attorneys failed to act with the necessary expediency.  And under *Kroytor*, that failure by counsel does not provide a valid reason for a six-year delay.[16]  977 U.S. at 963.  The delay is particularly unwarranted given Shin's intervening first coram nobis petition, which was silent on the knowledge-of-illegality issue embodied in the *Ajoku II*

---

[15] In a footnote, the Ninth Circuit noted that "Kroytor's coram nobis petition is based on a claim of ineffectiveness of the defense attorney who represented him at his sentencing.  We express no opinion about whether he could seek relief based on the representation he received from any other attorney." 977 F.3d at 963 n.3.  It is not clear whether that footnote is meant to indicate that the Ninth Circuit did not consider the effectiveness of postconviction counsel, who failed to act with the necessary expediency.

[16]  A defendant who establishes actual innocence may stand in different shoes from other defendants in terms of what constitutes a valid reason for delay.  *See generally McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013) (noting that claims of actual innocence allow defendants to "overcome various procedural defaults").  Shin has not demonstrated his innocence.

decision issued in 2014, the year before Shin filed his first
coram nobis petition.

In concluding that Shin has not satisfied the second
coram nobis requirement that he show that he had valid reasons
for not having attacked his conviction earlier, this court is
very much focused on the clear Ninth Circuit holding that "the
burden of proof is on the petitioner to offer valid reasons for
the delay." *Riedl*, 496 F.3d at 1008.  That is, Shin had the
affirmative obligation to establish his valid reasons for not
having raised his knowledge-of-illegality argument until he
filed his second coram nobis motion in 2020.  The *Bryan* case was
decided by the Supreme Court in 1998.  Even if Shin could be
excused for having waited until the Ninth Circuit ruled in *Ajoku
II* in 2014, he still does not explain why he waited six years
from then to raise his present argument.

In the course of extensive briefing and supplemental
briefing, lengthy oral arguments, and an evidentiary hearing
that spanned two days, Shin offered no reason for the extensive
delay, which was his burden to explain.  This court has no idea,
for example, what prompted him to seek out and retain his
present attorney to determine whether he had grounds for a
second coram nobis petition, or when that first occurred.  The
court cannot even tell when Shin or any of Shin's attorneys
first recognized that *Ajoku II* required proof of a defendant's

knowledge of illegality.  What is clear is that the time between when *Ajoku II* was decided in 2014 and the present coram nobis petition was filed far exceeds the ten-month delay that the Ninth Circuit in *Kroytor* deemed fatal because it lacked "the necessary expediency."

The Ninth Circuit has described this court's role as a "gatekeeping" one in the context of coram nobis proceedings; courts should not "open the door to inexcusably late claims." *Riedl*, 496 F.3d at 1007.  While ineffective assistance of counsel can extend the period in which courts will allow coram nobis proceedings, it cannot be the case that a party can endlessly cite ineffective assistance of counsel to justify delay without providing further detail.  Otherwise, a party could cite ineffective assistance of counsel many decades later in bringing what is actually an inexcusably late claim.  As understandably distressed as a party may be that an attorney failed to make a timely argument, the Ninth Circuit has limited the circumstances in which a party may avoid the consequences of a delay, whether by a party or by the party's attorney.

In the context of coram nobis petitions, the Ninth Circuit has found delays reasonable when the applicable law has recently changed, when new evidence has been discovered, and when a petitioner was improperly advised by counsel not to pursue habeas relief.  *Id.*  With respect to a change in the law,

the change typically must be recent.  *See United States v. Walgren*, 885 F.2d 1417, 1520-21 (9th Cir. 1989); *see also Riedl*, 496 F.3d at 1007 ("we have considered delay to be reasonable when the applicable law was *recently* changed and made retroactive" (emphasis added)).  Here, the change was hardly recent, and Shin has not met his burden of showing that his delay was reasonable.

To provide further context for this court's determination that Shin fails to justify his delay between 2014 and 2020, the court notes that, quite apart from the fatal delay from 2014 to 2016 in *Kroytor*, the Ninth Circuit found unjustified the six-year delay between a conviction in November 1999 and a coram nobis filing in January 2006 in *Riedl*.  The movant in that case had been incarcerated, then deported to Austria during that period, and claimed diminished capacity and the forfeiture of some of her properties, circumstances that the Ninth Circuit ruled failed to show justified her delay or were overstated.  *Riedl*, 496 F.3d at 1005.  Shin has not asserted, much less established, greater difficulties.[17]

In *Riedl*, the Ninth Circuit "denied coram nobis relief for unjustified delay where the grounds on which the petitioner sought relief could have been asserted in earlier proceedings."

---

[17] Shin, unlike the petitioner in *Riedl*, is a naturalized United States citizen.  ECF No. 64, at 2.

*Kroytor*, 977 F.3d at 961-62.  It is difficult to see why Shin's delay should be found justified when the delays by Riedl and Kroytor were not.  There may be valid reasons for Shin's delay, but, if there are, it was Shin's burden to show that.  Shin has failed in that regard.

**IV.       CONCLUSION.**

Shin's petition for a writ of coram nobis is denied. The Clerk is directed to enter judgment for the Government and to close this case.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, October 22, 2021.



/s/ Susan Oki Mollway

Susan Oki Mollway
United States District Judge

*Patrick Shin v. United States of America*, CRIM. NO. 04-00150 SOM, CIV. NO. 20-00390 SOM-KJM; ORDER DENYING DEFENDANT'S SECOND CORAM NOBIS PETITION